## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) | Case No.  18-12378 (CSS) |
| WELDED CONSTRUCTION, L.P. *et al.,* | ) | |
|  | ) | (Jointly Administered) |
| Debtors. | ) | |
| WELDED CONSTRUCTION, L.P., | ) | |
|  | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. No.: 19-50194 (CSS) |
|  | ) | |
| THE WILLIAMS COMPANIES, INC., | ) | |
| WILLIAMS PARTNERS OPERATING | ) | Re: Adv. Docket No. 50 |
| LLC, and TRANSCONTINENTAL GAS | ) | |
| PIPE LINE COMPANY, LLC, | ) | |
|  | ) | |
| Defendants. | ) | |

## OPINION[1]

| | |
|---|---|
| **YOUNG CONAWAY STARGATT**<br>**& TAYLOR, LLP** | **SAUL EWING ARNSTEIN**<br>**& LEHR LLP** |
| Sean M. Beach | Lucian B. Murley |
| Kevin A. Guerke | 1201 N. Market Street |
| Michael S. Neiburg | Suite 2300 |
| Travis G. Buchanan | Wilmington, DE  19899 |
| 1000 King Street | |
| Wilmington, DE  19801 | **HALL ESTILL** |
| -and- | Steven Soulé |
| **LEWIS BRISBOIS BISGARD** | John F. Heil, III |
| **& SMITH, LLP** | John Rogers |
| Kenneth D. O'Reilly | 320 South Boston Avenue |
| 77 Water Street, 21ST Floor | Suite 200 |
| New York, NY  10005 | Tulsa, OK 74103-3706 |
| Counsel for Welded Construction, L.P. | Counsel for Transcontinental<br>Gas PipeLine Company, LLC |

Dated: June 8, 2020

Sontchi, C.J. _____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## INTRODUCTION[2]

Before the Court is a motion for partial summary judgment filed by Welded Construction, L.P. (the "Plaintiff" or "Welded") on Counts I and IX of its Complaint.[3]  In connection with the Atlantic Sunrise Pipeline construction contract (the "Contract"), Plaintiff seeks (i) to apply Pennsylvania's Contractor and Subcontractor Payment Act ("CASPA"), and (ii) to recover $22,442,497.65 in Labor Costs and the $14,505252.40 Equipment Fee for July, August, September, and October 2018 true-up invoices.  Plaintiff also seeks interest, penalty interest, and attorneys' fees provided under applicable law.[4] The Williams Companies, Inc. ("The Williams Companies"), Williams Partners Operating LLC ("Williams Partners"), and Transcontinental Gas Pipe Line Company, LLC. ("Transco" and together with The Williams Companies and Williams Partners, the "Defendants") oppose this Motion.[5]

For the reasons set forth below, the Court will deny Plaintiff's Motion in its entirety.  Specifically, the Court will deny the Motion to apply CASPA to the Contract because Plaintiff has not shown that Pennsylvania law would be controlling. Additionally, unresolved factual issues preclude the Court from granting the Motion in connection with the Labor Costs and the Equipment Fee.  Finally, because the foregoing

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to them *infra*.  Count I of the Complaint is a breach of contract claim against Transco; Count IX of the Complaint is an Objection to Claim 636 against Transco.

[3] Del. Bankr. Adv. Pro. No. 19-50194 (the "Motion").  All references to the Adversary Proceeding Docket will be cited hereinafter as "Adv. D.I." and will refer to this Adversary Proceeding unless otherwise stated.

[4] Adv. D.I. 55 at 6.

[5] Plaintiffs and Defendants are, together, (the "Parties").

issues have not been fully adjudicated, the Court will deny Plaintiff's request for interest, penalty interest, and attorneys' fees.

## JURISDICTION & VENUE

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 11 U.S.C. § 157(b). Venue is proper before the United States Bankruptcy Court for the District of Delaware under 28 U.S.C. §§ 1408 and 1409. The Court has the judicial authority to enter a final order.

## BACKGROUND

### I.    Procedural History

On October 22, 2018 (the "Petition Date"), Welded and Welded Construction Michigan, LLC, its wholly owned subsidiary (the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court" or the "Bankruptcy Court") for relief under Chapter 11 of the Bankruptcy Code.[6]

On February 28, 2019, Transco filed two non-priority proofs of claim against Welded. Under claim number 632 ("Claim 632"), Transco contends it has identified "a number of anomalies/defects covered by Debtor's warranty under the Contract . . . ." Transco "seeks damages in the estimated amount of $16,320,000 for costs that [it] contends it will incur in connection with the repair of allegedly defective work performed

---

[6] Del. Bankr. 19-50194, D.I. 1.

by [Plaintiff]."[7]  Under claim number 636 ("Claim 636"), Transco contends that "Welded is indebted to Transco in the aggregate amount of $94,291,513.58."[8]  Pursuant to this claim, Transco asserts the following four general categories of damages against Welded: (1) overbilling ($45,611,991); (2) violations of municipal regulations and alleged improper billing of non-reimbursable expenses ($7,605,609.63); (3) mechanical completion delay damage ($1,928,571); and (4) failure to pay subcontractors and suppliers ($39,145,341.95).[9]

On May 3, 2019, Plaintiff filed *Complaint and Objection to Claims* (the "Complaint").[10]  On November 13, 2019, each of the Defendants filed their respective Answers to the Complaint.[11]

On July 3, 2019, Defendants filed *Defendants' Motion to (I) Abstain, or (II) in the Alternative, Transfer Venue, or (III) in the Alternative, Dismiss Certain Counts of the Complaint* (the "Motion to Dismiss").[12]  On July 26, 2019, Welded filed their response motion,[13] and Defendants filed their reply brief in support of the Motion to Dismiss on August 8, 2019.[14] On October 16, 2019, Judge Gross issued his *Opinion* and *Order* on the Motion to

---

[7] Adv. D.I. 1 at ¶ 189.

[8] Adv. D.I. 1 at ¶ 194.

[9] Adv. D.I. 1 at ¶ 194; Proof of Claim No. 636.

[10] Adv. D.I. 1.

[11] Adv. D.I. 63; Adv. D.I. 64; Adv. D.I. 65.

[12] Adv. D.I. 24.  This motion was filed along with Adv. D.I. 25 (*Brief in Support of Defendants' Motion to (I) Abstain, or (II) in the Alternative, Transfer Venue, or (III) in the Alternative, Dismiss Certain Counts of the Complaint*).

