## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WELDED CONSTRUCTION, L.P., et al., | Case No. 18-12378 (LSS) |
| Debtors. | (Jointly Administered) |
| WELDED CONSTRUCTION, L.P., | |
| Plaintiff, | Adv. Pro. No. 19-50194 (LSS) |
| v. | **Re: Docket No. 300** |
| THE WILLIAMS COMPANIES, INC., WILLIAMS PARTNERS OPERATING LLC, and TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC., | |
| Defendants. | |

### MEMORANDUM

This Memorandum is for the benefit of plaintiff Welded Construction, L.P. ("Welded") and defendant Transcontinental Gas Pipe Line Company, LLC ("Transco") in advance of a trial scheduled to begin on August 22, 2023.[1] The dispute surrounds the construction of certain segments of a pipeline and amounts each party claims are owed by the other. The contract at issue ("Contract") is that certain construction contract by and

---

[1] Defendants Williams Companies, Inc. and Williams Partners Operating LLC are not the subject of the briefing or the trial.

between Transco and Welded agreed to and accepted effective as of August 10, 2016, including exhibits and as amended.[2]

The parties filed cross motions for partial summary judgment. This Memorandum addresses Transco's Motion.[3] In support of its motion, Transco filed an Opening Brief[4] together with the Burwood Declaration[5] and the Sztroin Declaration.[6] Welded filed its Answering Brief[7] together with the Neiburg Declaration.[8] Transco then filed its Reply Brief[9] together with the Ewald Declaration.[10]

---

[2] Portions of the Contract were included as exhibits in the documentation supporting each party's respective briefs on summary judgment. I also requested that an entire copy of the Contract be filed on the docket, which was done. Adv. Pro. Dkt. No. 386. There is some disagreement whether certain Pre-Job Conference Agreements are part of the Contract. I need not resolve the disagreement for purposes of this Memorandum.

[3] Defendant Transcontinental Gas Pipe Line Company, LLC's Motion for Partial Summary Judgment (Adv. Pro. Dkt. No. 300).

[4] Defendant Transcontinental Gas Pipe Line Company, LLC's Memorandum of Law in Support of Its Motion for Partial Summary Judgment (Adv. Pro. Dkt. No. 301).

[5] Declaration of Jonathan Burwood in Support of Defendant's Motion for Partial Summary Judgment (Adv. Pro. Dkt. No. 302).

[6] Declaration of David Sztroin in Support of Defendant's Motion for Partial Summary Judgment (Adv. Pro. Dkt. No. 303).

[7] Welded's Response to Defendant Transcontinental Gas Pipe Line Company, LLC's Motion for Partial Summary Judgment (Adv. Pro. Dkt. No. 314).

[8] Declaration of Michael S. Neiburg in Support of Welded's Response to Defendant's Motion for Partial Summary Judgment (Adv. Pro. Dkt. No. 315).

[9] Defendant Transcontinental Gas Pipe Line Company, LLC's Reply in Support of Its Motion for Partial Summary Judgment Declaration (Adv. Pro. Dkt. No. 318).

[10] Declaration of Shelly L. Ewald in Support of Defendant Transcontinental Gas Pipe Line Company, LLC's Reply to Welded Construction L.P.'s Opposition to Transcontinental Gas Pipe Line Company, LLC's Motion for Partial Summary Judgment (Adv. Pro. Dkt. No. 319).

Since I am writing solely for the parties, I assume familiarity with the arguments made in the briefs and the supporting documentation, all of which has been reviewed. I also assume familiarity with the previous decisions in this adversary proceeding. Because there is still much to do prior to trial in this matter, this Memorandum is not as formal as it might otherwise be and may, at times, speak in shorthand. Nonetheless, I have confidence that the parties will understand the decisions and this Memorandum will, hopefully, provide some guidance for trial.

**Bankruptcy Jurisdiction**

Jurisdiction exists over this adversary proceeding pursuant to 28 U.S.C. § 1334. The parties agree that the claims between Welded and Transco which are the subject of this motion are core proceedings.[11] Accordingly, I may enter a final judgment in this matter.

**Legal Standard**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12] The movant bears the initial burden of demonstrating that no material facts are in dispute by citing the record, including documents, affidavits or declarations, admissions and interrogatory answers.[13] A fact is material if it could affect the outcome of the decision.[14]

---

[11] Joint Final Pretrial Order at 4 (Adv. Pro. Dkt. No. 390-1).

[12] Fed. R. Civ. P. 56 as made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7056.

[13] *In re Abeinsa Holding, Inc.*, 645 B.R. 680, 685 (Bankr. D. Del. 2022).

[14] *In re United Tax Grp., LLC*, No. 14-10486 (LSS), 2021 WL 6138214, at *2 (Bankr. D. Del. Sept. 2, 2021).

If the movant provides sufficient proof to support its motion, the burden shifts to the nonmoving party to point out the existence of genuine issues of material fact.[15]  The party asserting that genuine issues of material fact exist must support its contention by competent evidence "upon which a reasonable trier of fact could return a verdict in favor of the nonmoving party."[16]

## Choice of Law

The bulk of the legal briefing in the Opening Brief is devoted to a discussion of what state law should apply to the Contract dispute with a particular emphasis on whether Welded can bring claims under Pennsylvania's Contractor and Subcontractor Payment Act ("CASPA").  Boiled down, Transco argues that Welded cannot demonstrate that the choice of law provision in the Contract (which provides that Oklahoma law applies) is unenforceable as "Oklahoma has a significant nexus to the parties' transaction because Oklahoma is the principal place of business for i) Transco; ii) its [sic] Transco's sole parent company and co-Defendant, Williams Partners; and iii) Williams Partners' sole parent company and co-Defendant Williams Company."[17]

Setting aside (for purposes of this Memorandum) the two previous decisions of this Court, Transco's request for summary judgment is denied because Transco's own

---

[15] *Id.* at *3.