[13] Adv. D.I. 31 (*Welded's Brief in Opposition to the Defendants' Motion to (I) Abstain, or (II) in the Alternative, Transfer Venue, or (III) in the Alternative, Dismiss Certain Counts of the Complaint*).

[14] Adv. D.I. 36.

Dismiss.[15]   The *Order* granted the Defendants' motion to dismiss Count II (breach of implied covenant) against Transco, Count VII (unjust enrichment) against Williams Partners and The Williams Companies, and Counts IV (turnover of property of the estate) and V (stay violation) against all Defendants.[16]   Additionally, the *Order* denied the Defendants' motion to dismiss Count VII (unjust enrichment) against Transco and Count VI (impermissible setoff) against all Defendants.[17]

On October 28, 2019, Plaintiff filed *Motion for Partial Summary Judgment* (the "Motion").[18]   On November 13, 2019, Defendants filed their Answers "disputing Welded's entitlement to the Labor Costs and Equipment Fee, and Transco filed counterclaims seeking to recover overbillings in excess of $50,000,000 plus other damages."[19]   On December 5, 2019, Defendants filed *Defendants' Response Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment* (the "Response Brief").[20]   On December 20, 2019, Plaintiff filed *Welded's Reply Brief in Support of Its Motion for Partial*

---

[15] Adv. D.I. 48 and 49.

[16] Adv. D.I. 49.

[17] Adv. D.I. 49.

[18] Adv. D.I. 50.  The Motion was filed along with *Welded's Brief in Support of Its Motion for Partial Summary Judgment* (Adv. D.I. 55), the *Declaration of Frank A. Pometti in Support of Welded's Motion for Partial Summary Judgment* (Adv. D.I. 52) (the "Pometti Declaration"), and the *Declaration of Travis G. Buchanan in Support of Motion for Partial Summary Judgment* (Adv. D.I. 53) (the "Buchanan Declaration").

[19] Adv. D.I. 71 (referencing Adv. D.I. 63, 64, and 65).

[20] Adv. D.I. 71.  The Response Brief was filed along with *Declaration of Phil Burke of OGCS (Americas) Inc.* (the "Burke Declaration").

*Summary Judgment.*[21]  On December 27, 2019, Defendants filed *Defendants' Request for Oral*

*Argument on Plaintiff's Motion for Partial Summary Judgment.*[22]

## II.    Factual Background

<u>The Parties</u>

Plaintiff, Welded is a mainline pipeline construction contractor that is

incorporated in Delaware and is principally located in Ohio.  Defendant, Transco, is an

interstate natural gas transmission company that is incorporated in Delaware and is

principally located in Ohio.  Defendant, Williams Partners, is Transco's sole member; it

is incorporated in Delaware and is principally located in Tulsa, Oklahoma.  Defendant,

The Williams Companies, is an oil and gas pipeline operator that is incorporated in

Delaware and is principally located in Oklahoma.  The Williams Companies is Williams

Partners' sole member.

<u>The Atlantic Sunrise Project</u>

On or about August 10, 2016, Transco and Welded (the "Contracting Parties")

entered into a Contract pursuant to which Welded was charged with constructing a

ninety-six mile portion of the Atlantic Sunrise Pipeline Project (the "Project" or "ASR" or

the "Pipeline") in the Commonwealth of Pennsylvania.[23]  The 186 mile natural-gas

---

[21] Adv. D.I. 79.

[22] Adv. D.I. 83.  Defendants' request for oral argument is pending.

[23] Adv. D.I. 1 at ¶ 14.  Plaintiff was responsible for constructing three contiguous segments of the Pipeline—Spreads 5, 6, and 7—which covered more than half the length of the Pipeline.  The Contract followed a letter of intent signed on or about November 5, 2015. Adv. D.I. 1 at ¶ 11.

pipeline connects gas-producing regions to other markets that include the Mid-Atlantic and Southeast regions of the United States.[24]

The Contract includes choice of law and forum selection clauses that provide that Oklahoma law governs the Contract and that jurisdiction and venue shall lie exclusively with the appropriate courts of Tulsa County, Oklahoma.[25]  The Contract also provides that Transco would reimburse Welded for four categories of Direct Costs: (i) Labor, (ii) Equipment, Fuel and Supplies, (iii) Subcontracts, Materials, Specialty Equipment, and Outside Services, and (iv) Timber Mats.  The key payment terms under the Contract are as follows: (i) on the fifth day of each month, Welded is required to send Transco an invoice with an estimate of the funds required for the following month (the "Pay Month"),[26]  (ii) Transco is required to receive and pay the invoiced amount on or before the fifth day of the Pay Month,[27] and (iii) no later than thirty days following each Pay Month, Welded is required to provide Transco with a written reconciliation of its actual and estimated expenditures, which Welded would then true-up the amounts owed or owing in future invoices.[28]

On or about September 15, 2017, Welded began construction on the Pipeline.[29]  For the first ten months of construction, the Defendants paid Welded's invoices in ordinary

---

[24] D.I. 52 at 3.

[25] Adv. D.I. 1 at Ex 2 (§ I, Art. 35).

[26] Contract, App. G, § 1.2.2.

[27] Contract, App. G, § 1.2.3.

[28] Contract, App. G, § 1-2.4.

[29] Adv. D.I. 55 at 6.

course and without dispute.[30]   During the course of the project, however, the costs associated with the Project increased beyond the expectations of the Parties.   While the initial estimated cost of the Project was approximately $455 million, this figure increased to $700 million by May 2018.[31]

On July 3, 2018, R. Christopher Springer, Transco's project director, sent a letter to Stephen Hawkins, Welded's President and CEO, stating that Transco was releasing payment to Welded under protest.[32]  Springer justified this action based on "(1) Welded's failure to meet expectations on productivity, work quality, and safe work practices; (2) questions and concerns about the accuracy of billing and Welded's compliance with contract obligations; and (3) uncontrolled growth in Welded's estimated cost of completion."[33]   The letter further stated, "this payment and any payment made by Transco from this point forward in time are made under protest and shall not be construed as concurrence that Welded has earned invoiced amounts nor that 'true-ups' accurately reflect amounts owed and/or are payable by Transco."[34]

In his July 16, 2018 response, Hawkins expressed his "surprise" regarding Transco's allegations and also expressed concern that the dispute was not following the agreed upon escalation path in the Contract.[35]  Defendants subsequently engaged Oil and

---

[30] Adv. D.I. 1 at ¶¶ 41-43.

[31] Adv. D.I. 73 at 3.

[32] Adv. D.I. 1 at ¶ 44.