[16] *Id.*

[17] Opening Brief 34-5.  Transco also argues that Judge Gross upheld the choice of law provision "finding that 'all three Defendants have their principal place of business in Oklahoma.'"  *Id.* at 35.  A review of Judge Gross's decision shows that, in the context of ruling on Transco's motion to transfer venue of this case to Oklahoma, Judge Gross cited to Transco's motion for support of the quoted statement.  It is likely Judge Gross simply assumed the truth of the representations in the motion for purposes of the factor he was evaluating (the convenience of the parties as indicated by their physical and financial condition) as, notwithstanding, he concluded that the factor favored keeping the case in Delaware.

submissions show, at the very least, a disputed fact regarding Transco's principal place of business.[18] Notwithstanding the Sztroin Declaration, the Contract identifies Transco's principal place of business as Houston Texas.[19] Indeed, the address is part of the defined term "Company" used throughout the Contract.[20] Further, notices under the Contract are to be given to Transco at the same address in Houston.[21] While Transco argues in its Reply Brief that Welded (and Judge Sontchi's prior decision) focus too much on Transco's principal place of business, it is Transco that has made what should be a simple knowable fact into a credibility issue (assuming the Contract, itself, does not settle the matter).

Transco's other arguments are similarly unavailing. Transco argues that even if CASPA applies, Welded is not entitled to judgment because Transco properly withheld payment, gave proper notices under the statute of "deficiency items"[22] and that Welded cannot recover damages under CASPA because Welded, itself, violated CASPA by not paying its subcontractors per the statute.

---

[18] I also note that Transco cites no law for the proposition that the principal place of business of parent entities that are not a party to a contract should be considered in a choice of law analysis.

[19] Contract, Section I.

[20] *Id.* ("This construction contract "Contract", by and between Transcontinental Gas Pipe Line Company, LLC, whose principal place of business and address is Willliams Tower, 2800 Post Oak Boulevard (77056-6106), P.O. Box 1396, Houston, Texas 77251-1936 ("Company") . . . ."). The Book Contract Amendment also reflects the Post Oak Boulevard address. Neiburg Decl. Ex. 4. And there are many communications, including Transco's December 12, 2018 letter to the Federal Energy Regulatory Commission that reflect the Post Oak Boulevard Address. Neiburg Decl. Ex. 26.

[21] Contract, Section I, Article 30.

[22] Deficiency item is a defined term under CASPA. It means "work performed but which the owner, the contractor or the inspector will not certify as being completed according to the specifications of a construction contract." 73 Pa. Stat. Ann. § 502. Transco does not reference or discuss this defined term, but rather seems to assume its overpayments fall into this category.

As Welded points out, "Deficiency Item" is a defined term under CASPA. It means "work performed but which the owner, the contractor or the inspector will not certify as being completed according to the specifications of a construction contract."[23] Transco does not reference or discuss this defined term, but rather seems to assume its overpayments or withholding of payments fall into this category. Welded counters that Transco points to no money withheld because the work did not meet specifications in the Contract. Further, and as Welded also points out, Transco cites to no case law for the proposition that Transco can avoid its obligations under CASPA because (if true) Welded did not live up to its obligations under CASPA to pay subcontractors. Transco does not respond to either of these arguments. Moreover, Transco provided no evidence of any claims brought against Welded under CASPA.

Summary judgment on choice of law is denied.[24]

**Contract Issues**

Transco also moves for summary judgment on seven specific claims arguing that there are no material facts in dispute and that the claims are a simple matter of contract interpretation. Each claim will be addressed in the order discussed in the Opening Brief.

**Balance of Fixed Fee Retainage ($5,050,000)**

The parties agree that the Contract provides for Welded to be paid a Fixed Fee of $50,500,000.[25] There is no dispute that 90% of the Fixed Fee is to be paid in installments

---

[23] 73 Pa. Stat. Ann. § 502.

[24] The other arguments made by Transco (attorneys fees, penalties) cannot be determined until the basic issue of Welded's claims are decided.

[25] Section VIII Article 2.B of the Contract provides:

over the course of the project with the remaining 10% to be retained by Transco until certain

requirements are met.[26]  Specifically, the 10% retainage is payable to Welded when Transco

finally accepts the Work,[27] all material and labor bills have been paid and all liens have been

discharged.  It is also undisputed that Welded invoiced Transco for the remaining 10% of

the Fixed Fee and Transco did not pay it.[28]

Transco contends that the 10% retainage is not due because it has not

accepted the Work relying on the following provisions of the Contract:

> The remaining 10% will be retained by Company [Transco] until final acceptance of
> the Work and Company has been satisfied that all material and labor bills and all
> claims payable by Contractor have been paid and all liens discharged.[29]

> Final acceptance and final payment to Contractor shall be made when Authorized
> Company Representative has determined to his or her complete satisfaction that all

---

The Fixed Fee is a fixed, firm negotiated amount which is neither subject to modification
nor escalation or reduction, due to: (i) changes, modifications or deviations to the
proposed pipeline set forth in the Scope of Work; (ii) changes, modifications or
deviations to the pipeline route itself; (iii) any increase in the quantity of tasks, any
additional effort, and/or changes or modifications to the means of construction which
Contractor must employ to meet the Mechanical Completion Date set forth herein (iv)
underestimated Contractor overhead, costs and expenses; (v) delay due to low
Contractor productivity; (vi) extensions due to failure to achieve the Mechanical
Completion Date; and/or (vii) costs or delay due to due to unexpected weather or
geological conditions experienced over the course of the Project.  Contractor warrants
and represents that it will complete the Work in accordance with the schedule and the
Contract under the Fixed Fee set forth in the Contract.