[33] Adv. D.I. 1 at ¶ 44.

[34] Adv. D.I. 1 at ¶ 44.

[35] Adv. D.I. 1 at ¶ 45.

Gas Contract Services ("OGCS") to audit Plaintiff's alleged inaccurate billing.[36]  In June or July of 2018, OGCS visited Welded's offices to perform the audit.[37]

Approximately one year after Plaintiff began construction, it achieved mechanical completion of the Project on September 19, 2018.[38]  On October 4, 2018, Defendants received regulatory approval from the Federal Energy Regulatory Commission; two days later, the Pipeline went into full service.[39]

On October 4, 2018, Transco informed Welded that it was withholding $23,563,538 of the $27,363,816.46 due the next day under the September advance payment invoice (the "October 4th Letter").[40]  In connection with its withholding, Transco alleged (i) "Welded ha[d] erroneously billed Transco for fees and costs in excess of those allowed under the Contract and ha[d] failed to properly reconcile the overbillings as contemplated by the Contract,"[41] and (ii) that Welded "owed Transco at least $1,928,571 for delays to the completion date."[42]  In addition to failing to pay the September 2018 advance payment invoice, which included the $7,155,286.80 July true-up and other alleged erroneous billing dating back to the inception of the project, the Defendants failed

---

[36] Adv. D.I. 1 at ¶ 47.  This audit right was executed pursuant to Article 31 of the Contract.

[37] Adv. D.I. 1 at ¶ 48.  It is not clear when the audit occurred.

[38] Adv. D.I. 55 at 1.

[39] Adv. D.I. 1 at ¶ 19; Adv. D.I. 55 at 6.

[40] Adv. D.I. 55 at 1.  Transco paid $3,800,278.46 of the $27,363,816.46 invoiced for September 2018.  The $23,563,538 withheld included the $7,155,286.80 July 2018 true-up invoice.  Adv. D.I. 52 at 3.

[41] Adv. D.I. 1 at ¶ 54.

[42] Adv. D.I. 1 at ¶ 54.

to pay true-up invoices for the months of August ($16,592,432.09),[43] September ($16,299,081.57),[44] and October 2018 ($12,087,238.30).[45]  In connection with these true-up invoices, which reflect total construction reconciliation costs, Welded alleges that for the months of July through October, the Labor and Equipment costs are undisputed and should be paid.

The Plaintiff asserts that the Defendants' withholding of payments caused it "substantial and immediate harm and . . . jeopardized [its] ability to continue as a viable business."[46]  The Defendants assert, however, that Welded has overbilled more than $50 million.[47]

The Summary Judgment Dispute

The Parties' dispute arises out of Transco's withheld labor and equipment charges under the Contract.  In connection with the Contract, the Motion seeks (i) to apply Pennsylvania's Contractor and Subcontractor Payment Act, and, in connection with true-up invoices for the months of July, August, September, and October of 2018, (ii) to recover $22,442,497.65 in Labor Costs and (iii) to recover the $14,505252.40 Equipment Fee.

---

[43] Adv. D.I. 52 at 3.  Welded submitted this invoice on October 5, 2018.

[44] Adv. D.I. 52 at 4.  Total construction costs for September 2018 were $17,440,392.90. Of this total, Transco made a $1,141,311.33 postpetition payment for September 2018 union dues. Welded submitted this invoice on March 4, 2019.

[45] Adv. D.I. 55 at 12.  Total construction costs for October 2018 were $13,713,655.68.  Of this total, Transco made a $1,626,417.38 postpetition payment for October 2018 union dues.  Welded submitted this invoice on March 4, 2019.

[46] Adv. D.I. 55 at 10 (citations omitted).

[47] Adv. D.I.  73 at 9.

Plaintiff also seeks interest, penalty interest, and attorneys' fees provided under applicable law.[48]

## ANALYSIS

### I.    Summary Judgment Standard

Summary judgment is a mechanism used to ascertain the existence of a genuine factual dispute between the parties that would necessitate a trial.  FED. R. Civ. P. 56, made applicable by FED. R. BANKR. P. 7056 is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[49]

When seeking summary judgment, the movant bears the initial burden of "establishing the absence of a genuine issue of material fact."[50]  A genuine issue is not simply based on opposing opinions or unsupported assertions but rather on conflicting factual evidence over which "reasonable minds could disagree on the result."[51]  Furthermore, a fact is material if it could "alter the outcome of a case."[52]  In other words,

---

[48] Adv. D.I. 55 at 1.

[49] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted).

[50] *J. Aron & Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 504 B.R. 39, 51 (Bankr. D. Del. 2013) (*quoting Celotex*, 477 U.S. at 322).

[51] *The Liquidating Tr. v. Huffman (In re U.S. Wireless Corp.)*, 386 B.R. 556, 560 (Bankr. D. Del. 2008) (citations omitted).

[52] *Id.*

the movant's goal is "to establish an absence of evidence to support the nonmoving party's case."[53]

If the movant meets this initial burden, the burden shifts to the nonmoving party to defeat summary judgment by producing "evidence in the record creating a genuine issue of material fact."[54]  To demonstrate a genuine issue of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[55] The nonmoving party must demonstrate "sufficient evidence (not mere allegations) upon which a reasonable trier of fact could return a verdict in favor of a nonmoving party."[56]  This evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial."[57]

When considering a motion for summary judgment, "the court does not weigh the evidence and determine the truth of the matter; rather, the court determines whether there is a genuine issue for trial."[58]  The Court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."[59]  "If the

---

[53] *Id.* (*quoting Celotex*, 477 U.S. at 325).

[54] *In re W.R. Grace & Co.*, 403 B.R. 317, 319 (Bankr. D. Del. 2009).

[55] *Matushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[56] *Giuliano v. World Fuel Servs., Inc.* (*In re Evergreen Int'l. Aviation*), 2018 WL 4042662, at *2 (Bankr. D. Del. Aug. 22, 2018) (citations omitted).

[57] *The Liquidating Tr. v. Huffman*, 386 B.R. at 559-60 (*quoting Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)).

[58] *Argus Mgmt. Grp. v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del .2005) (*quoting Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249 (1986) (citations omitted)).