[26]  Contract Section I Appendix G ¶ 1.2 provides:

The remaining 10% will be retained by Company [Transco] until final acceptance of the Work
and Company has been satisfied that all material and labor bills and all claims payable by
Contractor have been paid and all liens discharged.

[27]  Contract Section I Article 1 provides:

The term "Work", as used in this Contract, shall mean the entire construction project
and/or parts thereof that are to be performed by Contractor pursuant to this Contract,
including its appendices.

[28]  Burwood Decl. Ex. F.

[29]  Contract, Section I, Appendix G ¶ 1.2.

7

> Work is of good quality and workmanship; all data, records, etc. have been delivered to and accepted by Company; all Contract provisions regarding liens, waivers, claims, affidavits, releases, etc. have been fulfilled; and all Work has been accomplished according to the terms of the Contract. Anything above notwithstanding, this article is subject to Article 4, ("Claim Settlement") below.[30]

Transco argues that Welded is not entitled to the 10% retainage because Welded did not complete the Work and it did not pay certain of its material and labor bills. Welded counters that Transco cannot assert that it has not finally accepted the pipeline because Transco has been operating the pipeline for over four years. Although Welded concedes that it did not complete certain clean-up and restoration tasks, it argues that it substantially completed the Work and that Transco's unexpected refusal to pay proper invoices plunged Welded into bankruptcy thus creating a situation in which certain clean-up and restoration work remained incomplete. Accordingly, Welded argues that, at the very least, a material issue of fact exists.

I agree with Welded. It is uncontested that the project achieved Mechanical Completion on September 19, 2018, that FERC approved the pipeline on October 4, 2018[31] and the pipeline began operating shortly thereafter. Further, Mr. Springer, Transco's project director testified:

> Q.    As you sit here, from your perspective as project director, were there any things that Welded did well?
>
> A.    Yes
>
> Q.    And, what are those?
>
> A.    Well, they ultimately completed the project, and we have an asset that we believe is safe to operate for the life of the asset.

---

[30] Contract, Section I, Article 3.B.

[31] Neiburg Decl. Ex. 20, Document Info. for Accession No. 2018004-3012 noting the entry of the FERC approval letter.

They provided the necessary labor, materials and equipment to ultimately complete the project.[32]

\*       \*       \*

Q.    As you sit here today as project director of the ASR pipeline project, are you aware of any issues on any of the spreads that lead you to believe that the life of the asset won't be at least approximately 50 years?

A.    No.[33]

Moreover, the Commitment Letter dated November 6, 2018 approved by the Court on November 8, 2018 noted the "limited remaining work on the Project" and reduced the scope of Work on the Contract as follows:

At 12:01 a.m. EST on November 7, 2018, unless otherwise agreed in writing by Welded and Transco, the Scope of Work set forth in the Contract shall be deemed reduced such that any remaining clean-up, restoration and mainline valve work on the pipeline right of way for Spread 7 shall not be required under the Contract. From that point, Welded shall not be obligated to complete any such remaining clean-up, restoration and mainline valve work on the project. In addition, from that point, Transco shall not be obligated to use Welded to complete any such remaining clean-up, restoration and mainline valve work on the project. At 12:01 a.m. EST on November 16, 2018, unless otherwise agreed in writing by Welded and Transco, the Scope of Work set forth in the Contract shall be deemed reduced such that any remaining restoration work shall not be required under the Contract. From that point, Welded shall not be obligated to complete any remaining restoration work on the project. In addition, from that point, Transco shall not be obligated to use Welded to complete any remaining restoration work on the project. At 12:01 a.m. EST on November 22, 2018, unless otherwise agreed in writing by Welded and Transco, the Scope of Work set forth in the Contract shall be deemed reduced such that any remaining cleanup work on Spreads 5 and 7 yards shall not be required under the Contract. From that point, Welded shall not be obligated to complete any remaining cleanup work on Spreads 5 and 7 yards on the project. In addition, from that point, Transco shall not be obligated to use Welded to complete any remaining cleanup work on Spreads 5 and 7 yards on the project. At 12:01 a.m. EST on December 9, 2018, unless otherwise agreed in writing by Welded and Transco, the Scope of Work set forth in the Contract shall be deemed reduced such that any remaining cleanup work on Spread 6 yard shall not be required under the Contract. From that point, Welded shall not be obligated to complete any remaining cleanup work on Spread 6 yard on the project. In

---

[32] Neiburg Decl. Ex. 22, Springer Dep. Tr. at 59:8-18.

[33] *Id.* at 60:9-14.

addition, from that point, Transco shall not be obligated to use Welded to complete any remaining cleanup work on Spread 6 yard on the project. Transco shall use its commercially reasonable best efforts to remove Welded from all permits associated with the Project as of December 9, 2018, including, but not limited to those certain permits that Welded and Transco are co-permittees on PADEP Permit No. ESG03000150001 and all related local government permits, consistent with the applicable rules, guidelines and regulations of PADEP and other applicable governmental authorities, and from the date of the conclusion of Welded's work on each Spread as set forth herein, shall indemnify and hold harmless Welded (including any officers and directors of Welded) for any permit responsibilities or liabilities arising under the project from any acts and/or omissions occurring after the completion of the work on such Spread contemplated by this Third Commitment Letter. Transco shall not indemnify and hold harmless Welded (including any officers and directors of Welded) for any permit responsibilities or liabilities arising under the project from any acts and/or omissions occurring on or before the completion of the work contemplated by this Third Commitment Letter. Transco and Welded otherwise reserve all rights against each other as provided in the Contract and the Surety Bond shall remain in full force and effect.[34]

At the very least, therefore, an issue of material fact is in dispute with respect to whether the Work was substantially completed, a concept acknowledged under Pennsylvania law,[35] or whether Transco caused an inability to complete the Work. It is also possible, given the agreed-to reduction in the scope of Work, that the Work may have actually been completed.[36] Finally, Transco submitted no information that any contractor was not ultimately paid or that any liens were placed on (or not removed from) the project.