[59] *Saldana v. Kmart*, 260 F.3d 228, 231-32 (3d Cir.2001).

opposition evidence is merely colorable or not significantly probative, summary judgment may be granted."[60]    However, where the record could lead reasonable minds to draw "conflicting inferences, summary judgment is improper, and the action must proceed to trial."[61]  Summary judgment is proper only where one reasonable inference or interpretation of the facts can be drawn in favor of the moving party.[62]

## II.    The Motion Concerning CASPA Will Be Denied

The Parties dispute whether Pennsylvania's Contractor and Subcontractor Payment Act applies to the Contract.  Plaintiff argues that CASPA applies to the Contract because it accords with the purpose of the statute and not to apply it would violate the strong public policy of Pennsylvania.  Specifically, Plaintiff contends CASPA Section 514 (the "Anti-Waiver Provision") expresses Pennsylvania's "fundamental policy," which supersedes the Parties' contractually-designated Oklahoma choice of law provision. Section 514 states that "making a contract subject to the laws of another state or requiring that any litigation . . . on the contract occur in another state, shall be unenforceable."[63]

The Defendants, however, argue that CASPA does not apply to the Contract because the Contract's Oklahoma choice of law provision is enforceable and binding.  The

---

[60] *Whitlock v. Pepsi Am*s., No. C 08-24742 SI, 2009 WL 3415783, at *7 (N.D. Cal Oct. 21, 2009) (citations omitted).

[61] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (*quoting Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir.2000).

[62] *Id.*

[63] 73 Pa. Cons. Stat. § 514 (2020).

choice of law provision states that "[t]he laws of the State of Oklahoma, excluding its choice of law principles, shall govern this Contract" (the "Choice of Law Provision").[64]

In *Klaxon Co. v. Stentor Electric Manufacturing Co.*, the Supreme Court held that a federal court sitting in diversity must apply the choice of law rules of the forum state when questions "arise in federal court but whose determination is not a matter of federal law."[65]  While it remains unclear if this holding extends to circumstances in which a court derives its jurisdiction from a federal question, the absence of an overriding federal interest permits this Court to apply *Klaxon* and, thus, the Delaware choice of law rules.[66]

Generally, "Delaware courts will . . . honor a contractually-designated choice of law provision."[67]  The Delaware Court of Chancery has noted:

> when parties have ordered their affairs voluntarily though a binding contract, Delaware law is strongly included to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract.  Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations.[68]

---

[64] "The laws of the State of Oklahoma, excluding its choice of law principles, shall govern this Contract. . . . Jurisdiction and venue shall lie exclusively with the appropriate courts of Tulsa County, Oklahoma." D.I. 1, Exh. 2 (§ 1, Art. 35).

[65] *In re Kaiser Group Intern. Inc.*, No. 09-52317, 2010 WL 3271198, at *4 (D. Del. Aug. 17, 2010) (quoting *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

[66] *In re LMI Legacy Holdings, Inc.*, No. 13-12098, 2017 WL 1508606, at *5 (Bankr. D. Del. Apr. 27, 2017).

[67] *VSI Sales, LLC v. Int'l Fidelity Ins. Co.*, 2015 WL 5568623, at *2 (D. Del. Sept. 22, 2015) (*quoting J.S. Alberici Construction Co., Inc. v. Mid-West Conveyor Co., Inc.*, 750 A. 2d 518, 520 (Del. 2000).  *See also Kruzits v. Okuma Machine Tools, Inc.*, 40 F. 3d 52, 55 (3d Cir. 1994).

[68] *Libeau v. Fox*, 880 A. 2d 1049, 1056-57 (Del. Ch. 2005).  *See Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A. 2d 1032, 1048 (Del. Ch. 2006) ("When parties have chosen a state's contract law to govern their

Delaware courts rely on Section 187 of the Second Restatement of Conflict of Laws ("Section 187") to determine whether the Parties' contractually-designated choice of law should be given effect. Section 187 provides that the choice of law clause will be enforced unless either: (a) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or (b) "application of the law of the chosen state would be contrary to the fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and . . . would be the state of the applicable law in the absence of an effective choice of law by the parties."[69]

Yet, Delaware Courts do not view the presence of strong public policy—including that expressed in the form of an anti-waiver provision—as, by itself, controlling over a contractually-designated choice of law provision.[70] Without evidence that a choice of law provision would stifle the enforcement of the statutory purpose or would leave the Plaintiff without a remedy concerning a matter of important state public policy, there is no contradiction of a fundamental state policy under Section 187, and, therefore, no need to disregard the negotiated choice of law provision.[71]

---

contract, it is illogical to assume that they wished to have the enforceability of that contract judged by another state's law.").

[69] Restatement (Second) of Conflicts of Laws § 187 (1971).

[70] *Redick v. E. Mortg. Mgmt., LLC*, No. 11-1260, 2013 WL 1089710, at *7 (Bankr. D. Del. Mar. 15, 2013) ("[T]he Court finds that the Delaware Wage Act's anti-waiver provision provides a clear indication that the Act's provisions represent the strong public policy of Delaware. The Inquiry does not end here, however. Next the Court must determine whether enforcement of the choice law provision in the Agreement would *contravene* this strong public policy. If so, the provision is unreasonable, and thus unenforceable.")

[71] *Organ v. Byron*, 435 F. Supp. 2d 388 (D. Del. 2006) (enforcing a Delaware choice of law provision over the public policy of Illinois because enforcement would not leave the plaintiff without remedy or violate policy); *Redick v. E. Mortg. Mgmt., LLC*, No. 11-1260, 2013 WL 1089710, at *7 (Bankr. D. Del. Mar. 15, 2013)

The Court finds that the substantial relationship exception of Section 187(2)(a) applies to the Contract, which renders the Oklahoma choice of law provision unenforceable.   Nevertheless, the Motion will be denied in connection with the application of CASPA to the Contract as Plaintiff has not shown that Pennsylvania law would be controlling.

As a threshold matter, the Court finds that the Contract dispute between the Parties falls within the ambit of Pennsylvania's Contractor and Subcontractor Payment Act, which was designed (i) to "require timely payment to contractors and subcontractors under a construction contract[72] . . . , [(ii)] to provide remedies if timely payment is not made[,]"[73] and (iii) to "anticipate payments originating from the owner and set deadlines for making payments."   This Contract, by which the Defendants were to compensate Plaintiff for constructing a natural-gas pipeline in Pennsylvania, meets the definition of a "construction contract"[74] where Plaintiff is a "Contractor" and the Defendants are "Owners" under the statute.[75]

---

(*citing Meli v. Rembrandt IP Mgmt., LLC*, No.  09C-09-108, 2010 WL 2681853, at *1 (Del. Super. Ct. June 28, 2010) (holding that the Pennsylvania forum selection clause did not violate a Delaware statutory anti-waiver provision because the agreement of which it was part did not disregard the statute, preclude its enforcement, or impair the Plaintiff's ability to seek a cause of action under the statute).