Summary judgment as to the Fixed Fee is denied.

---

[34] Burwood Decl. Ex. Y, Order Approving Third Commitment Letter from Transcontinental Gas Pipe Line Company, LLC.

[35] *G.A. West & Company, Inc. v. Transcontinental Gas Pipleine Company, LLC et al.*, Case No. 26-08148 (Pa. Ct. Common Pleas, Luzerne County Feb. 5, 2020) (Opinion and Order) at 1 ("Pennsylvania law recognizes substantial performance as part of its contract jurisprudence."). While no one cited an Oklahoma case on this point, Transco takes the position that there is no difference between Oklahoma law and Pennsylvania law on the non-CASPA claims. Opening Brief n.7.

[36] No one discussed the effect of the third Commitment Letter on the payment of the 10% retainage.

**Cost Penalty ($10,000,000)**[37]

The parties agree that the Contract contains an Incentive Program whereby Welded can earn a bonus or incur a liability based on whether the Work comes in on time, on budget and without any safety incidents.[38] The parties also agree that there is a negative incentive, capped at $10,000,000, if the Work is finished over budget.[39] There is no dispute that the initial cost estimate against which the incentive/disincentive is measured was $335,000,000 and that it was subsequently increased to $454,500,000.[40] There is also no dispute that Welded ultimately invoiced Transco in excess of $700 million.[41]

Based on the above undisputed facts, Transco moves for a summary judgment determination that Welded is liable for the $10 million cost penalty. Citing to a June 20, 2018 draft Contract Amendment[42] which reflects an updated cost estimate of $723 million, Welded argues that Transco "improperly tied the cost penalty" to the $454 million estimate rather than the most current one. Welded also argues that Transco was responsible for some of the increased cost reflected in the June 20, 2018 draft Contract Amendment.

---

[37] I am not ruling on, nor intending to touch upon in any way, the Schedule Incentive or the Safety Multiplier, which are not the subject of Transco's Motion.

[38] Contract Section VIII Article 2.A provides:

"Incentive Program" means the bonus program, as fully described in this Article VIII, including the incentive worksheets attached hereto, whereby Contractor is incentivized to complete all Work: (i) at or below the target budget; (ii) by or before the targeted completion date; and (iii) without (safety) incident.

[39] *See generally* Contract Section VIII Exs. 5-7 for the mechanics of calculation.

[40] Neiburg Decl. Ex. 4, Book Contract Amendment, Section VIII, Article 2.I.

[41] Burwood Decl. Ex. D, FTI Initial Report at 18.

[42] Neiburg Decl. Ex. 32.

Finally, Welded argues that Transco, in bad faith, violated an agreement that the $10 million disincentive payment would be "paid" in installments of $2 million rather than in one installment of $10 million.[43]

Even if the arguments Welded makes are true, they do not create a dispute of material fact. First, the Contract was never amended to change the cost estimate to $723 million for purposes of calculating the negative incentive. And, Welded did not provide a calculation from which I could conclude that Welded was not liable for all or any portion of the negative incentive even if using $723 million as a cost estimate.[44] Second, Transco's bad faith in disregarding the agreed upon timeline for payment of the $10 million disincentive actually confirms (not disputes) that Welded was liable for the disincentive payment.[45]

Based on the evidence submitted, I conclude that there is not a material fact in dispute regarding whether Welded is liable for the $10 million cost disincentive penalty under the terms of the Contract.[46] Summary judgment is granted in Transco's favor on this item.

---

[43] The disincentive penalty was actually accounted for as a deduction from a monthly invoice, with the first invoice sent in July 2018.

[44] I note the June 20, 2018 draft Contract Amendment already includes a $5 million "Cost Overrun Penalty in Incentive Plan" as part of the $723 million cost estimate.

[45] Indeed, Welded states at page 44 of its Answering Brief that Welded's July 2018 invoice reflects a "$2 million credit for Transco as the first installment on the agreed payment plan." *See also* Neiburg Decl. Ex. 22, Springer Dep. Tr. at 264:22-256:16.

[46] In so holding, I come to no conclusion regarding whether Transco contributed to the cost overruns or acted in bad faith with respect to the withholding of the $10 million all at one time or whether such could result in damages.

**General Liability Insurance Costs ($1,266,984)**

It is undisputed that Welded invoiced Transco for $1,266,984 for the cost of general liability insurance, which Transco paid.[47]  Transco seeks summary judgment that this cost was improperly charged under the Contract.  Welded disagrees and contends it is a Labor Cost.  Welded also argues that if any ambiguity exists in the language of the Contract, that Transco's course of performance—Transco paid this line item for over nine months— supports the position that general liability insurance was contemplated by the parties as a reimbursable cost.