[72] 73 Pa. Cons. Stat. § 502 (2020) (A construction contract is defined as "[a]n agreement . . . to perform work on any real property located within [the Commonwealth of Pennsylvania].").

[73] *Reco Equipment, Inc. v. John T. Subrick Contracting, Inc.*, 780 A. 2d 684, 687 (Pa. 2001).

[74] 73 Pa. Cons. Stat. § 502 (2020).

[75] 73 Pa. Cons. Stat. § 502 (2020) (a Contractor  is "a person authorized or engaged by an owner to improve real property;" an Owner is "a person who has an interest in the real property that is improved and who orders the improvement to be made.")

Pursuant to Section 187(2)(a), Oklahoma, the Parties designated law under the Contract, does not have a substantial relationship to the transaction or to the Contracting Parties.  Welded is a Delaware company with a principal place of business in Ohio.  Although the Plaintiff has filed its Complaint against three defendants, Transco is the only Defendant that is signatory to the Contract from which this proceeding arises.  As such, Transco does not have a substantial relationship to the transaction as it is a Delaware company with a principal place of business in Texas.[76]

The Court must also consider whether CASPA's Anti-Waiver Provision represents a fundamental policy interest that supersedes the Oklahoma Choice of Law Provision.  Specifically, under Section 187(2)(b) the Court must address the following:

> [Whether] "the application of . . . [Oklahoma law] would be contrary to a fundamental policy of . . . [Pennsylvania], which has a materially greater interest than . . . [Oklahoma] in the determination of the particular issue and which, under the rule of § 188 would be the state of the applicable law in the absence of an effective choice of law by the parties."[77]

First, Delaware courts have found that "when a state statute contains an anti-waiver provision . . . this is a signal that the law in question amounts to a

---

[76] While ruling on the Motion to Dismiss, Judge Gross stated that "all three Defendants have their principal places of business in Oklahoma." *See Welded v. Williams Companies, Inc.  (In re Welded Construction, L.P.), 609 B.R. 101, 129 (Bankr. D. Del. 2019).*  Although this Court's finding that Transco's principal place of business is in Texas appears to contradict Judge Gross' statement, his statement was not a finding of fact or conclusion of law.  Judge Gross' statement was made at the motion to dismiss stage, when the Court was not required to make findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  *See* Fed. R. Bank. P. 7052 (applying Fed. R. Civ. P. 52(a) which provides that [f]indings of fact and conclusions of law are unnecessary on decision of motions under Rules 12 . . . .").  Because the court was not required nor does it appear there was a finding of fact or a conclusion of law, this Court's finding concerning Transco's principal place of business does not contravene the law of the case.

[77] Restatement (Second) of Conflicts of Laws § 187(2)(b) (1971).

fundamental public policy of the state."[78]  However, even if the Anti-Waiver Provision represents the "fundamental policy" of a Pennsylvania, Plaintiff cannot rest on the mere existence of a statutory anti-waiver provision to demonstrate that "the application of the law of the chosen state would be contrary to the fundamental policy" of Pennsylvania.[79] Instead, Plaintiff must show that honoring the Parties' choice of law provision would violate the purpose of the statute or would leave Plaintiff without a remedy concerning a matter of important public policy to the Commonwealth of Pennsylvania.  Plaintiff has not addressed these underlying points.

Second, while the absence of a relationship between the Contracting Parties and Oklahoma demonstrates that Pennsylvania, the location of performance, has a "materially greater interest" in the transaction than the chosen state of Oklahoma,  it is not clear, and Plaintiff has not shown, that Pennsylvania law would apply "in the absence of an effective choice of law by the parties."[80]

In the absence of an effective choice of law by the Parties, the Court, under Section 188, must evaluate which state has the most significant relationship to the transaction and to the Contracting Parties by considering the following contacts: the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties.

---

[78] *Redick v. E. Mortg. Mgmt., LLC*, No. 11-1260, 2013 WL 1089710, at * 6 (Bankr. D. Del. Mar. 15, 2013).

[79] Restatement (Second) of Conflicts of Laws § 187(2)(b) (1971).

[80] Restatement (Second) of Conflict of Laws § 187(2)(b) (1971).

In connection with this standard, the record indicates the following: all the construction contemplated in the Contract was performed in Pennsylvania; the Contracting Parties are Delaware corporations; Transco's principle places of business is in Texas; and Welded's principal place of business is in Ohio.  This information, at best, reveals the scattered interest of four states without conclusively showing Pennsylvania's interest to be dominant among them.  Although the Pennsylvania is the place of performance, all of the Contracting Parties are incorporated in the state of Delaware.  The fact that all of the construction contemplated in the Contract occurred in Pennsylvania is not dispositive.[81]  While it may be true that "Pennsylvania has an interest in protecting . . . [contractors in its state], . . . [the Court] cannot say that [Delaware] has a lesser interest in protecting businesses . . . [incorporated] [with]in it."[82]

For the reasons stated above, Plaintiff has not shown that CASPA is applicable to the Contract, and the partial summary judgment motion will be denied.

### III.    The Motion Regarding the Labor Costs and Equipment Fee Will Be Denied.
### A.  Labor Costs

The Motion implicates the below terms in connection with the recovery of Labor Costs.  The Contract defines these terms as follows:

---

[81] *See Coface Collections N. Am. Inc. v. Newton*, 430 F. Appx 162 (3d Cir. 2011) (*finding* that the acquisition of a Louisiana-headquartered corporation by a national business incorporated in Delaware by an agreement containing a Delaware choice of law provision, where one party signed in Louisiana did not have sufficient geographic contacts to warrant to the application of Louisiana law); *see also W.R. Berkley Corp. v. Niemela*, No. 17-32, 2019 WL 5457689, at *4 (D. Del. Oct. 24, 2019).

[82] *Gay v. CreditInform*, 511 F. 3d 369, 390 (3d Cir. 2007).