Transco relies on the following provisions of the Contract.  First, the Contract requires Welded to carry insurance:

> Contractor will carry or cause to be carried and maintained in force throughout the entire term this Contract, and for as long thereafter as necessary to support any post-completion obligations, insurance described below with insurance companies having at least an A.M. Best A-VIII rating (or equivalent if not rated by A.M. Best).  The limits set forth below are minimum limits and will not be construed to limit Contractor's liability.  *All costs and deductible amounts will be for the sole account of Contractor.*
>
>        *       *       *
>
> All policies providing the required insurance, with the exception of Workers' Compensation and Professional Liability, shall be endorsed to include Company Group as an additional insured per ISO endorsements CG 20 10 and CG 20 27 or CG 20 33 and CG 20 37 or industry accepted and approved endorsements(s) with equivalent working as per ISO endorsements noted herein and these policies will respond as primary to any other insurance available to Company Group.[48]

---

[47] Burwood Decl. Ex. D, FTI Initial Report at 48-49.

[48] Contract, Section I, Article 8 (emphasis supplied).  In addition to general liability the Contract also requires that Welded carry the following types of insurance: worker's compensation and employer's liability, automobile liability, excess or umbrella liability, watercraft protection and indemnity and hull and machinery, aircraft liability, pollution legal liability, railroad protective liability and contractor's equipment floater.  *Id.*  Neither party has indicated how these types of insurance were to be paid under the Contract.

Second, Transco cites to the Fixed Fee definition which covers "all: (i) Contractor

cost and expenses attributable to Contractor's Home Office overhead and

management in connection with the Project" and argues that insurance is part of

overhead.

Welded supports its position by pointing to the following (different) portions of the

Contract. First, Labor Costs is defined as

> i) the actual wage rates and benefits paid to NPLA Personnel pursuant to the NPLA
> for actual Work performed, ii) the actual wages and benefits, in accordance with
> Exhibit I paid to Field Personnel for actual Work performed and iii) for both i and ii
> above, to the extent however not already addressed by or covered under the NPLA
> with respect to NPLA Personnel, fringe benefits, employee vehicle rental/pay, travel
> pay, per diem, fuel pay, payroll taxes and *insurance* in accordance with Exhibit I
> actually paid to NPLA and Field Personnel in connection with payment for actual
> Work.[49]

Second, Welded looks to Exhibit 4, which is the "list of benefits which may apply to

personnel who are paid pursuant to the NPLA."[50] This list of benefits includes general

liability insurance in the Category of "Earnings," Code "ERGLB" and Note of "Employer

Paid Benefits."[51] Based on these provisions of the Contract, Welded argues that general

---

[49] Contract, Section VIII, Article 2A.

[50] Contract Section VIII, Ex. 4.

[51] Exhibit 4 is title Benefit Codes and at the top of each page listing is the title "Welded Construction L.P. Payroll Definitions as of 1 February 2016." Similar entries include:

| Category | Code | Description | Notes |
|----------|------|-------------|-------|
| Earnings | ER4KF | Manual 401K FUND | Employer Paid Benefits |
| Earnings | ERANN | Manual Annuity | Employer Paid Benefits |
| Earnings | ERAPP | Manual Apprenticeship | Employer Paid Benefits |
| Earnings | ERBEN | Manual Retiree Benefits | Employer Paid Benefits |
| Earnings | ERDNT | Non-Manual Paid Dental | Employer Paid Benefits |
| Earnings | ERGLB | General Liability Insurance | Employer Paid Benefits |
| Earnings | ERGTL | Non-Manual Group Term Life/AD&D | Employer Paid Benefits |
| Earnings | ERHW | Manual H&W (Hourly) | Employer Paid Benefits |
| Earnings | ERHW1 | Manual H&W (%) | Employer Paid Benefits |

liability insurance can be—and in this instance is—an employee benefit and so included in the definition of Labor Costs, which includes "insurance." Welded also argues that general liability insurance is not a Home Office expense because this type of insurance provides coverage for bodily injuries and property damage caused or suffered on the Project. Welded's expert supports this position, testifying that general liability insurance in a cost-reimbursable contract is typically considered a labor-related cost allocated to the job.[52]

I conclude that the language of the contract is ambiguous. First, "Home Office overhead and management" is not defined. But, "Home Office" is. Home Office means Contractor's primary office in Perrysburg, Ohio.[53] To the extent that insurance is to be included in this definition, I fail to see how general liability insurance, to the extent it is intended to cover personnel performing in the field (which seems to be the case here), falls into that category. Second, the language "for the sole account of Contractor" is not in Section VIII (Compensation), rather it is in Section I, a more general section of the Contract. Further, at the very least this language in Section I of the Contract is awkward. To the extent the cost of insurance was to be paid for by the Contractor and included in the Fixed Fee, the Contract could have easily said that.[54] It does not.

---

[52] Neiburg Decl. Ex. 18, Scott Expert Report at ¶¶ 36-39.

[53] Contract, Section VIII, Article 2.A.

[54] For example, the Contract could provide that all insurance premiums will be paid by the Contractor or will be included as part of the Fixed Fee. *See e.g.* Contract Section VIII, Article D.4 (Between the effective date of the Contract and the date Company issues authorization for Contractor to mobilize, Company shall compensate Contractor for any Work performed by Home Office Personnel who are categorized as "Corporate Managers" (refer to definition of Home Office Personnel") in accordance with the actual hourly wages and benefits paid to such individual and actual travel expenses in accordance with Subsection G below. Thereafter, compensation for Work performed by any such individuals *shall be included and accounted for under the Fixed Fee.*") (Emphasis supplied.). "For the account of" sounds more like language used to described who is the beneficiary of something, such as an escrow account that earns interest.

On the other hand, the word insurance actually appears in Section VIII of the Contract. First, it is included in the definition of Labor Costs in a list of items typically included as part of employee compensation (i.e. fringe benefits, employee vehicle rental/pay, travel pay, per diem, fuel pay, payroll taxes).[55]  Second, general liability insurance is actually included in the list of Benefit Codes/Payroll Definitions in Exhibit 4.

Summary judgment on Insurance Costs is denied.