- **Work**: Work . . . shall mean the entire construction project and/or parts thereof that are to be performed by Contractor pursuant to this Contract . . . . Work may also be referred to . . . as "Job", "Construction" or "Project".[83]

- **Labor Costs**: i) the actual wage rates and benefits paid to NPLA Personnel pursuant to the NPLA for actual Work performed, ii) the actual wages and benefits, in accordance with Exhibit 1 paid to Field Personnel for actual Work performed and iii) for both i and ii above, to the extent however not already addressed by or covered under the NPLA with respect to NPLA Personnel, fringe benefits, employee vehicle rental/pay, travel pay, per diem, fuel pay, payroll taxes and insurance . . . actually paid to NPLA and Field Personnel in connection with payment for actual Work.[84]

- **Equipment Fee:** a flat fee calculated as 50% of Labor Costs payable for actual Work performed by all NPLA Personnel and Field Personnel assigned to the project.[85] Contractor shall provide and supply all included Equipment in connection with the Work.  The Equipment Fee shall cover the cost, expense, overhead, profit and all compensation due and payable to Contractor in connection with the provision and supply of Included Equipment."[86]

Plaintiff seeks declaratory judgment for approximately $22 million of Labor Costs in connection with unpaid true-up invoices for July, August, September, and October 2018.[87]  Plaintiff argues that it is entitled to these costs for the following reasons: (i) the terms of the Contract are clear and unambiguous, (ii) Transco never disputed the Labor Costs in its October 4th Letter or in its Proof of Claim (No. 636), and (iii) the Defendants' withholding is inconsistent with the Contract's terms, which provide that (a) "[o]n or before the fifth (5) day of the Pay Month, [Transco] will pay [Welded] the undisputed amounts invoiced,"[88] (b) Transco is obligated to "work diligently" with

---

[83] Adv. D.I. 1, Exh.  2 (§ I, Art. 1) at 366.

[84] Adv. D.I. 1, Exh.  2 (§ VIII, Art. 2) at 337.

[85] Adv. D.I. 1, Exh.  2 (§ VIII, Art. 2) at 336.

[86] Adv. D.I., Exh. 2 (§ VIII, Art. 2) at 336.

[87] Adv. D.I. 55 at 24.  The following list represents the monthly invoices allegedly due: July 2018 ($3,930,402.82), August 2018 ($10,260,379.71), September 2018 ($7,711,920.60), October 2018 ($539,794.52).

[88] Adv. D.I. 1, Exh. 2 (§ I, Art. 1.2.3) at 37.

Welded "to resolve any disputed amounts prior to the date for payment of such invoice,"[89] (c) "[a]ny differences between the Parties related to verifying actual expenditures or invoices and adjusting against forecast and funded amounts shall be reconciled within one pay period" and "will not interrupt the payment of [Welded]'s undisputed invoices . . . ."[90] Although Welded acknowledges that "Transco has contested certain categories of reimbursement on various occasions . . ., [it maintains] there is no dispute as to Welded's Labor Costs" and that 'Transco has simply not paid.'"[91]

Defendant argues that the Motion should be denied for the following reasons: (i) "OGCS has identified systemic billing issues that have resulted in substantial overbilling" highlighted in Proofs of Claim 632 and 636,[92] (iii) "Welded has not presented sufficient evidence establishing the validity of the claimed Labor Costs and Equipment Fees,"[93] and (iii) Defendants have not had an opportunity to complete discovery in connection with the disputed invoices.

The Court finds that there are genuine issues of material fact that preclude partial summary judgment with respect to the Labor Costs.

First, contrary to the Plaintiff's assertions, the record demonstrates that Defendants' dispute of Labor Costs is longstanding. The Court is not persuaded that Labor Costs were undisputed in the October 4th Letter or in the Proof of Claim (no. 636).

---

[89] Adv. D.I. 1, Exh. 2 (§ I, Art. 1.2.3) at 37.

[90] Adv. D.I. 1, Exh. 2 (§ I, Art. 1.2.5) at 37.

[91] Adv. D.I. 55 at 24.

[92] Adv. D.I. 71 at 35.

[93] Adv. D.I. 71 at 35.

While the Defendants may not have explicitly stated that they disputed Labor Costs in these documents, there is no doubt that they did so constructively.

In the October 4th Letter with the subject line "Atlantic Sunrise Spreads 5, 6, and 7-Contract 2016-0001; Disputed Charges," and in Proof of Claim (no. 636) Defendants disputed the application of the Equipment Fee to "costs that do not include 'actual Work performed.'"   If the Contract defines Labor Costs as the "the actual wage rates and benefits paid to NPLA Personnel . . . for actual Work performed," Equipment Fee costs as "50% of Labor Costs for actual Work performed," and the Defendants challenged whether particular categories of costs fall under the Definition of Equipment Fee, it must be true that the Defendants were disputing Labor Costs.  Plaintiff's October 7th response to Defendants' October 4th Letter further supports that Plaintiff interpreted the dispute to concern Labor Costs.  In its response letter, Plaintiff lists categories of Labor Costs, which it believes are applicable to the dispute.[94]

Second, the Court finds that the Plaintiff overlooks two categories of disputed Labor Costs that were identified in the OGCS audit and were later described in the Burke Declaration.  The first disputed category consists of equipment costs for trucks, vehicles, welding machines, and toolkits that were charged to both the Labor Costs and the Equipment Fee categories ("Double-counted Labor Costs); the Defendants argue that these costs should only be charged as Included Equipment under the Equipment Fee.[95]

---

[94] *See* D.I. 53, Exh 9 (October 7, 2018 Letter).

[95] Adv. D.I. 73, Burke Decl. at ¶ 11(c) ("Welded improperly charged and recovered direct costs for certain equipment plus an added 'Equipment Fee' for that same equipment (even when that equipment was to be provided as 'Included Equipment' under the contract.)").

The second category of disputed Labor Costs consists of (i) rework/weld repaid damages, (ii) damage to materials, machinery or equipment, (iii) safety shut down damages, (iv) environmental compliance damages, and (v) regulatory violation damages, which the Defendants argue should not have been charged to the Labor Costs category ("Non-chargeable Labor Costs," and together with the Double-counted Labor Costs, the "Disputed Labor Costs").[96]   Even if the Burke Declaration does not comprehensively explain the contractual basis for concluding that the Disputed Labor Costs were erroneously invoiced, the Burke Declaration— a sworn statement of an independent auditor that describes the findings of his audit—is sufficiently probative of disputed Labor Costs to deny the Motion.  A more substantial factual record will be necessary to resolve the Disputed Labor Costs.

Additionally, with respect to each of the alleged Non-chargeable Labor Costs, the Court has determined that the following Contract provisions may support Defendants' assertion of erroneous invoicing:

- rework/weld repair damages: Section I, Article 22(C) of Contract provides that "[Transco] may reject Defective Work and require [Welded] at its sole cost and expense, to correct Defective Work at any time prior to completion and final acceptance."[97]  The Contract further provides that "to the extent Welded does not exceed a weld repair rate of 5% over the course of the project, the repair of such welds will not constitute correction of Defective Work that Contractor must correct at its sole cost and expense."[98]

---

[96] Adv. D.I. 73, Burke Decl. at ¶ 11(f) ("The audit team also identified a number of specific contract exclusions from the chargeable labor category, which had actually been included in invoices and previously paid for by Transco); *See* Proof of Claim No. 636 at 14.