**Bechtel Costs ($4,449,999)**

It is undisputed that Bechtel seconded employees to Welded to perform Work on the Project.  In its statement of undisputed facts, Transco refers to these workers as "Field Personnel."[56]  It is also undisputed that Welded invoiced, and Transco paid, $4,449,999 in compensation ($2,966,666) and Equipment Fees ($1,483,333) based on the Work performed by the seconded employees.[57]  In the Opening Brief, Transco makes a hodge podge of statements regarding the Bechtel costs, but boils its argument down to this: "the Bechtel costs are unallowable under the express language of the Contract for multiple reasons, but primarily because the undisputed facts demonstrate that the Bechtel costs were not actually incurred or paid by Welded."[58]

While Transco submitted evidence that Welded did not pay all of Bechtel's invoices as and when due, Transco submitted no evidence that Welded did not "incur" the cost of

---

[55]  In noting that insurance is included in this list, I am not suggesting that the defined term "Labor Costs" has a purpose other than as a baseline for calculation of the Equipment Fee.

[56]  *See e.g.* Opening Brief 24.

[57]  Burwood Decl. Ex. D, FTI Initial Report at 56-59.

[58]  Opening Brief 44.

the seconded employees.[59] Transco submitted a chart listing Bechtel's invoices to Welded, which chart is replicated in FTI's Expert Report.[60] Thus, the evidence shows that Welded incurred the obligation.

To the extent Transco argues that Welded did not pay Bechtel's invoices, the undisputed evidence shows that invoices after October 2017 were not paid on a monthly or other regular basis. Nonetheless, Bechtel submitted a proof of claim (Claim Number 601) for prepetition goods and services, including for "loaned employees," which proof of claim was resolved as part of that certain Settlement Agreement made as of June 18, 2020.[61] While Transco argues (in its Reply Brief) that the proof of claim did not encompass Bechtel's invoices for the Project, this is, at the very least, a material disputed fact as to whether Bechtel was paid (through the Settlement Agreement) for the services of the seconded employees.[62]

Alternatively, Transco argues that the Bechtel invoices for the seconded employees included a 50% markup, and as such, the markup amount was not for wages or benefits and could not be passed along to Transco as a reimbursable cost. For this conclusion, Transco

---

[59] Transco uses the word "incurred" repeatedly in the Opening Brief, often accompanied, as here, by the word "paid." Incur means "to suffer or bring on oneself (a liability or expense)." *Incur, Black's Law Dictionary* (7th ed. 1999).

[60] Burwood Decl. Ex. D, FTI Initial Report at 56.

[61] *In re Welded Construction, L.P. et al.,* Case No. 18-12378 (Dkt. No. 1485-1) (Notice of Filing Exhibit B to Plan Supplement for the Amended Chapter 11 Plan of Welded Construction, L.P., and Welded Construction Michigan, LLC) (specifically referencing proof of claim 601 and waiving all claims for payment whether asserted or not).

[62] Transco also suggests that Bechtel's write-off of the unpaid invoices in December 2020 somehow shows it was not paid for these services. The write off, to the extent it is relevant, occurred after the June 18, 2020 Settlement Agreement that resolved all of Welded's prepetition claims.

cites to the deposition testimony of Mr. Hawkins (Welded's corporate representative and

former President):

> Q     And what was this multiplier intended to – what was the purpose of
> this multiplier?
>
> A     To cover other Bechtel costs in addition to employee wages.
>
> * * *
>
> Q     And do you know if the . . . Bechtel multiplier was actually paid to the
> employee for his or her services?
>
> A     I don't believe that multipliers are paid directly to the employee, other
> than – through the benefits and the other costs.[63]

Bechtel then turns to its expert's report (Joe Slavis, FTI Consulting), in which Mr. Slavis

interprets this testimony to conclude (perhaps as a legal matter) that the 50% "multiplier

was compensation or profit to Bechtel and not 'actual wages rates and benefits paid' to Field

Personnel."[64]

Welded counters contending that the 50% markup/multiplier included in Bechtel's

invoices to Welded for seconded employees is actually for employee benefits, pointing to

additional testimony provided by Mr. Hawkins:

> Q     And what was this multiplier intended to – what  was the purpose of this
> mulitplier?
>
> A     To cover other Bechtel costs in addition to the employee wages.
>
> Q      And what costs were those?
>
> A     For example, the payroll additives for things like 401(k), company IST and –
> [] Okay. The -- I don't know the exact breakdown of what their costs are in the
> multiplier, but it's -- I know it's to cover other costs, like insurances, 401, other --
> other company IST charges. Just the cost that an employee -- a Bechtel employee
> attracts on any job over and above his wages.

---

[63] Burwood Decl. Ex. G, Hawkins Dep. Tr. at 26:25-27:3, 27:18-23.

[64] Burwood Decl. Ex. D, FTI Initial Report at 59.

Q (BY MS. EWALD) And do you know if the co- -- the Bechtel multiplier was actually paid to the employee for his or her services?

A        I don't believe that multipliers are paid directly to the employee, other than -- than through the benefits and the other costs.  For example, you know, the 401 piece, they would -- if they were in the program, they would get that.  Their medical insurance, things like that.  So all the insurances, all the benefits that are provided are covered in the adds.

Again, I don't have the current breakdown of what Bechtel attracts in all of their markup services, but it's -- it's a cost.

Q        Is any portion of it profit?

A        No.

Q        And how do you know that, if you don't know what it is?

A        Well, I don't -- well, that's a good -- that's a really good point.  I don't know exactly, but I know that I didn't want any profit baked into the Continuing Services Agreement, which is why we updated it, because I only wanted costs going through to the customers.  And then Welded wasn't putting a markup on top of it either.[65]

Accordingly, at a minimum, there is a disputed issue of material fact regarding whether the Bechtel invoices for the seconded employees contained any profit component or were for wages and benefits.