[97] Adv. D.I. 1, Exh 2. (§ 1, Art. 22(C)) at 17-18.

[98] *Id.*

- safety shut down damages: Section I, Article 12 of Contract provides that "if [Transco] issues [Welded] a stop work notice due to (i) Welded's failure to remediate a previously reported unsafe action, (ii) [Welded's] willful disregard of [Transco's] safety standards . . ., or (iii) [Welded's]involvement in a severe safety incident, such a life-threatening injury or death, then all resulting costs of associated corrective actions, safety meetings, safety stand down, and/or safety training sessions will be at [Welded's] sole costs and expense."[99]

- environmental compliance damages: Section II, Article 3(G) provides: "[Welded] will provide full time Safety Inspectors during construction to ensure that all work is constructed in accordance with all applicable Federal, State, and Local laws and regulations . . . Any stoppage in work as a result of [Welded's] willful, repeated, or unaddressed safety-related actions or inaction [will] be at the sole expense of Contractor."[100]

- regulatory violation damages: Section 1, Article 19 provides: "Contractor shall defend, indemnify and hold harmless Company Group from and against all cost, expenses, fines and levies imposed by any agency or other governmental body on [Welded] or any member of Company Group based upon Contractor's activities that are not in compliance with the requirements of Company's certificates, permits, and licenses; *See also* Section 1, Article 5, which provides: "[Welded] shall defend . . ., indemnify and hold harmless [Transco and the Company Group] from and against any claim, . . . penalty, . . . fine, liability, damages . . . incurred by Company Group . . . in any Claim, action or proceeding . . . between Company Group and any third party arising directly or indirectly from or related in any way to Work . . . ."

At this time, however, without knowing the specifics of the disputed Labor Costs, the Court can neither determine whether Welded's initial categorization of the undisputed Labor Costs was accurate nor can it determine whether the Defendants' withholding was justified under the terms of the Contract. In the absence of these facts, the Court is not positioned to make a liability determination. Nevertheless, the Court

---

[99] *See* Proof of Claim 636 at 15 ("Nevertheless, the audit findings evinced Debtor called seven (7) separate safety shutdowns. Transco did not direct or instruct Debtor to undertake these shutdowns. As such, all costs associated with the seven (7) shutdowns should be borne by the Debtor. The audit did not reflect Debtor adjusted its invoices to account for the costs associated with the shutdowns."); Adv. D.I. 79 at 15 (Welded's Reply Brief) ("Transco never issued a stop work notice due to a safety incident.").

[100] Adv. D.I. 1, Exh 2. (§ I, Art. 3(G)) at 74.

finds that, together, the findings of the independent audit set forth in the Burke Declaration and the contractual provisions highlighted above are sufficiently probative of unresolved Labor Costs issues.  At trial, a more developed record in connection with the Disputed Labor Cost will permit the Court to address unresolved factual questions and allocate liability.

Accordingly, for the reasons stated above, the Court will deny the Motion as it concerns Labor Costs.  Additionally, at this stage of the proceeding, Defendants' argument that partial summary judgment should be denied because of the need for discovery is moot.  Although the Motion was filed before discovery, fact discovery was conducted and ended on March 30, 2020.  Given that the Court will deny the Motion, the Defendant will not be disadvantaged.  Furthermore, whether the parties "worked diligently to resolve any disputed amounts prior to the date for payment of such invoice" or "[gave] good faith consideration to using alternative dispute resolution prior to or in lieu of litigation" are questions of fact that are inappropriate to decide at this stage of the proceeding.[101]

### B.  Equipment Fee

The Motion implicates the below terms in connection with the recovery of the Equipment Fee.  The Contract defines these terms as follows:

- **Work**: Work . . . shall mean the entire construction project and/or parts thereof that are to be performed by Contractor pursuant to this Contract . . . . Work may also be referred to . . . as "Job", "Construction" or "Project".[102]

---

[101] Adv. D.I. 1, Exh. 2 (§ I, App. G, 1.2.3) at 37.

[102] Adv. D.I. 1, Exh. 2 (§ I, Art. 1) at 366.

- **Equipment Fee:** a flat fee calculated as 50% of Labor Costs payable for actual Work performed by all NPLA Personnel and Field Personnel assigned to the project.[103] Contractor shall provide and supply all included Equipment in connection with the Work. The Equipment Fee shall cover the cost, expense, overhead, profit and all compensation due and payable to Contractor in connection with the provision and supply of Included Equipment."[104]

- **Included Equipment:** "Included Equipment" means materials, equipment, supplies, tools, vehicles, machines, offices, office equipment, furnishings, communications and utilities typically owned, leased and/or provided by contractors performing work similar to this Work, such as those shown in Exhibit 2 . . . .[105]

- **Specialty Equipment:** means equipment not typically owned by contractors performing work similar to this Work . . . .[106]

- **Materials:** means material which Contractor may provide in connection with the Work . . . .[107]

Plaintiff seeks declaratory judgment for an Equipment Fee of approximately $14 million in connection with unpaid true-up invoices for July, August, September, and October of 2018.[108]   Defendants oppose the Motion as they allege that Welded (i) improperly applied the Equipment Fee to actions that were not Labor Costs (Non-chargeable Equipment Costs), and (ii) separately charged Included Equipment while at the same time applying the Equipment Fee ("Double-counted Equipment Costs").

---

[103] Adv. D.I. 1, Exh. 2 (§ VIII, Art. 2) at 336.

[104] Adv. D.I., Exh. 2 (§ VIII, Art. 2) at 336.

[105] Adv. D.I., Exh. 2 (§ VIII, Art. 2) at 338.

[106] Adv. D.I., Exh. 2 (§ VIII, Art. 2) at 338.

[107] Adv. D.I., Exh. 2(§ VIII, Art. 2) at 338.

[108] Adv. D.I. 55 at 32.  The monthly invoice amounts allegedly due include: July 2018 ($1,965,201.41), August 2018 ($5,130,189.86), September 2018 ($4,426,615.96), October 2018 ($2,983,245.18).  The sum of these monthly amounts is $14,505,252.41.