In yet another alternative argument, Transco contends that the Bechtel costs were improperly billed because Welded outsourced the Work performed by the seconded employees.[66]  Transco points to Contract Section VIII, Article 2.D.5, which provides:

Contractor shall not subcontract or outsource the following scopes of work to a third party:

(i)  project management (including planning, scheduling and reporting);

---

[65]  Neiburg Decl. Ex. 6, Hawkins Dep. Tr. 26:25- 28:17.

[66]  As Welded points out, this position directly contradicts by Transco's own "Uncontroverted Material Fact" that "Bechtel provided Welded with seconded employees to act as 'Field Personnel' for Welded."  Transco Mot. Summ. J. at 24.

(ii) field supervision;

(iii) procurement and project controls (including, but not limited to: bidding of work, issuance of Subcontracts and management of Subcontractors and vendors);

(iv) Mainline production, including grading, welding, and backfilling excavation required for pipeline installation.[67]

Welded counters that the Bechtel personnel were expressly loaned into positions within Welded and were not subcontractors. Welded cites a Bechtel letter to Marcus Hood who served as a senior project manager on the Project. The letter states "[t]his is to confirm your assignment to Welded Construction . . . where you will serve as a loaned employee to Welded Construction."[68] Transco points to no facts in the record contradicting the agreements between Welded and Bechtel indicating that the Bechtel personnel were seconded employees to Welded. Based on the evidence cited by the parties, whether the Bechtel personnel were "subcontractors" or "outsourced" pursuant to Section VIII of the Contract or whether the Bechtel personnel became Welded's employees through the seconded arrangement is, at least, the subject of a material dispute of fact.[69]

Summary judgment on the Bechtel costs is denied.

---

[67] Contract, Section VIII, Article 2.D.5.

[68] Neiburg Decl. Ex. 27.

[69] Neither party discusses the definitions of "Subcontractor" or "Agency Personnel."

"Subcontractor" means any third party contracted by Contractor (excluding however Agency Personnel) to provide Work, services and/or equipment, materials, supplies or consumables to the Project. For the avoidance of doubt, the term "Subcontractor" includes third parties with whom Contractor has entered into leases or rental agreements for equipment, machinery and other project/construction items.

"Agency Personnel" means any individual or individuals who are hired through an agency and/or staffing agreement to supplement Contractor's work force.

Contract, Section VIII, Article 2. It is certainly within the realm of possibilities that the seconded employees are Agency Personnel. *See also* Neiburg Decl. Ex. 11 at Transco_00044877.

**Standby Equipment Costs ($6,095,894)**

It is undisputed that the Contract provides for Welded to receive compensation in the event personnel and equipment are placed on standby because of any delay in the commencement of the project.  Specifically,

> Work under this Contract is subject to Federal Energy Regulatory Commission processes and issuance of Contractor's "Notice to Proceed" (NTP) by Company. Company anticipates issuing the NTP to Contractor for: (i) "Hand-Felling Tree Crews" by February 1, 2017; and (ii) full mobilization of main line production crews by March 1, 2017.  The NTP date is subject to change based on regulatory approvals and events outside Company's control.  In the event the NTP for mobilization of main line production crews is delayed beyond March 1, 2017, Contractor shall be entitled to a change order for payment of Contractor's demonstrable costs associated with the NTP delay.  For purposes of this provision, "demonstrable costs" means Contractor's substantiated direct actual costs incurred due to NTP delay such as: Contract rates for personnel and equipment who are placed on stand-by as a result of NTP delay.  "Demonstrable costs" excludes, and Contractor shall have no claim against Company for any, Contractor Group damages or losses for: missed business opportunities, loss of business, loss of revenue, loss of profit and/or damages incurred, or claims, by any other client of Contractor in connection with or arising out of NTP delay. Once the delay is over, Contractor shall commence the Work in accordance with Company issued NTP.[70]

It is also undisputed that:

- Transco issued the Notice to Proceed on September 25, 2017;[71]

- Welded issued to Transco a series of invoices (including both estimations and actual) for standby costs for both personnel and equipment for the months of February through September, 2017;[72]

- after reconciliation of estimate to actual, the standby costs for equipment totaled $6,095,894;[73]

- Welded and Transco discussed the invoices and Transco paid them in full;[74]

---

[70] Contract, Section I, Article 26.

[71] Sztroin Decl. ¶ 9.

[72] Burwood Decl. Ex. T, Ex. D, FTI Initial Report at 12.

[73] Neiburg Decl. Ex. 15.

[74] Neiburg Decl. Exs. 11-16.

- when the cost estimate of the project was increased from $335,000,000 to $454,500,000, a standby equipment fee of $6,250,313 was included in the estimate.[75]

Transco now seeks summary judgment that it is entitled to recover the standby equipment fee because it was not "substantiated." Transco's argument (or at least the emphasis of it) seems to change from the Opening Brief to the Reply Brief. But, in essence, Transco argues that the invoices supplied by Welded (which Transco paid) are simply not enough substantiation. The spreadsheets supplied with the invoices described the equipment, stated the number of units, the number of days or months the equipment was on standby and the daily or monthly rate, as applicable.[76]

Neither party pointed me to a part of the Contract that identifies what is enough "substantiation" for standby equipment charges. But, given that (i) Transco paid the invoices, (ii) did not assert a claim for standby charges for equipment in either of its very detailed proofs of claim[77] and (iii) did not assert a claim for standby charges in its counterclaim, there is at least a dispute over whether the documentation provided was enough.

Summary judgment is denied.