In connection with the alleged misapplication of the Equipment Fee, Defendants argue that the Equipment Fee charge should be restricted to "Labor Costs for actual work performed" with actual work defined as "actions attributable to carrying out, accomplishing or fulfilling tasks or functions that furthered the work on the project in a real, substantial, genuine way."[109]   Therefore, Defendants argue that because certain Labor Costs that did not fall within the definition of "actual work" were assessed an Equipment Fee, the Plaintiff erroneously charged Equipment Fee to waiting time, show up time, travel pay, per diem expenses, paid time off, holidays, project overhead (employer's tax and insurance liabilities), sick leave, weather stand-downs, rig rental allowances, and vehicle allowances.

With respect to the second allegation, Defendants contend that OGCS's audit identified a number of instances where Plaintiff separately charged for equipment, which should have been paid for as Included Equipment under the Equipment Fee.  The Burke Declaration highlights three examples of this alleged error:

- "Welded improperly invoiced Transco for equipment that is 'typically owned, leased and/or provided by contractors performing work similar to this Work,' while, at the same time, collecting the Equipment Fee which was intended to cover such equipment."[110]

- Welded improperly recovered the direct cost of . . . equipment [via the sub-contractor and materials costs categories] on top of the Equipment Fee that should have covered he payment for this "Included Equipment."[111]

---

[109] Adv. D.I. 71 at 32.

[110] Adv. D.I. 73, Burke Decl. at ¶ 11(b); *See also* Proof of Claim No. 636 at 12 ("Included Equipment was improperly charged as Specialty Equipment.").

[111] Adv. D.I. 73, Burke Decl. at ¶ 11(d); *See also* Proof of Claim No. 636 at 12 (Nos. 8, 9, 10).

- "Welded improperly recovered the direct cost of [temporary offices, site cabins, and leases for more permanent offices] on top of the Equipment Fee that should have covered the payment for this 'Included Equipment.'"[112]

Because of these findings, the Defendants argue that the Motion should be denied.

In response, Plaintiff argues that it is entitled to a $14 million unpaid Equipment Fee because (i) "the plain and unambiguous language entitles [it] to payment of an Equipment Fee in an amount equal to half of Welded's Labor Costs" for "actual Work performed by all NPLA Personnel and Field Personnel assigned to the project;"[113] (ii) Labor Costs include fringe benefits for both NPLA and Field Personnel, which includes time when equipment is committed but not used; (iii) Defendants' interpretation of "actual Work" would lead to an inconsistent interpretation throughout the Contract, and because (iv) Plaintiff interprets "actual Work" as distinguishing between work performed by onsite and offsite personnel. Plaintiff does not address Defendants' allegation of Double-counted Equipment Costs.

The Court is not persuaded that the Equipment Fee should be restricted to Labor Costs "carrying out, accomplishing or fulfilling tasks or functions that furthered the work on the project in a real, substantial, genuine way."[114] First, it is important to note that all of the costs that Defendants argue do not fall within the definition of "Labor Costs . . . for actual Work performed" are Labor Costs under the NPLA contract.[115] Second, even if, as the Defendants suggest, "words are to be given their ordinary meaning," this meaning

---

[112] Adv. D.I. 73, Burke Decl. at ¶ 11(e).

[113] Adv. D.I. 55 at 25 (citation omitted).

[114] Adv. D.I. 71 at 32.

[115] *See* Adv. D.I. 1, Exh 2 (ASR Contract § VIII) at 356-58; *See also* Adv. D.I. 1, Exh. 5 (Teamsters NPLA).

must make sense within the context of the contract.[116]  Distinguishing between active and passive Labor Costs effectively casts aside this principle and renders the definition of Labor Costs incomprehensible.

For example, following the first two parts of the Labor Costs definition, part three of the definition provides that "to the extent however not already address by or covered under the NPLA with respect to NPLA Personnel, [Labor Costs means] fringe benefits, employee vehicle rental/pay, travel pay, per diem, fuel pay, payroll taxes and insurance . . . paid to NPLA and Field Personnel in connection with payment for actual Work."  If, as the Defendant argues, "actual Work" effectively means active Work, it would not make sense for the drafters to reference "payment for actual Work" in connection with four costs (i.e. passive work) which Defendants have excluded under their definition of "actual Work."

Given that this is a cost-plus contract, where the contractor is being paid a fixed fee plus the actual cost of work, it is more likely that the phrase "actual Work" is referencing this pricing structure rather than a distinction between active and passive Labor Costs.  The Contract says as much in Article I, Section VIII, which provides that "Work shall be paid on an actual cost-basis in accordance with the components and methods of payment . . . ."[117]  Nevertheless, because the Contract does not explicitly

---

[116] *MBIA Ins. Corp. v. Royal Indem. Co.*, 426, F. 3d 204, 2010 (3d Cir. 2005).

[117] Adv. D.I. 1, Exh 2 (§ VIII, Art. 1) at 336.

clarify the meaning of the phrase "actual Work," the Court must gather extrinsic evidence of the Parties intent at trial.

The Court also finds, by way of the Burke Declaration, that Defendants have established sufficient independent evidence to deny the Motion in connection with the Double-counted Equipment Costs. The audit's findings are probative, even it is not specific enough to be dispositive. Given that Plaintiff has not responded to these allegations and the Court does not have enough information about the alleged mischarges to determine liability, the Court will deny partial summary judgment.

Accordingly, for the reasons stated above, the Court will deny the Motion as it concerns the Equipment Fee.

### C. The Court Need Not Address the Defendants' Argument Regarding Setoff and Recoupment.

Defendants argue Plaintiff's "Motion should be denied because genuine issues of material fact still exist regarding Defendants' Proofs of Claim and Counterclaims, which subject the Labor Costs, Equipment Fees, and other amounts asserted by [Plaintiff], to Transco's rights of setoff and recoupment."[118]  Because the Court has already found that it will deny the Motion due to unresolved factual issues that preclude the Court from fully adjudicating the disputed Labor Costs and Equipment Fee, the Court need not address the Defendants' argument.

---

[118] Adv. D.I. 71 at 27.

## CONCLUSION

In sum, the Court will deny Plaintiff's Motion in its entirety.  The Court will deny the Motion in connection with application of CASPA because Plaintiff has not shown that Pennsylvania law would be controlling.  Additionally, unresolved factual issues preclude the Court from granting the Motion in connection with the Labor Costs and Equipment Fee.  Finally, because these issues have not been fully adjudicated, the Court will deny interest, penalty interest, and attorneys' fees.  An order will be issued.