## Post Petition Costs for Included Equipment ($2,338,549)

It is undisputed that post-bankruptcy Transco and Welded executed three Letter Commitments under which Welded agreed to perform Work on the Project and for

---

[75] Neiburg Decl. Ex. 4, Book Contract Amendment, Section VIII, Article 2.I, Ex. 8 at Transco_00757701.

[76] *See e.g.* Neiburg Decl. Ex. 15 at Transco_00022362; Neiburg Decl. Ex. 11 at Transco_00044875.

[77] *See* Proofs of Claim Nos. 632, 636.

estimated prepayments that totaled $8,050,000.[78]  It is also undisputed that: (i) Welded

invoiced Transco $7,875,000 for postpetition services which included an Equipment Fee of

$2,541,234 and (ii) the $2,541,234 charge is based on an actual cost and not on the flat fee

specified in the Contract, which is 50% of the Labor Costs of NPLA and Field personnel.[79]

The additional $175,000 invoiced appears to be for fixed overhead costs of $25,000 per

week, and is not the subject of Transco's motion.[80]

Relying on FTI's report, Transco contends that Welded overbilled Transco on two

fronts.  First, the use of actual cost rather than the flat Equipment Fee calculation resulted in

overbilling of $1,320,377.  Second, Transco contends that $1,117,692 invoiced was not

substantiated with documentation.[81]  As to the charge for equipment, Transco argues that

the Contract terms continued post-bankruptcy mostly relying on an inconclusive email

exchange and ignoring testimony to the contrary.  Welded contends that the Contract terms

were superseded by the three Letter Commitments (presumably, at least to the extent the

terms differed) and also relies on the testimony of Frank Pometti who was clear that he was

not going to enter into agreements that would create an administratively insolvent estate.

A review of the three Letter Commitments shows that they clearly changed the terms

of the Contract.  For example, in the second Letter Commitment, Transco agreed to pay

---

[78] Burwood Decl. Exs. W-Y.

[79] Specifically, "Equipment Fee means a flat fee calculated as 50% of Labor Costs payable for actual Work performed by all NPLA Personnel and Filed Personnel assigned to the project."  Contract, Section VIII, Article 2.

[80] *See* Burwood Decl. Ex. Y, third Commitment Letter n.2.

[81] These numbers are taken from the Opening Brief.  My addition shows that these two amounts total $2,439,069.  I cannot reconcile the difference of $102,154, but given my conclusion this is not an issue.

union dues and to directly pay certain subcontractors. Similarly, in the third Letter

Commitment, Transco agreed to pay all subcontractors, service providers and vendors for

the remaining agreed-to work. The third Commitment Letter also limited the remaining

work on the Project (as set forth above). Finally, part of the estimated cost Transco agreed

to pay Welded was for "fixed overhead costs of $25,000 per week from the Petition Date

through December 8, 2019, which amount shall be available to the Debtors for general use,

not subject to reconciliation, to offset the significant overhead costs not captured in the

project cost estimate."[82]

The Equipment Fee is not specifically mentioned in the Commitment Letters, but it

is clear that the cost estimates were to cover the cost of the Included Equipment. In fact, the

whole premise of the Commitment Letters is that Welded will do work post-petition as long

as its expense is covered. As the first Commitment Letter explains:

> During the phone call [on October 21, 2018] Welded indicated its plans to file for
> Chapter 11 bankruptcy protection in federal court in Delaware on October 22, 2018.
> Welded also requested pre-payment to cover Welded's internal costs and expenses of
> providing work, as well as Welded Third-party subcontractor, vendor, materialmen,
> and supplier costs, expenses, profit and invoices for work, labor, material and rentals
> (currently estimated to be $5,000,000) (the "Estimated Prepayment").[83]

Consistent with this premise, it is difficult (if not impossible) to understand the basis of the

Court approving an agreement that did not cover all postpetition costs and Transco offers

no explanation for such a result.[84] Further, by week three of the post-petition Work,

---

[82] Burwood Decl. Ex. Y, third Commitment Letter n. 2.

[83] Burwood Decl. Ex. W, first Commitment Letter 1.

[84] No party directed me to the first day motion filed to support entry of the Orders approving the
Letter Commitments or the representations to the Court regarding the benefit to the estate in
approving the Letter Commitments (and similar agreements with other parties).

Welded had provided a reconciliation to Transco of the week 1 Estimated Payment.  If Transco had any issue with the invoicing for the Equipment Fee, it should have raised the issue prior to execution of the third Commitment Letter.  There is no evidence that it did.  At the very least, therefore, there are material disputed facts.

Further, at the very least, there are disputed facts regarding the $1,117,692 of invoiced fees which Transco argues are unsubstantiated.  Transco's expert says no back-up was received,[85] but Welded's expert states that he understands that the support was provided at WELDED0631549 to WELDED0631982.[86]

Accordingly, summary judgment is denied as to the postpetition costs.

**Union Dues**

Transco seeks a summary judgment determination that it is not obligated to pay $2,767,729 to Welded for union dues.  Welded is not seeking to recover that amount.[87]

Summary judgment is granted in favor of Transco on this item.

Dated:  July 28, 2023

Laurie Selber Silverstein
United States Bankruptcy Judge

---

[85]  Burwood Decl. Ex. D, FTI Initial Report at 84.

[86]  Neiburg Decl. Ex. 19, Second Expert Report of Scott D. Gray, Ankura Consulting Group LLC at ¶ 99.  Transco's argument changed in its Reply Brief and it now wants summary judgment in the amount of $482,878.  Reply Brief 37.  As this was an argument it should have made in its Opening Brief and there is still some uncertainty regarding this amount, this too, will be left for trial.

[87]  Answering Brief 46.