## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WELDED CONSTRUCTION, L.P., et. al., | Case No. 18-12378 (LSS) |
| Debtors. | (Jointly Administered) |
| WELDED CONSTRUCTION, L.P., | |
| Plaintiff, | |
| v. | Adv. Pro. No. 19-50194 (LSS) |
| THE WILLIAMS COMPANIES, INC., WILLIAMS PARTNERS OPERATING LLC, and TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC., | |
| Defendants. | |

## OPINION

**Introduction**

    This is a multi-million dollar contract dispute arising out of the construction of a natural gas pipeline in the Commonwealth of Pennsylvania.  The contractor, Welded Construction, L.P. ("Welded" or "Debtor"), and the owner of the pipeline, Transcontinental Gas Pipe Line Company, LLC ("Transco"), each assert the other breached the construction contract and seek damages and penalties, as appropriate.  Debtor's claims are deceptively simple:  it billed for services performed and costs incurred under the contract and seeks the balance of unpaid invoices.  Transco asserts both that Debtor billed for items not compensable under the contract and that Debtor's poor

performance under the contract negates amounts owed.    Transco concludes that it, not Debtor, is the net winner.

After a ten-day trial, I am left to determine whether numerous categories of costs are compensable under the contract.    While certain categories can be determined as a legal matter by review of the contract, certain items require determinations of fact.    Having considered the evidence and the credibility of the witnesses presented both through testimony in court and by deposition designations, I make the following findings of fact and draw conclusions of law.

## I.    BACKGROUND[1]

### A.    *Transco Decides to Build a Pipeline*

Transco is a natural gas transmission pipeline company that constructs, maintains and operates pipelines across the country.    No later than May 2014,[2] Transco began planning the Atlantic Sunrise Pipeline Project ("ASR Project")—the construction of a 197 mile large-diameter intrastate natural gas pipeline running through the Commonwealth of Pennsylvania.[3]    This new pipeline would permit Transco to bring gas from the Marcellus Shale south to Transco's existing pipeline system.[4]

---

[1] This background contains my findings of fact as required by Federal Rule of Civil Procedure 52, made applicable by Federal Rule of Bankruptcy Procedure 7052.    Additional factual findings will be made when addressing specific disputes.

[2] Aug. 28, 2023 Trial Tr. (Sztroin) 1128:19–22.

[3] *See generally* D0007.0005.    The ASR Project contained several pipelines of varying lengths.    Aug. 28, 2023 Trial Tr. (Sztroin) 1130:9–11; D0007.0006.    For example, Welded's spreads were located on the Central Penn Line South, which had a total length of 128.3 miles.    Aug. 28, 2023 Trial Tr. (Sztroin) 1132:25–1133:2.

[4] Aug. 28, 2023 Trial Tr. (Sztroin) 1132:2–1133:7.

In May 2014, David Sztroin, Transco's Project Manager for the portion of the ASR Project known as the Central Penn Line South, was engaged in planning activities, including (1) selecting the route of the pipeline, (2) performing environmental analyses and gathering data from the field to obtain necessary permissions and permits, (3) working with and obtaining permission and permits to construct the pipeline from federal and state agencies such as the Federal Energy Regulatory Commission and the Pennsylvania Department of Environmental Protection and (4) securing easements from landowners.[5]

In June 2015, Transco hosted a full day pipeline job showing to which it invited approximately ten contractors capable of performing the required work.[6] An eighty-seven page slide presentation provided detailed drawings and specifications for the ASR Project and set out numerous permitting milestones culminating in the beginning of construction in July 2016 and an in-service date of July 2017.[7] For bidding purposes, the ASR Project was divided into seven spreads.[8]

Transco's pipeline job showing occurred at a time when domestic pipeline work was starting to pick up. In 2015 and 2016, the pipeline industry for both liquids and natural gas was very competitive in the northeast/Marcellus Shale region.[9] Large diameter pipeline work (over thirty-six inches), which was dormant in the United States for the prior ten years, provided significant opportunities for contractors and owners. But, the increased

---

[5] Aug. 28, 2023 Trial Tr. (Sztroin) 1128:20–1129:22.

[6] *See* Aug. 28, 2023 Trial Tr. (Sztroin) 1131:7–14.

[7] *See generally* D0007.

[8] D0007.0006.

[9] *See* Aug. 22, 2023 Trial Tr. (Hawkins) 59:8–17.

demand also created limitations on the equipment and labor fronts as all companies were pulling from the same pools.[10]

Welded was well positioned to take advantage of the abundance of work. It had fifty years of experience in the pipeline business, was centrally located in Ohio, had yards from Michigan to Pennsylvania and an experienced superintendent.[11] As most relevant here, Welded owned a fleet of equipment that could service large diameter pipeline construction in the United States.[12]

In the late summer, Welded received requests for construction proposals from two good customers: (1) the ASR Project from Williams Co. ("Williams"), Transco's parent company, and (2) a thirty-six inch pipeline project in Ohio from Spectra.[13] Welded submitted a proposal for both.[14] Welded's bid for the Spectra work was initially on a fixed price basis for two spreads.[15] When approached to bid on three spreads, which required commitment of more of Welded's equipment, Welded would only bid on the work on a cost-reimbursable plus fixed fee basis. Spectra eventually determined to move forward with

---

[10] Aug. 22, 2023 Trial Tr. (Hawkins) 59:8–61:16; Aug 23, 2023 Trial Tr. (Wall) 389:24–390; Kirchen Dep. 35:17–24, Dec. 14, 2020; *see* Springer Dep. 51:22–52:12, Dec. 3, 2020; Sztroin Dep. 35:14–36:4, Dec. 3, 2020.

[11] Aug. 22, 2023 Trial Tr. (Hawkins) 60:7–18.

[12] Aug. 23, 2023 Trial Tr. (Wall) 391:23–392:11; *see also* Kirchen Dep. 36:8–13, 36:22–37:7, 41:12–15, Dec. 14, 2020.

[13] Aug. 23, 2023 Trial Tr. (Wall) 390:5–14.

[14] Aug. 23, 2023 Trial Tr. (Wall) 390:15–18.

[15] Aug. 23, 2023 Trial Tr. (Wall) 391:1–7.

Welded on a two-spread, fixed price contract and the parties began to finalize documentation.[16]

In the meantime, Welded heard nothing from Williams on the ASR Project bid. It was not until November 2015, on the eve of signing the deal with Spectra, that Williams reached out to secure Welded's participation on the ASR Project.[17] Welded responded by detailing its current situation: (1) a meeting the following Monday to sign/accept the deal with Spectra, (2) the extremely high demand for Welded's fleet and (3) the need to reach a preliminary understanding on the ASR Project by that Friday afternoon. To facilitate meetings, Welded sent a draft letter of intent (contingent award) outlining the compensation terms it would require to work on the ASR Project, including a cost-reimbursable fixed fee structure and cash flow neutrality for Welded.[18] Transco returned a signed Letter of Intent to Rich Wall, Welded's then-CEO, on November 7, 2015 (the following Saturday).[19] Aside from changing certain dates, the only major change from the draft letter of intent is that the proposed contract party is Transco, not Williams.[20] Based on the signed Letter of Intent, Welded declined to go forward with Spectra.

---

[16] Aug. 23, 2023 Trial Tr. (Wall) 391:12–392:20.

[17] Aug. 23, 2023 Trial Tr. (Wall) 392:21–393:9.

[18] Aug. 23, 2023 Trial Tr. (Wall) 395:15–397:19; PX013.

[19] PX009; PX638. In a Motion in Limine, Transco objected to the use of parol evidence, arguing that the Contract is unambiguous and contains an integration clause such that looking beyond the four corners of the Contract is forbidden. Def. Transcontinental Gas Pipe Line Company, LLC's Mot. in Lim. to Exclude Parol Evid., ECF No. 349. At trial, Transco renewed its objection, specifically contesting the admission into evidence of the Letter of Intent to the extent it is used to interpret the Contract or determine the parties' intent. Aug. 23, 2023 Trial Tr. (Wall) 400:1–401:13. I overruled the objection because the Letter of Intent provides relevant background. To the extent that I look to this document to interpret the Contract, it will be because I find the Contract ambiguous on a disputed point. To be clear, this Motion in Limine is denied for these reasons.

[20] *Compare* PX013.0007–0010 *with* PX638.0003–07.

Per the Letter of Intent, Welded and Transco agreed to "use good faith efforts to reach a definitive agreement for the execution of the [ASR] Project based on the . . . principles" outlined therein.[21] Mr. Wall negotiated on behalf of Welded while Transco's Project Director, Chris Springer, led negotiations for Transco.[22] On August 10, 2016, Transco and Williams executed that certain contract for the construction of a pipeline on Spreads 5, 6 and 7 ("Original Contract"). The detailed 521-page document includes eight sections: Section I: General Contract, Section II: Scope of Work, Section III: Materials, Section IV: Environmental, Land and Permits, Section V: Drawings, Section VI: Codes, Standards and Specifications, Section VII: Technical Exhibits and Section VIII: Compensation. Welded and Transco worked together to establish deliverables, costs and a schedule.[23] Compensation to Welded and accompanying incentives are scaled to an all-in construction cost of $335 million.[24]

In 2018, the Original Contract was amended via a Book Contract Amendment (together, "Contract"). The Book Contract Amendment replaced in their entireties the Scope of Work and Compensation Sections, changed the listing of specifications in the Codes, Standards and Specifications Section and added numerous attachments to the Technical Exhibits Section.[25] The all-in cost estimate was updated to $454 million reflecting

---

[21] PX009.0002.

[22] Aug. 23, 2023 Trial Tr. (Wall) 405:6–23.

[23] Aug. 23, 2023 Trial Tr. (Hawkins) 266:18–267:3.

[24] JX001.0495.

[25] JX001.0529–857.

a revised cost estimate generated by Welded at the request of Transco and presented at an August 17, 2017 meeting.[26] This revised cost estimate is reflected in a new Exhibit 8 to the amended Compensation Section, which breaks down the costs by activity and spread.[27]

Broadly speaking, the Contract is a cost-plus reimbursable contract. Transco's key negotiators had not previously negotiated a cost-plus reimbursable contract.[28] Rather, Transco usually entered into unit rate-based or lump sum contracts.[29] Nonetheless, Transco understood this type of contract and the risks associated with it. As Mr. Kirchen, Transco's most senior person with responsibility for negotiating the contract,[30] explained: a cost-plus reimbursable contract means "they [sic] are costs that are compensated, and the plus side is the profit portion."[31] Such a contract allows the owner to "secure resources earlier . . . before you have final design and final permit authorizations."[32] However, it also allocates to the owner the risk that costs will exceed expectations.[33]

B.   *Welded Begins Work on the ASR Project*[34]

---

[26] Aug. 24, 2023 Trial Tr. (Hood) 522:17–523:10, 526:17–527:6; PX121; JX001.0836.

[27] JX001.0845.

[28] *See, e.g.*, Kirchen Dep. 20:2–6, Dec. 14, 2020; Springer Dep. 43:1–10, Dec. 3, 2020.

[29] *See, e.g.*, Kirchen Dep. 20:7–18, Dec. 14, 2020; Springer Dep. 43:1–18, Dec. 3, 2020.

[30] Kirchen Dep. 26:19–24, Dec. 14, 2020.

[31] Kirchen Dep. 24:3–10, Dec. 14, 2020.

[32] Kirchen Dep. 32:8–15, Dec. 14, 2020.

[33] Aug. 29, 2023 Trial Tr. (Sztroin) 1312:10–12; Springer Dep. 53:15–54:10, Dec. 3, 2020.

[34] "Work" is a defined term in the Contract. It means "the entire construction project and/or parts thereof that are to be performed by Contractor pursuant to this Contract, including its appendices." JX001.0009. In this Opinion, I use the term work more generically unless it is capitalized.

1. Pre-Construction

The first phase of the construction of the pipeline is a pre-construction period as documented in that certain Request for Services ("RFS").[35] From September 15, 2016 through August 31, 2017, Welded conducted pre-mobilization work, including "construction planning, community outreach, design and material procurement assistance, and/or other services as requested by the ASR Project team."[36] Payment for pre-construction services is to be made pursuant to the RFS, not the Contract. Much of the planning had already been done by Williams/Transco, including the planned route, anticipated environmental impacts and the estimates of rock in each area.[37] Welded's role was primarily planning the execution of the project.[38]

The second phase of the construction is the mobilization period—the period in which resources are deployed to the Field to be available for the start of construction work. Welded cannot mobilize resources to the Field without Transco's authorization.[39] Welded sought Transco's authorization on or about August 10, 2017."[40]

---

[35] D0025. The RFS was signed by Welded on March 23, 2017 and by Transco on April 5, 2017, with an effective date of September 15, 2016. The RFS incorporates an earlier agreement (Agreement No. 300686 with an effective date of November 29, 2007). This earlier agreement is not attached nor did either party ask to have it admitted into evidence separately.

[36] D0025.0003.

[37] Aug. 28, 2023 Trial Tr. (Sztroin) 1128:23–1129:17; Kirchen Dep. 91:5–9, Dec. 14, 2020.

[38] *See* Aug. 24, 2023 Trial Tr. (Hood) 561:13–562:5, 615:2–8, 630:23–631:7.

[39] JX001.0828 ("Contractor shall not mobilize personnel, equipment and/or resources to the Worksite without prior express authorization from Company.").

[40] *See* D0285.0001. *But see* Aug. 24, 2024 Trial Tr. (Hood) 649:7–21.

Additionally, prior to beginning Work on the ASR Project, Transco must issue a Notice To Proceed ("NTP").[41] The parties anticipated the NTP would issue and mobilization would begin by February 1, 2017 for tree felling work and March 1, 2017 for full mobilization of mainline construction crews.[42] These dates assumed required regulatory approvals would be received by that time.[43] Instead, Transco did not receive FERC clearance to proceed on the ASR Project until September 15, 2017 and did not complete pre-construction meetings with Pennsylvania County Conservation Districts until September 22, 2017.[44] Accordingly, Transco did not issue the Restricted Notice to Proceed on the ASR Project until September 25, 2017.[45] As a consequence of the later start date, the revised target Mechanical Completion[46] date was moved from October 6, 2017 to June 14, 2018.[47]

### 2. Welded's Team

Welded required significant personnel to perform the Contract. Welded's team was led by Marcus Hood, the Senior Project Manager, who reported directly to Steve Hawkins,

---

[41] JX001.0027.

[42] JX001.0027.

[43] The Letter of Intent anticipated a start date of between October 1, 2016 and January 1, 2017 because regulatory approvals were anticipated to be received at that time. *See, e.g.*, PX009.0002; Kirchen Dep. 44:11–46:4, Dec. 14, 2020.

[44] PX135; D0394.0005–06; *see, e.g.*, Kirchen Dep. 45:17–47:22, Dec. 14, 2020.

[45] PX135.

[46] The Mechanical Completion date is "the date which all equipment has been set in place and aligned, all welding and tie-ins are complete, the pipe has been installed and hydrotested, caliper pigs have been run, and the pipeline is ready to receive gas." JX001.0531.

[47] *Compare* JX001.0495 *with* JX001.0835.

Welded's President and Chief Executive Officer during the relevant time period.[48]  Mr.
Hood directed the project management team for the ASR Project.  In this capacity, he
supervised the project controls manager, the project safety manager, the project quality
manager and the project contracts manager.[49]  Additionally, Mr. Hood supervised lower-
level project managers, quality managers and safety managers at each spread that reported
to the project management team.[50]  The project controls manager had primary responsibility
for cost reporting and invoicing.[51]  This position was staffed by James Grindinger from
February 2017 until January 2018.[52]  Following Mr. Grindinger's departure, Sean Singleton
assumed the role.[53]  Under the project controls manager, a team led by Mary Lynn Murphy
and Sue Hallowell was responsible for invoicing Transco and providing appropriate backup
documentation.[54]  Spread superintendents assisted cost engineers in the invoicing process.[55]

 Welded staffed the ASR Project with either direct employees or individuals obtained
through an outside source.  The Contract specifically contemplates that Welded can use
Agency Personnel (i.e., individuals hired through an agency or a staffing agreement) to

---

[48] Aug. 22, 2023 Trial Tr. (Hawkins) 48:21–25, 52:5–9; Hood Dep. 23:16–18, Dec. 14, 2020.  Sandy
Williams was the original Project Manager, but he left Welded in June or July of 2017.  Grindinger
Dep. 21:13–22:5, Dec. 14, 2020.

[49] Hood Dep. 22:13–23:8, Dec. 14, 2020.

[50] Aug. 24, 2023 Trial Tr. (Hood) 515:6–20.

[51] Hood Dep. 27:6–20, Dec. 14, 2020.

[52] Grindinger Dep. 15:17–24, Dec. 14, 2020.

[53] Hood Dep. 30:11–17, 31:24–32:1, Dec. 14, 2020.

[54] Aug. 23, 2023 Trial Tr. (Hawkins) 245:22–246:7; Aug. 25, 2023 Trial Tr. (Hood) 744:13–20;
Grindinger Dep. 30:2–8, 86:14–87:19, Dec. 14, 2020.

[55] Aug. 24, 2023 Trial Tr. (Hood) 650:24–651:19.

supplement its work force.[56] As Mr. Wall testified, Welded is a "project company,"
meaning that as it takes on projects, it hires more personnel.[57]

Additionally, the ASR Project was a union job with work performed by "craft" labor
covered by four National Pipe Line Agreements (each a "Union Agreement" and
collectively "Union Agreements") negotiated between the Pipe Line Contractors
Association (on behalf of its contractor members) and the unions for truckers, plumbers and
pipe fitters, operating engineers and laborers.[58] The Union Agreements contain the benefits
and conditions of labor and are specifically incorporated into the Contract as are individual
Pre-Job Conference agreements for each of the three spreads, negotiated between Welded
and union representatives of each union.[59] These unions supplied the labor for the ASR

---

[56] JX001.0827 ("'Agency Personnel' means any individual or individuals who are hired through an
agency and/or staffing agreement to supplement Contractor's work force."). Agency Personnel are
also contemplated within the definitions of Field Personnel and Home Office Personnel.
JX001.0826.

[57] Aug. 23, 2023 Trial Tr. (Wall) 389:2–14.

[58] The four Union Agreements are: (1) International Brotherhood of Teamsters Union Agreement
(JX001.0860–85), (2) The United Association of Journeymen and Apprentices of the Plumbing and
Pipe Fitting Industry of the United States of America Union Agreement (JX001.0886–958), (3) The
International Union of Operating Engineers Union Agreement (JX001.0959–1000) and (4) The
Laborers International Union of North America Union Agreement (JX001.1001–33). *See also* Aug.
22, 2023 Trial Tr. (Hawkins) 69:1–8; Kirchen Dep. 49:9–17, Dec. 14, 2020.

[59] JX001.0825–26:
    The "NPLA" means collectively, or individually (as context requires), the effective
    National Pipeline Agreement between the Pipeline Contractors Association and: (i)
    the Laborers' International Union; and/or (ii) the International Brotherhood of
    Teamsters; and/or (iii) the United Association of Journeymen; and/or (iv)
    Apprentices of the Plumbing and Pipe Fitting Industry and the International Union of
    Operating Engineers. Reference to "NPLA" also includes (i) any written
    amendment(s) thereto; and/or (ii) project specific written agreements between
    Contractor and the aforementioned unions which result from the "Pre-Job
    Conference."

Project from the clearing and grading, to trenching and preparation, to laying the pipe, welding the pipe and restoration.[60]

Transco holds approval power over Key Personnel: Superintendent, Project Manager, Environmental Coordinator and Project Safety Manager.[61]  And, it has the right to force Welded to remove any individual whom Transco believes lacks the skill to do the necessary Work on the ASR Project.[62]  Transco also has the right to review any Pre-Job Conference agreement.[63]

Welded's team was generally stationed in one of three locations.  Welded's home office is in Perrysburg, Ohio.[64]  During the ASR Project, Welded also maintained a Field headquarters in Mt. Joy, Pennsylvania, close to Spread 7.[65]  It also had Field offices on each spread.[66]

---

[60] *See, e.g.*, Aug. 22, 2023 Trial Tr. (Hawkins) 54:11–24 (describing the work encompassed by the Contract), 69:1–3 (acknowledging that union labor is the primary source of labor for Welded).

[61] JX001.0829–30.

[62] JX001.0024:
> In accordance with Company's quality control program, Company maintains the right to require that Contractor remove from the Work, any individual who, in Company's sole discretion, lacks the skill and/or care to perform acceptable Work.  With respect to welding, Company shall not require that Contractor remove any welder for quality of workmanship issues unless or until Contactor has been notified of such quality issues and has been given three (3) opportunities to correct such quality issues ("3 Strike Rule").

[63] JX001.0835 ("Company shall have the right to review any Pre-Job Conference agreement.").

[64] *See* Aug. 22, 2023 Trial Tr. (Hawkins) 60:11–13.

[65] Aug. 22, 2023 Trial Tr. (Hawkins) 58:9–23; Aug. 23, 2023 Trial Tr. (Hood) 439:18–21.

[66] Aug. 22, 2023 Trial Tr. (Hawkins) 58:9–23.

3. Transco's Team

Transco actively managed the Work performed by Welded.  It, too, had a team of construction managers working in the Field under Chris Springer, Transco's Project Director.[67]  Mr. Springer oversaw the entire ASR Project, but rarely visited the Field.[68] David Sztroin, the Project Manager for the Central Penn South Pipeline, reported to Chris Springer.[69]  David Sztroin was based in Houston, Texas, but he made frequent trips to the Field.[70]

Colby Pew served as Transco's senior construction manager on Spreads 4 through 7.[71]  Mr. Pew hired an inspection staff and he and the staff "work alongside the contractor, to make sure the contractor is adhering to all our specs and expectations."[72]  Mr. Pew was in the Field three to four days a week.[73]  On those days, he held daily morning meetings with his team and they would drive around the Field as needed.[74]  LaDonna Rothgeb led a team of field accountants who performed monthly invoice reviews.[75]  Contract support for the

---

[67] Springer Dep. 30:11–17, Dec. 3, 2020; Aug. 28, 2023 Trial Tr. (Sztroin) 1129:23–1130:23.

[68] Springer Dep. 34:13–15, Dec. 3, 2020.

[69] Aug. 28, 2023 Trial Tr. (Sztroin) 1124:24–1125:1; Springer Dep. 23:10–18, 32:6–9, Dec. 3, 2020; Kirchen Dep. 25:8–15, Dec. 14, 2020.

[70] Springer Dep. 38:13–19, Dec. 3, 2020.

[71] Aug. 28, 2023 Trial Tr. (Sztroin) 1130:12–18; Aug. 30, 2023 Trial Tr. (Pew) 1481:15–24.

[72] Aug. 30, 2023 Trial Tr. (Pew) 1482:2–9.

[73] Aug. 30, 2023 Trial Tr. (Pew) 1483:6–11.

[74] Aug. 30, 2023 Trial Tr. (Pew) 1484:22–1485:9.

[75] Sztroin Dep. 63:4–24, Dec. 3, 2020; Aug. 28, 2023 Trial Tr. (Sztroin) 1164:12–1165:6.

ASR Project was provided by Tina Malone from Williams's contracting department.[76]  And, Transco had a quality control team led by Gerry McLaughlin, whose team would periodically audit the construction.[77]

To oversee the ASR Project, Transco acquired two Field offices in Pennsylvania.  It rented office space in Lancaster to oversee Spread 7 and in Pine Grove to oversee Spreads 5 and 6.[78]  Between the two Field offices, Transco deployed around 100 personnel.[79]

4.  Regular Meetings/Reporting

Welded and Transco engaged in regular meetings throughout construction.  For example, Welded executives met with Transco executives monthly in Houston for a high-level discussion of the ASR Project.[80]  At these meetings, Welded provided actual cost updates and updated cost forecasts, and the parties discussed the construction schedule, resources, production and manpower.[81]

---

[76] Aug. 28, 2023 Trial Tr. (Sztroin) 1140:20–25.

[77] Aug. 28, 2023 Trial Tr. (Sztroin) 1261:22–1262:10.

[78] Sztroin Dep. 76:11–77:3, Dec. 3, 2020.

[79] Sztroin Dep. 78:5–13, Dec. 3, 2020; see also Aug. 30, 2023 Trial Tr. (Pew) 1482:10–17:
   Q:  Okay.  Who were your primary – who primarily reported up to you for this project?
   A:  It kind of tiered as myself and then I hired two other construction managers that are not Williams-related, and then, beneath them, there's a chief, and one other CM had two other chiefs; and below them we do environmental leads, welding leads, utility leads, and they each have a group of people beneath them.

[80] Aug. 22, 2023 Trial Tr. (Hawkins) 79:23–80:21; Kirchen Dep. 60:23–61:15, Dec. 14, 2020.

[81] Aug. 22, 2023 Trial Tr. (Hawkins) 81:12–82:10.

At lower levels, Welded's project management team submitted weekly progress reports updating Transco on actual work versus planned work for the week.[82] Welded's Field team also met weekly with Transco's project team.[83]

    5. Construction

The order of the Work is mapped out in Section VIII Exhibit 9—the Baseline Construction Schedule—that anticipates construction beginning on October 2, 2017 with the issuance of the NTP.[84] Broadly speaking, the Work consists of clearing and grading the site, excavating, laying the pipe, welding, backfilling and restoration.

The Baseline Construction Schedule set a Mechanical Completion date of June 14, 2018 and a final completion date of September 11, 2018.[85] Mechanical Completion occurs when construction is complete and the pipeline is able to receive gas.[86] Final completion is achieved when all Work has been completed, including all cleanup and restoration work.[87]

As noted, Transco issued the NTP on September 25, 2017, which was one week earlier than the anticipated start date of October 2, 2017.[88] Upon receipt of the NTP, Welded began to mobilize Field Personnel and Union Personnel to begin Work.

---

[82] Aug. 22, 2023 Trial Tr. (Hawkins) 79:23–80:8; Aug. 25, 2023 Trial Tr. (Hood) 794:24–795:3; *see* D1530 (weekly progress report dated September 23, 2018).

[83] Aug. 22, 2023 Trial Tr. (Hawkins) 79:23–81:2; Aug. 24, 2023 Trial Tr. (Hood) 539:21–540:15.

[84] JX001.0846–58.

[85] JX001.0846.

[86] JX001.0531.

[87] *See* JX001.0836–37 (distinguishing final completion from Mechanical Completion).

[88] PX135.

Two different types of crews were used to lay and weld the pipe.[89] The mainline crew on each spread consists of welders and the pipelaying heavy equipment employed by them. This crew goes systematically along the pipeline like a moving assembly line and is the most productive and efficient part of the assembly welding process.[90] As the mainline crew progresses, areas requiring crossing or bending of pipe may arise; the mainline crew keeps going, leaving these sections of pipe unwelded.[91] Following behind the mainline crews are smaller tie-in crews, consisting of different welders and the equipment they employ for this special purpose.[92] These smaller crews join the pipeline sections that were left undone by the mainline crew.[93] Welded planned for 2,641 tie-in welds, but the amount of tie-in welds increased to 2,944 over the course of construction.[94]

The ASR Project encountered delays throughout. Welded cites to winter weather, poor working conditions and additional environmental requirements, which were acknowledged by Mr. Springer.[95] Additionally, delay occurred when Transco's imaging expert rejected proper welds, requiring rework by Welded.[96] Transco cites to Welded's low productivity and lack of planning. Regardless, eventually, Mr. Sztroin instructed Welded to

---

[89] Aug. 23, 2023 Trial Tr. (Hood) 336:15–338:5.

[90] Aug. 23, 2023 Trial Tr. (Hood) 336:22–337:4.

[91] Aug. 23, 2023 Trial Tr. (Hood) 337:4–13.

[92] Aug. 23, 2023 Trial Tr. (Hood) 337:17–22.

[93] Aug. 23, 2023 Trial Tr. (Hood) 337:17–338:5.

[94] Sept. 6, 2023 Trial Tr. (Triche) 1965:13–1966:16.

[95] PX648.0022; Aug. 30, 2023 Trial Tr. (Sztroin) 1376:11–1377:18; *see also* Kirchen Dep. 84:13–86:9, Dec. 14, 2020.

[96] PX648.0022; *see also* Kirchen Dep. 73:3–19, Dec. 14, 2020.

increase the number of tie-in crews to speed up the work pace.[97]  Mechanical Completion was finally achieved on September 19, 2018.[98]

### 6. Safety

The Contract requires timely reporting of safety incidents.  It also provides for a reduced incentive payment if Welded's safety record is below stated standards.[99]  Every morning, the construction crews would discuss the potential safety issues for that day.[100] And, when Welded and Transco leadership met, safety was often the first topic of discussion.[101]  During the project, Welded incurred safety incidents, including "near miss" incidents; at times, Welded stopped work for supplemental training.[102]  While Transco could issue stop work notices for repeated, wilful or unaddressed safety concerns, no stop work notices were issued.[103]  Ultimately, Welded's safety record fell within the allowable range.[104]

### C.  The Dispute Emerges

### 1. The Invoices/Payment

---

[97] Aug. 24, 2023 Trial Tr. (Hood) 572:15–573:11; *see also* Aug. 30, 2023 Trial Tr. (Sztroin) 1388:2–14.

[98] *See, e.g.*, Aug. 24, 2023 Trial Tr. (Hood) 577:4–5.

[99] JX001.0842–44.

[100] Aug. 30, 2023 Trial Tr. (Pew) 1530:3–13.

[101] Aug. 22, 2023 Trial Tr. (Hawkins) 80:22–81:21.

[102] *See, e.g.*, Aug. 29, 2023 Trial Tr. (Sztroin) 1187:2–25; Aug. 30, 2023 Trial Tr. (Pew) 1526:10–25.

[103] JX001.0019, 0080.  Notwithstanding Transco's general testimony attempting to paint the picture of an unsafe work environment, it did not introduce any stop work notices into the record, or at least it did not point the Court to any such evidence.  *See* Transco's Post-Trial Br. in Supp. of Its Claims and Defenses against Welded 49–50, ECF No. 435 ("Transco Br.").  Further, Transco's expert is unaware of any stop work notices. Sept. 6, 2023 Trial Tr. (Slavis) 1884:5–16.

[104] Aug. 28, 2023 Trial Tr. (Kakol) 964:18–965:15.  *See also* Sept. 6, 2023 Trial Tr. (Triche) 2005:18–2006:2.  Transco asserted no claim or defense based on the Safety Modifier.

In general, Welded billed Transco for services provided under the Contract on the fifth of the month.[105] The invoices contain two distinct parts. First, the invoices contain a Cash Call component, which is Welded's good-faith estimate of the cost of the Work for the ensuing month.[106] Second, the invoices provide a reconciliation (or true up) for the actual services provided two months prior. The reconciled amount is then netted (positive or negative) against the current Cash Call to arrive at the amount owed that month.[107] The invoices also seek payment of a portion of the Fixed Fee.[108]

The chart immediately below lists the invoices issued by Welded under the Contract.[109]

| Invoice Number | Invoice Date | Cash Call Amount | Reconciliation Amount | Net Invoice Amount |
|---|---|---|---|---|
| 2017-0109 | Sep-1-2017 | $ 17,865,073 | $          0.00 | $ 17,865,073 |
| 2017-0111 | Oct-5-2017 | $ 43,839,870 | $          0.00 | $ 43,839,870 |
| 2017-0113 | Oct-30-2017 | $  6,553,428 | $          0.00 | $  6,553,428 |
| 2017-0114 | Nov-6-2017 | $ 77,840,815 | $          0.00 | $ 77,840,815 |
| 2017-0115 | Dec-8-2017 | $ 74,203,035 | $  4,196,247 | $ 78,399,282 |
| 2017-0116 | Jan-5-2018 | $ 72,865,820 | $  1,086,079 | $ 73,951,899 |
| 2017-0117 | Feb-5-2018 | $ 95,090,514 | ($ 4,104,287) | $ 90,986,227 |
| 2017-0118 | Mar-5-2018 | $ 77,332,863 | $    179,753 | $ 77,512,616 |

[105] *See* JX001.0042 ("Contractor will invoice Company each month, and deliver to Company on the fifth (5) day of the month for funds forecast to be required for the following calendar month[.]").

[106] Aug. 23, 2023 Trial Tr. (Hood) 468:2–15; *see also* JX001.0042.

[107] Aug. 23, 2023 Trial Tr. (Hood) 468:16–469:2.

[108] The Fixed Fee is a lump sum of $50,500,000 covering overhead, management, profit and costs related to Home Office Personnel. JX001.0825; *see also* JX001.0041 ("Ninety percent of Contractor's Fee shall be divided into equal installments and paid in equal installments between the Initial invoice and subsequent invoices until 90% of the total fee has been paid."); Aug. 24, 2023 Trial Tr. (Hood) 503:8–504:1 (describing cost categories in each invoice, including the Fixed Fee).

[109] JX030, JX034, JX060, JX067, JX068, JX071, JX085, JX102, PX124, PX140, PX151, PX182, PX192, PX207, PX329, PX394 (Welded's monthly invoices).

| 2017-0119 | Apr-5-2018 | $ 73,665,244 | ($ 3,626,483) | $ 70,038,761 |
| 2017-0120 | May-5-2018 | $ 79,380,375 | ($16,327,709) | $ 63,052,666 |
| 2017-0121 | Jun-5-2018 | $ 52,277,395 | ($ 5,321,722) | $ 46,955,673 |
| 2017-0122 | Jul-5-2018 | $ 36,407,002 | ($ 8,879,802) | $ 27,527,199 |
| 2017-0122 | Jul-5-2018 | $        0.00 | $         0.00 | ($10,000,000) |
| 2017-0123 | Aug-5-2018 | $ 21,273,616 | $  3,523,193 | $ 24,796,808 |
| 2017-0124 | Sep-5-2018 | $ 20,208,530 | $  7,155,287 | $ 27,363,816 |
| 2017-0125 | Oct-5-2018 | $ 12,797,451 | $ 16,592,432 | $ 29,389,883 |
| 2017-0126 | Mar-4-2019 | $        0.00 | $ 17,440,393 | $ 17,440,393 |
| 2017-0127 | Mar-4-2019 | $        0.00 | $ 13,713,656 | $ 13,713,656 |
| Subtotal – Pre-Petition Period | | $761,601,028 | $ 25,627,037 | $777,228,065 |

Payment is due on the fifth of the following month.[110]  In this fashion, Welded is not advancing funds for Work on the Contract; Transco is fronting costs.[111]

Transco paid the first nine invoices in full and on time.  Then, on June 5, 2018, Transco short-paid Welded's invoice dated May 5, 2018.[112]  Transco informed Welded that it had run out of budgeted funds and needed to seek approval from its executive management before it could make further payments.[113]  On July 3, 2018, Transco sent two nearly identical letters to Welded paying the balance of the short-paid invoice and stating that future payments would be made "under protest" because of "(1) Welded's failure to meet expectations on productivity, work quality, and safe work practice; (2) questions and

---

[110]  JX001.0042 ("On or before the fifth (5) day of the Pay Month, Company will pay Contractor the undisputed amounts invoiced.").

[111]  Aug. 22, 2023 Trial Tr. (Hawkins) 64:10–14 (describing the Contract's cash-flow neutrality for Welded).

[112]  Aug. 22, 2023 Trial Tr. (Hawkins) 83:10–18.

[113]  Aug. 22, 2023 Trial Tr. (Hawkins) 83:19–84:14.  *See also* PX648.

concerns about the accuracy of billing and Welded's compliance with contract obligations; and (3) uncontrolled growth in Welded's estimated cost of completion."[114]

Transco also delayed payment of Welded's July 5, 2018 invoice. The invoice reflects a $2 million deduction toward the $10 million Cost Incentive Penalty Welded acknowledged was owed under the Contract.[115] Notwithstanding an apparent agreement for payment over five months, Transco deducted the full $10 million Cost Incentive Penalty and paid the remainder of the invoice.[116]

Then, on October 4, 2018, Transco sent Welded a letter announcing the withholding of $23,563,538 from the September 2018 invoice.[117] Transco asserted that Welded had billed for fees and costs in excess of those permitted under the Contract and that Welded owed Transco a penalty under the Incentive Program for failure to achieve Mechanical Completion on June 14, 2018. Transco paid only $3,800,278.46 of the September 5, 2018 invoice. That was Transco's last payment for prepetition Work on the ASR Project.

2. The Dispute Resolution Process

The Contract establishes a dispute resolution mechanism. If Transco disputes any portion of an invoice, the parties are to "work diligently" to resolve the dispute prior to the invoice due date. If not resolved by that time or within ten business days after, the dispute is to be "immediately escalated to senior management for a discussion as soon as reasonably

---

[114] D1296; *see also* PX282.0002–03.

[115] *See infra* for a discussion of the Incentive Plan.

[116] *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, Adv. Pro. No. 19-50194, 2023 WL 4853146, at *5–6 (Bankr. D. Del. July 28, 2023), ECF No. 394 (granting summary judgment in favor of Transco; determining that Welded had incurred a $10 million Cost Incentive penalty).

[117] JX094.

possible."[118] If the matter is still not resolved after escalation, the parties are to consider, in good faith, whether an alternative dispute resolution method could resolve the matter rather than litigation.[119]

The October 4, 2018 letter states the withholding of $23,563,538 is "in accordance with" the Contract's audit provision (*see infra*), Section VIII and Appendix G of the Contract.[120] But, while Transco field accountants asked for additional backup information for the reconciliation portion of certain invoices (and some may have remained outstanding),[121] no evidence was submitted that Transco was dissatisfied with the additional materials eventually supplied or that documentation was overall lacking. Further, Transco did not identify any specific items improperly billed or escalate any invoicing disputes to senior management for discussion prior to sending the October 4, 2018 letter.

### 3. The Audit

Separate and apart from the Dispute Resolution procedures in Appendix G, the Contract provides audit rights to Transco. Specifically, the Contract contemplates a three-year period after completion of the Contract for audit of expenses charged other than fixed rates, unit rates or similar amounts agreed to by the parties.[122]

---

[118] JX001.0042.

[119] JX001.0042.

[120] JX094.0002.

[121] For example, Transco's field accountants completed their audit of the October 2017 reconciliation invoice in February 2018 and requested "clarification or justification" for certain issues. D1057.0008–09. Transco's field accountants continued to review reconciliation invoices and submit discovered discrepancies to Welded for clarification or justification. *See* D1059; D1108; D1251. Welded's responses to these discrepancies were not immediately forthcoming, with October 2017 discrepancies still outstanding in July 2018. D1291.

[122] JX001.0030:

Mr. Kirchen made the decision to conduct an audit "early on" because the Contract was a cost-plus fixed fee contract.[123] He viewed it as part of "risk mitigation."[124] Transco retained Oil & Gas Consultant Services ("OGCS") in March or April of 2018 to perform what OGCS described as an invoice verification exercise ("Audit").[125] OGCS began by reviewing the Contract and invoices and speaking with Transco employees in its Field offices.[126] OGCS originally reported to Transco's business side, but after a preliminary audit update, Transco's legal department began to oversee the Audit.[127]

Welded was informed of Transco's intention to conduct an audit through OGCS in July 2018.[128] Following a virtual introduction, Adrian Green and Phil Burke, OGCS auditors, visited the Welded Field offices on July 24 and 25, 2018.[129] Welded's CEO

---

Company may audit or have audited and copy the books and records of Contractor that in any way relate to this Contract upon reasonable notice during normal work hours. When requested by Company, Contractor shall provide auditors with access to all personnel, property and records and the cooperation of Contractor's personnel necessary for audit. Contractor shall retain all books and records relating to the Work for at least three (3) years after Company's final acceptance of the Work. Nothing herein is to be deemed as authorization to audit the composition of any fixed rate, unit rate or similar fixed figure as agreed upon by the parties. Contractor shall include identical audit provisions in its contracts with subcontractors and, upon request of Company, shall secure equivalent rights and information from any subcontractors. Any adjustments to be made as a result of audit shall be made within reasonable amount of time (not to exceed 90 days) from presentation of findings to Contractor.

[123] Kirchen Dep. 148:2–6, Dec. 14, 2020.

[124] Kirchen Dep. 145:1–14, Dec. 14, 2020.

[125] See, e.g., Kirchen Dep. 151:11–14, Dec. 14, 2020; see Burke Dep. 17:24–18:12, 41:8–17, 282:17–23, Dec. 17, 2020.

[126] Burke Dep. 84:10–86:18, Dec. 17, 2020.

[127] Kirchen Dep. 146:16–20, Dec. 14, 2020; Burke Dep. 125:11–15, Dec. 17, 2020; PX276.

[128] Aug. 22, 2023 Trial Tr. (Hawkins) 104:13–105:11; see PX294.

[129] Aug. 22, 2023 Trial Tr. (Hawkins) 105:25–107:15.

instructed his employees to cooperate "[t]ransparently, fully, [and] fulsomely."[130]
Notwithstanding the significant work OGCS had already performed, OGCS intended to
(and did) show a "low level of contractual awareness" to Welded at that meeting.[131] For
several weeks after this in-person meeting, OGCS auditors met virtually with Welded
employees on a weekly basis.[132]

     An interim report was provided to Transco on August 22, 2018.[133] In September
2018, Transco internally decided to withhold monies from Welded allegedly based on the
audit findings.[134] The October 4, 2018 letter followed.

     On October 11, 2018, an executive meeting occurred between Mr. Hawkins and Mr.
Wall (as a representative of Bechtel, Welded's parent company) for Welded and Mr.
Kirchen and Mr. Springer for Transco.[135] Nothing was resolved.[136]

     On October 16, 2018, OGCS orally presented its audit findings to Welded and
Transco.[137] Following this presentation, Welded requested a copy of the audit findings, but
Transco did not provide it.[138]

---

[130] Aug. 22, 2023 Trial Tr. (Hawkins) 107:16–19.

[131] Burke Dep. 116:6–10, Dec. 17, 2020; Green Dep. 162:20–163:16, Dec. 18, 2020.

[132] Green Dep. 50:15–51:17, Dec. 18, 2020; *see* Aug. 24, 2023 Trial Tr. (Hood) 576:13–577:3.

[133] Green Dep. 217:23–218:16, Dec. 18, 2020.

[134] Goebel Dep. 40:1–16, Mar. 24, 2022.

[135] Aug. 22, 2023 Trial Tr. (Hawkins) 151:10–152:2.

[136] *See* Aug. 23, 2023 Trial Tr. (Wall) 411:14–23.

[137] Burke Dep. 224:12–225:21, Dec. 17, 2020; Green Dep. 48:4–49:8, Dec. 18, 2020.

[138] Green Dep. 229:4–230:24, Dec. 18, 2020.

OGCS gave its final audit report to Transco on June 1, 2019.[139]  OGCS concluded that even if Transco succeeded on each challenged item, Transco would still owe Welded $8 million; otherwise it could owe Welded up to $66 million.[140]  Notwithstanding the audit provision in the Contract, Transco did not present OGCS's final audit findings or report to Welded until required discovery in this case.

    4.  The Oklahoma Lawsuit

On October 4, 2018—the same day it sent its withholding letter—Transco sued Welded for breach of contract in Oklahoma state court.[141]  Welded was unaware of any impending lawsuit because Transco did not follow the Contract's dispute resolution mechanism.  Further, there is no evidence that Transco "worked diligently to resolve" the disputed costs prior to the payment date.[142]  The October 4 letter is also the first evidence that Transco sought to escalate any disputed costs to senior management.  Transco did not wait until the failure of the requested senior management discussions before filing its lawsuit in Oklahoma.[143]  Further, there is no evidence in the record to support the idea that Transco gave "good faith consideration" to engaging in alternative dispute resolution methods.[144]

    *D.  Welded Files Its Bankruptcy Case*

    1.  The Postpetition Contracts

---

[139] *See* Green Dep. 44:24–47:22, Mar. 10, 2022.

[140] Green Dep. 132:13–134:19, Mar. 10, 2022.

[141] Aug. 22, 2023 Trial Tr. (Hawkins) 131:7–15, 139:2–4.

[142] *Compare* JX001.0042 *with* JX094.

[143] *Compare* JX001.0042 *with* PX400.

[144] JX001.0032.

Welded filed a voluntary bankruptcy petition on October 22, 2018. Following the filing, Welded, now a debtor-in-possession, sought to continue work on certain of its construction projects. As part of its first-day relief, Welded sought approval of the ability to enter into a Commitment Letter providing for continuation of work on the ASR Project under specified conditions. After a hearing, at which Transco was represented, the Court authorized Debtor to execute the agreement.[145] Subsequently, Welded and Transco entered into two more Commitment Letters to continue work on the ASR Project, which were also approved by the Court.[146] The Third Commitment Letter reduced Welded's scope of Work and established the timeline for the winddown of Welded's Work on each spread.[147] Welded successfully completed this reduced scope of Work.[148]

2. Transco's Proofs of Claim

On February 28, 2019, Transco filed two proofs of claim.[149] Proof of Claim number 632 asserts a general unsecured claim of $16,320,000 based on Welded's purported warranty obligations under the Contract with respect to defects and anomalies.[150]

---

[145] Order Approving Commitment Letter from Transcontinental Gas Pipe Line Company, LLC, *In re Welded Constr., L.P.*, No. 18-12378 (Bankr. D. Del. Oct. 23, 2018), ECF No. 45.

[146] PX421.0006; PX428.0006; PX434.0006; Order Approving Second Commitment Letter from Transcontinental Gas Pipe Line Company, LLC, *In re Welded Constr., L.P.*, No. 18-12378 (Bankr. D. Del. Oct. 29, 2018), ECF No. 111; Order Approving Third Commitment Letter from Transcontinental Gas Pipe Line Company, LLC, *In re Welded Constr., L.P.*, No. 18-12378 (Bankr. D. Del. Nov. 8, 2018), ECF No. 172.

[147] *See* PX434.

[148] Kirchen Dep. 54:15–55:6, Dec. 14, 2020.

[149] Joint Final Pretrial Order 2, ECF No. 390 ("Pretrial Order").

[150] Joint Final Pretrial Order 2; Transco Proof of Claim Number 632, https://www.veritaglobal.net/welded/document/181237819022800000000044 ("Transco Claim 632").

Proof of Claim number 636 asserts a general unsecured claim of $94,291,513.58. In a seventeen-page Addendum, Transco details its legal theories and specific damage calculations in four categories: (1) overbilling under the Contract, (2) billing for nonreimbursable expenses, (3) schedule overruns and (4) failure to pay subcontractors.[151] The first category includes improper application of the Equipment Fee to: wait/show up time, travel pay and per diem, paid time off and holiday pay, Welded's tax and insurance liabilities, rig rental and vehicle allowance, as well as improper charges for portable toilets, dump trucks, truck rental via subcontractors, trailers, Included Equipment charged as Specialty Equipment, transportation of Included Equipment and union dues. The second category is for damages relating to rework and weld repairs, safety shut down costs, failures in environmental and regulatory compliance and other damage to materials, machinery and equipment. The third category is Transco's demand for payment of a penalty under the Incentive Program because Welded failed to timely achieve Mechanical Completion. The final category asserts damages relating to Welded's failure to pay subcontractors. The claims documented in this proof of claim are based on the results of the OGCS Audit.[152]

---

[151]  Joint Final Pretrial Order 2; Transco Proof of Claim Number 636, https://www.veritaglobal.net/welded/document/181237819022800000000048 ("Transco Claim 636").

[152]  Transco Claim 636 at 2, 12. From the outset of this litigation until 2020, Transco relied substantially on the OGCS audit results as the basis for its claims. Former Judge Sontchi also relied on the existence of the audit as a basis to deny summary judgment in Welded's favor. After Transco asserted privilege over the audit findings, former Judge Sontchi ordered production of the audit and wrote:

> Here, [Transco] substantially relied on the Audit in representations to Welded and the Court. [Transco] ha[s] asserted that the Audit "revealed wrongdoing" and repeatedly sought specific relief because of the Audit, including through the Oklahoma Complaint, Transco's proof of claim . . . Transco's counterclaims, the 2019 Burke Declaration, and the Defendant's summary judgment response.

Mem. Order 12, Feb. 15, 2021, ECF No. 236.

On April 26, 2019, Transco filed a Request for Payment of Administrative Expense
alleging that Welded owes it $2,399,279.48 for overpayments made under the Commitment
Letters.[153]

## II.    PROCEDURAL POSTURE

On May 3, 2019, Welded commenced this adversary proceeding against Transco and
Williams.[154] Welded alleges that Transco (1) breached the Contract by failing to pay
Welded and (2) violated Pennsylvania's Contractor and Subcontractor Payment Act
("CASPA") by withholding payment for completed work.[155] Welded also objects to
Transco's proofs of claim and its request for administrative expense. Finally, Welded seeks
a declaratory judgment that no money is owed Transco in connection with the
Commitment Letters.[156]

---

From that point onward, Transco no longer relied on the audit to support its claims. In July 2020,
Transco retained its current expert, Joseph Slavis, to perform a new review and divine new legal
arguments. Aug. 31, 2023 Trial Tr. (Slavis) 1770:22–23, 1773:24–1774:7 (describing that Transco
hired him to "start from scratch.").

[153] Transco Req. for Payment of Administrative Expense Claim for the Period from the Pet. Date
through and Including March 31, 2019,
https://www.veritaglobal.net/welded/document/181237819042600000000008.

[154] Pretrial Order 3; Compl. and Obj. to Claims, ECF No. 1 ("Complaint"). In November 2020,
Transco and Williams filed a motion to withdraw the reference of the adversary proceeding to the
Bankruptcy Court. Defs.' Mot. for Withdrawal of the Reference and Renewed Demand for Jury
Trial, *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, No. 20-cv-1613 (D. Del.
Nov. 25, 2020), ECF No. 1. Chief Judge Connolly denied the motion with prejudice as to Transco
and without prejudice to the Williams defendants, with leave to renew their request upon my
resolution of the Transco claims. Order Denying Defs.' Mot. for Withdrawal of the Reference,
Without Prejudice with Respect to the Williams Defs., *Welded Constr., L.P. v. Williams Cos., Inc. (In re
Welded Constr., L.P.)*, No. 20-cv-1613 (D. Del. July 21, 2021), ECF No. 14.

[155] Complaint 62–67, 79–81.

[156] Complaint 73–79.

Transco filed its answer on November 13, 2019, denying each claim and asserting affirmative defenses of material breach and offset; Transco also brought counterclaims.[157] Transco's first counterclaim mirrors Proof of Claim number 636 and seeks damages for breach of contract arising from (1) contract overbilling, (2) violation of Contract policies, procedures and specifications, (3) Mechanical Completion delay and (4) Welded's failure to pay subcontractors and suppliers. Transco's second counterclaim mirrors Proof of Claim number 632 and seeks damages for coating anomalies and defects. Transco's final counterclaim asserts that Welded breached the Commitment Letters.[158]

Each party filed summary judgment motions. I ruled on Transco's motion by a written Memorandum dated July 28, 2023.[159] I ruled on Welded's motion in an August 4, 2023 Bench Ruling subsequently memorialized in writing and filed on the docket.[160] Notwithstanding these rulings, myriad factual issues remained.

In the months preceding trial, Transco and Welded submitted motions in limine objecting to certain evidence expected to be introduced at trial. Transco sought to exclude: (1) parol evidence, (2) testimony of Dennis Kakol, (3) testimony of Peter Singh and (4) testimony of Scott Gray.[161] Welded sought to exclude: (1) testimony of Joseph Slavis, (2)

---

[157] Def. Transcontinental Gas Pipe Line Company, LLC's (A) Answer to Compl. and Obj. to Claims of Pl. Welded Construction, L.P. and (B) Countercl., ECF No. 63 ("Counterclaim").

[158] Counterclaim 61–64.

[159] *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, Adv. Pro. No. 19-50194, 2023 WL 4853146 (Bankr. D. Del. July 28, 2023), ECF No. 394.

[160] *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, Adv. Pro. No. 19-50194, 2023 WL 5010429 (Bankr. D. Del. Aug. 4, 2023), ECF No. 404.

[161] Def. Transcontinental Gas Pipe Line Company, LLC's Mot. in Lim. to Exclude Parol Evid., ECF No. 349; Transcontinental Gas Pipe Line Company, LLC's Mot. in Lim. to Exclude Test. and Written Report of Dennis Kakol, ECF No. 351; Transcontinental Gas Pipe Line Company LLC's

testimony of Brian Triche and (3) evidence regarding Welded's cash management.[162] I refrained from ruling on these motions in limine pending the actual admission of evidence, and this case proceeded to trial. Having heard the evidence: (1) I accept the testimony of Scott Gray and Joseph Slavis for their calculations, but not for their conclusions with respect to what was properly or improperly billed,[163] (2) for the reasons set forth *infra*, I grant Welded's motion with respect to Brian Triche's testimony on Defective and nonconforming Work and conclude the motion is moot with respect to testimony regarding tie-in welds and (3) I decline to exclude the testimony of Dennis Kakol on schedule analysis for reasons set forth *infra*.[164]

A ten-day trial was held from August 22 through September 7, 2023. Six fact witnesses and four expert witnesses were presented live. Welded and/or Transco also read into evidence portions of various depositions and designated portions of twenty

---

Mot. in Lim. to Exclude Test. and Written Report of Peter Singh, ECF No. 353; Transcontinental Gas Pipe Line Company, LLC's Mot. in Lim. to Exclude Certain Test. of Scott Gray, ECF No. 355.

[162] Welded's Mot. in Lim. to Preclude Joseph Slavis from Offering Legal Conclusions and Unreliable Ops., ECF No. 357; Welded's Mot. in Lim. to Preclude Transco from Raising Certain Irrelevant Matters at Trial, ECF No. 358; Welded's Mot. in Lim. to Preclude Brian Triche from Offering Improper and Unreliable Ops. and Test., ECF No. 359.

[163] In that same vein, I admit Exhibits D2044A–D2047AU, which are the schedules attached to Mr. Slavis's opinion as support for his calculations. Welded did not have a general objection to these exhibits subject to my ruling on the scope and qualifications of Mr. Slavis. *See* Aug. 31, 2023 Trial Tr. 1766:8–1767:2, Sept. 6, 2023 Trial Tr. 1887:7–21.

[164] Mr. Singh did not testify at trial, so Transco's motion to exclude his testimony is moot. No evidence regarding Welded's cash management was presented, so Welded's motion to exclude testimony on this topic is moot. Finally, I will only look to parol evidence where the Contract is ambiguous.

depositions.[165]  Additionally, hundreds of exhibits comprising thousands of pages and

numerous excel spreadsheets were admitted.

On October 23, 2023, Transco and Welded submitted their posttrial briefs.  On July

22, 2024, I asked for argument and directed the parties to focus on four topics: (1) the

burden of proof when disputed categories of costs are included in Welded's outstanding

invoices and Transco's proofs of claim/counterclaims, (2) the impact of the audit provision

on the burden of proof, (3) the experts' respective schedule analysis and (4) Welded's waiver

argument.[166]  At the parties' request, I also granted one-half hour of argument on topics each

party wanted to raise.  Argument took place on August 20, 2024.  This matter is ripe for

decision.

## III.    JURISDICTION

Jurisdiction exists over this adversary proceeding pursuant to 28 U.S.C. § 1334.  The

parties have stipulated that both the claims and the counterclaims are core.[167]  Accordingly, I

can enter a final judgment on all claims in this adversary proceeding.

## IV.    BURDEN OF PROOF

The dispute before me centers around whether certain costs are properly billed to

Transco under the Contract.  Welded (as plaintiff) seeks payment of its unpaid invoices,

---

[165] While now there appears to be some disagreement over designated deposition testimony, the parties agreed it could be submitted.  Pretrial Order 42–44; *see also* Aug. 2, 2023 Hr'g Tr. 1–39, ECF No. 406.  As for documents relying upon designated testimony for admission, Welded seeks to admit six documents (PX233, PX278, PX279, PX289, PX470, PX474) to which Transco objects on grounds of foundation, relevance and hearsay.  Because I have not relied on any of these documents and because each is hearsay, I grant the objection.  To the extent I cite to an exhibit or testimony, any objection thereto is overruled.

[166] Letter to Counsel, ECF No. 438.

[167] Pretrial Order 4.

which detail the costs of the Work.  Transco (as counterclaim plaintiff) seeks affirmative recovery of payment already made for alleged improper charges and to avoid payment for those same costs in the unpaid invoices.[168]  Transco also asserts the rights of setoff and recoupment against any award to Welded in this litigation.[169]  Because of the overlapping nature of the claims, which party has the ultimate burden of persuasion on each contested cost is not straightforward.[170]

The default rule is that the plaintiff—the party seeking to alter the status quo—bears the risk that he will fail to persuade the factfinder.[171]  The default rule means that Welded bears the burden on its claim and Transco bears the burden on its counterclaims and defenses.  Strictly applied, both parties carry the burden on the same disputed costs.  The Supreme Court, however, has recognized that while the default rule "solves most [cases]," it "admits of exceptions."[172]  "For example, the burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or exemptions."[173]  Indeed, the burden of proof can be

---

[168]  As only two examples: Welded's unpaid invoices include costs for pickup trucks and hauling services.  Transco contends that these costs are not properly billable under the Contract and so it does not owe Welded for these items.  Transco also seeks to recover the payments it has already made for these costs.

[169]  Transco's "Affirmative Defenses" include: "In the event it is determined that Transco owes any amounts to Welded, Transco is entitled to set off and/or recoup any such amounts from and/or against amounts due and owing to Transco from Welded's estate."  Counterclaim 48.  Transco made some payments "under protest," but Transco cites to no law that payment under protest absolves it of its voluntary payment.

[170]  The burden of production is not at issue here.

[171]  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S 49, 56 (2005).

[172]  *Id.* at 57 (examining burden of proof for statutory causes of action; not shifting the burden of proof in the circumstances) (citing 2 J. Strong, *McCormick on Evidence* § 337 (5th ed. 1999)).

[173]  *Schaffer*, 546 U.S. at 57 (citing *FTC v. Morton Salt Co.*, 334 U.S 37, 44–45 (1948)).

placed on a defendant for an entire claim.[174]  Recently, the Delaware District Court,

applying Delaware law and looking to the same authority, ruled that a defendant's claim in

the nature of recoupment—"the right of a defendant to have the plaintiff's claim reduced or

eliminated because of the plaintiff's breach of contract or duty in the same transaction"—

shifts the burden of persuasion to the defendant in a contract action.[175]  These cases

recognize that the default rule is flexible and that an allocation of this burden can look to

practical concerns such as policy, fairness and convenience.[176]

Several other matters complicate—or are asserted to complicate—this analysis.

Transco filed two proofs of claim based in large part on the same disputed costs.  It also filed

a separate request for payment of administrative expense.  In the Complaint, Welded objects

to both.  It is beyond dispute that Transco has the ultimate burden of proof on both its proof

of claim and its request for administrative expense.[177]  This holds true even when a debtor's

objection is contained in an adversary proceeding.[178]

Further, Transco argues (presumably, regardless of the above discussion) that

Welded has the burden of proof to show that each cost invoiced was reasonable and/or

---

[174] *Schaffer*, 546 U.S. at 57 (citing *Alaska Dept. of Env't Conservation v. EPA*, 540 U.S. 461, 494 (2004)).

[175] *Blattman v. Siebel*, Civ. No. 15-530-CFC Consolidated, 2020 WL 475413, at *18 (D. Del. Jan. 29, 2020) (quoting *Recoupment*, Black's Law Dictionary (11th ed. 2019)).

[176] 2 Kenneth S. Broun, et al., *McCormick on Evidence* § 337 (Robert P. Mosteller ed., 8th ed. 2022); *see also Cline v. Sunoco, Inc. (R&M)*, Civ. A. No. 6:17-cv-313-JAG, 2020 WL 7246590, at *3 n.6 (E.D. Okla. Dec. 9, 2020) (claims made under Oklahoma's Production Revenue Standards Act; court declining to put burden on plaintiff to prove marketable title and entitled to interest on oil royalties where issue of marketable title "not legitimately a question.").

[177] *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992).

[178] *Empire Radio Partners, Ltd. v. Brothers (In re Empire Radio Partners, Ltd.)*, Adv. Nos. 93-0419DAS, 93-0572DAS, 1993 WL 515832, at *1 (Bankr. E.D. Pa. Dec. 8, 1993).

necessary and/or proper because of the nature of the Contract. It cites cases standing for the proposition that because it is a cost-plus contract, there is an implicit obligation/duty of Welded to minimize costs. Inherent in Transco's argument is that the nature of the Contract trumps all.

Finally, Transco invokes and relies upon its audit rights under the Contract in ultimately refusing to pay Transco, filing its Oklahoma lawsuit, filing its proofs of claim and pursuing its counterclaims.[179] Commentators suggest that when an owner seeks repayment of costs through an audit or seeks to retain funds it has not paid a contractor, the owner has the burden of proof.[180] In response to my request for assistance on the intersection between

---

[179] The complaint in the Oklahoma lawsuit is not in the record so I do not know what causes of action were asserted. In any event, one would think that Transco, as plaintiff, took on a burden of proof in that action.

[180] Albert Bates, Jr. & Amy Joseph Coles, *Audit Provisions in Private Contracts: Which Costs Are Subject to Audit, Who Bears the Expense of the Audit, and Who Has the Burden of Proof on Audit Claims?*, 6 J. Am. Coll. Constr. Laws. 111, § V.A. (2012).

> During contract performance, a Contractor must establish that it is entitled to be paid under the terms of the contract. The Owner typically reviews Contractor invoices, approves the portion or portions that are due and payable, and rejects or seeks further information as to the remainder. Quite commonly the Owner's architect or other design professional will have first reviewed the Contractor's payment request and "certified" it before the Owner receives it. Having reviewed and approved a Contractor's invoice for payment, the Owner which later asserts that the invoice was improperly paid must prove that overpayment.
>
> It is not unusual for an Owner's accounting staff to be stretched thin on occasion during the course of a long and complex project; however, an Owner should not expect the Contractor to prove that it is entitled to keep money voluntarily paid to it during the course of the project by the Owner. That is not to say that progress payments by the Owner necessarily constitute a waiver of the Owner's right to question the costs after the project through an audit; however, the law does not support shifting the burden to the Contractor to prove its entitlement to retain money paid to it by the Contractor during the project. To do so would essentially provide an Owner with a license to pay its Contractor's invoices on a periodic basis, sit on its hands until the project is complete, and then "question" each and every payment previously made to the Contractor during the Project. Should the Owner decide to do so, it does so at its own peril and must bear its own burden to recover monies paid to the Contractor during the project.

burden of proof and audit rights, Transco relied at oral argument on *Olmstead*, which does not address the issue.[181]

So – where does this leave me?  If I can determine the contested cost issues as a matter of law, then the burden of proof does not matter.  But, if I cannot, the burden of proof may be dispositive.[182]  Accordingly, I will address the burden of proof where necessary to reach a result and in a specific context.

## V.    CHOICE OF LAW

The parties disagree about whether Oklahoma law or Pennsylvania law applies to this dispute, with Transco advocating for Oklahoma law and Welded advocating for

---

[181] The decision focuses on what a contractor must do to prove his case.  *Olmstead Constr., Inc. v. Otter Creek Invs., LLC*, 940 N.W.2d 44, 2019 WL 4678167, at **10 (Iowa Ct. App. 2019) (Table):

> Keeping detailed records allows the owner to check on the contractor's expenditures.  *See Shaw*, 38 So. 2d at 918; William Garth Snider, *Defamation Claims in Construction Litigation*, Construction Briefings No. 2000-7 (July 2000) (noting an owner can always challenge the reasonableness of costs incurred).  Therefore, any contract requiring an owner to reimburse a contractor's costs implicitly allows the owner to approve the contractor's accounting system and audit contract costs and pricing data.  *See* 1 *Bruner & O'Connor on Construction Law* § 2:26; *see also* Dib, 1 *Forms and Agreements for Architects, Engineers and Contractors* § 8:4 ("An owner who lets out a cost-plus job normally requires the contractor to use owner's approved accounting system or 'chart of accounts,' so that contractor's records may be readily audited.").  And if the owner disputes the billing, the burden is on the contractor to prove "each and every item of expense." *Joe Bonura, Inc.*, 419 So. 2d at 29; *see also* 17A Am. Jur. 2d Contracts § 484.

[182] *See, e.g., Goldstein v. Denner*, 310 A.3d 548, 586 (Del. Ch. 2024) (discussing in the context of presumptions and "their close cousin—the burden of proof by a preponderance of the evidence" what occurs when evidence is in equipoise, or when "there is no credible evidence on a topic, or if there is some credible evidence, but not enough that either side could carry a burden by a preponderance.").  Alternatively, neither party may win. *See Ill. Cent. R. Co. v. Midwestern Grain Co.*, 308 F. Supp. 323, 324–25 (W.D. Mo. 1969) (Plaintiff sued defendant for outstanding track storage fees claiming defendant provided special directions which resulted in the fees; defendant counterclaimed seeking return of overpaid track storage fees alleging plaintiff error caused the incurrence of the fees.  The court concluded that "[t]he evidence in this case . . . is so lacking in detail and weight" that neither party proved the cause of the track storage fees.  As neither party met its burden of proof, neither party received a recovery.).

Pennsylvania law. A court will only perform a conflict-of-laws analysis if the opposing laws *actually* conflict.[183] If the laws do not conflict, "the conflict is a false one, and the court can apply the law the parties have selected."[184]

The parties do not suggest that Oklahoma and Pennsylvania law differ in most respects. Both recognize the core contract doctrines of substantial performance and material breach.[185] The main point of contention is whether CASPA applies. Accordingly, the choice-of-law analysis will be made in that context.

## VI.    DISCUSSION

### A.  *Welded's Claims*[186]

1.  Subject to Decisions on Certain Specific Costs Set Forth below, Welded Demonstrated Entitlement to Payment of Its Unpaid Invoices

To prove its claim for breach of contract, Welded must show the existence of a contract, breach and damages.[187] Transco contends that because this is a cost-plus contract,

---

[183] *Focus Fin. Partners, LLC v. Holsopple*, 241 A.3d 784, 814–15 (Del. Ch. 2020); *Parks v. Horizon Holdings, LLC*, C.A. No. 2021-0988-SG, 2022 WL 2821337, at *7 (Del. Ch. July 20, 2022).

[184] *Holsopple*, 241 A.3d at 814–15.

[185] *Compare Sgarlat v. Griffith*, 36 A.2d 330, 332 (Pa. 1944) *with Collins v. Baldwin*, 405 P.2d 74, 81 (Okla. 1965); *compare LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 648 (Pa. 2009) *with Polymer Fabricating, Inc. v. Emps. Workers' Comp. Ass'n*, 980 P.2d 109, 115 (Okla. 1998). This is also evident in the parties' respective filings. A review of the Table of Authorities in Transco's posttrial briefs reveals that of the fifty-two cases cited, only seven were decided by courts within Oklahoma or applied Oklahoma law. While half the cases cited by Welded are Pennsylvania cases, none are cited for contract principles and most relate to CASPA.

[186] Welded also seeks damages under CASPA. Because Welded's entitlement to such damages depends, in part, on whether Transco improperly withheld payment of invoices, I will address CASPA after I have ruled on Transco's affirmative claims. I will also address Welded's entitlement to the final installment of the Fixed Fee later in the opinion.

[187] *See Cates v. Integris Health, Inc.*, 412 P.3d 98, 103 (Okla. 2018); *412 North Front St. Assocs., LP v. Spector Gadon & Rosen, P.C.*, 151 A.3d 646, 657 (Pa. Super. Ct. 2016).

there is an implicit obligation that expenditures be reasonable. From this, Transco

concludes that Welded has an additional burden to meet its affirmative case; it must show

that the expenditures were "necessary" and "reasonable."[188] Transco contends that Welded

has made neither showing. Welded counters that it is not required to "prove a negative"

and simply must put forth a case that it performed and was not paid. Welded has the better

side of the argument.

The Contract is a cost-plus contract, but it also contains a fixed fee, a formula for

payment for Included Equipment and an Incentive Program, which contemplates that costs

can exceed the Target Goal (estimated cost) and the schedule can extend beyond the target

Mechanical Completion date. It also has extensive provisions and requirements regarding

the relationship between the parties and the types of reporting—both written and oral—that

Welded is required to provide. For example: (1) Transco set the "expectations for schedule,

cost and progress tracking, and the methodology on how to do so" which includes forms of

necessary reports and daily, weekly and monthly meetings,[189] (2) Transco has approval

and/or veto power over Key Personnel[190] and can require Welded to remove any worker

from the job if Transco determines that the worker "lacks the skill and/or care to perform

acceptable Work"[191] and (3) Transco and Welded are required to "work together ahead of

---

[188] Transco Br. 17–18 ("Thus, Welded's burden was threefold; Welded was required to demonstrate that the unpaid invoiced amounts were reimbursable costs in accordance with Section VIII, Art. 2 (the components of payment at issue); that they were necessarily incurred; and that they were reasonable.").

[189] *See* JX001.0709–19.

[190] JX001.0829–30.

[191] JX001.0024.

the Notice to Proceed to jointly determine the execution plan to achieve the lowest capital cost to build the Project in the allotted schedule."[192]   The Contract also specifies, in detail, what costs are chargeable, and in many instances, the agreed to price.

None of the decisions cited by Transco are remotely in this context.   The majority involve residential or small commercial projects in which the owner places significant—even complete—trust in the contractor.[193]   And, the trust and confidence placed in the contactor by the unsophisticated owner is a recurring theme throughout.[194]   Interestingly, many of these cases are based upon oral contracts.[195]

Moreover, many of the cases cited for the proposition that the majority of courts put an additional burden on the contractor do not support that position.   For example, in *Charles A. Burton, Inc. v. Durkee*, the court first ruled (based on an earlier decision) that a contractor under a cost-plus contractor is entitled to its actual cost—not reasonable costs—pursuant to

---

[192]   JX001.0534.

[193]   *See Knott v. Moore-Lamb Constr. Co.*, 144 N.E. 697, 700 (Ohio 1924) (noting that the contractor's burden is heightened "[e]specially . . . where the contractor has refused to allow the owner to have any supervision over the work, and required him to implicitly trust the contractor[.]") (quoting *Title Guarantee & Tr. Co. v. Pam*, 155 N.Y.S. 333, 337 (N.Y. Sup. Ct. 1915)).

[194]   *See, e.g., Jones v. J.H. Hiser Constr. Co., Inc.*, 484 A.2d 302, 304 (Md. Ct. Spec. App. 1984) ("The [owners] were not experts in house construction; [the contractor] was. . . . Under the contract the [owners] were entitled to rely on [the contractor] to protect their financial interests.").

[195]   *See, e.g., Union Supply Co. v. Morris*, 30 P.2d 394 (Cal. 1934); *Burdette v. Drushell*, 837 So. 2d 54 (La. Ct. App. 2002); *Knott v. Moore-Lamb Constr. Co.*, 144 N.E. 697 (Ohio 1924).   *See also Charles A. Burton, Inc. v. Durkee*, 123 N.E.2d 432, 443–44 (Ohio 1954) (observing that "in that case [*Knott*] there was no written contract and there arose a disagreement between the parties as to the terms of the oral contract.   Evidence of the estimated value of the building contracted for was held competent solely for the purpose of tending to show what the agreed price was.   Likewise, evidence of the reasonable cost of labor and materials was held competent as tending to show what the actual cost was. . . . The *Knott* case does not announce" the principle "that the builder is entitled to recover his cost plus his fee only if he proves that it is reasonable."); *Joe Bonura, Inc. v. Hiern*, 419 So. 2d 25, 26 (La. Ct. App. 1982) (contractor sues on oral construction contract); *Wendel v. Maybury*, 75 So. 2d 379 (La. Ct. App. 1954) (contractor sues; no written contract).

the contract. In those circumstances, the contractor was only required to *meet* the owner's

evidentiary record and then only after the owners produced evidence of contractor's

negligence or default.[196] The court's rationale was that: "There is no established principle in

the law that one who contracts to do certain work for another must disprove his default as a

part of his affirmative case for compensation. In fact the opposite must be the general rule.

Honesty and good faith are always presumed[.]"[197]

---

[196] 123 N.E.2d at 437–38 (rejecting owner's claim that contractor had burden to show
reasonableness because of disparity between actual cost and estimated cost given terms of contract;
"[i]f and when the owners produce evidence of such character as to raise a presumption of
negligence or default on the part of the builder, the latter will be required only to produce evidence
sufficient *to balance* the state of proof.") (emphasis added); *see also MCM Home Builders, LLC v.
Sheehan*, No. 18 CAE 09 0074, 2019 WL 4724682, at *9 (Ohio Ct. App. Sept. 25, 2019) (discussing
*Durkee* and holding that, after contractor introduced evidence of invoices sent to owners, "[i]t was
the burden of the [owners] to show the costs were erroneous or false."); *Mid-Ohio Mech., Inc. v.
Eisenmann Corp.*, Nos. 07 CA 000035, 08 CA 00012, 2009 WL 3633846, at *9 (Ohio Ct. App. Nov.
2, 2009) (also discussing *Durkee*: "Proposed Jury Instruction 11 does not accurately state the law
according to *Burton II*. The instruction does not squarely place the burden of proof on [owner] to
show that the costs billed by [contractor] were erroneous or false. The instruction further allows the
jury to reduce the amount owed to [contractor] to the amount which would have been appropriate
under a fixed-price contract, which reverts to the 'reasonableness' standard which the Supreme
Court expressly rejected for a cost-plus contract in *Burton I*.").

[197] 123 N.E.2d at 438 (citing 17 Ohio Jurisprudence, 112, Section 89; fraud is not presumed, 17
Ohio Jurisprudence, 113, 143, Sections 91 and 114; negligence is not presumed, 17 Ohio
Jurisprudence, 158, Section 124; and performance of duty is presumed, 17 Ohio Jurisprudence, 98,
Section 77).

It is not clear why Transco cited certain cases. For example, a review of *Lofton v. Don J. Trahan, Inc.*,
399 So. 2d 818 (La. Ct. App. 1981), shows no reference to the burden of proof on cost-plus
contracts. Rather, the decision revolves around a stipulation between the parties that "placed the
responsibility for performing the job satisfactorily" on the contractor, not the owner. *Id.* at 820.
Accordingly, the court did not apply the general rule of law that "the owner must bear the expenses
of correcting the mistakes made in construction on a cost plus contract, unless it has been agreed to
differently in the contract." *Id.* Similarly, *Pathe Laboratories, Inc. v. du Pont Film Manufacturing Corp.*,
3 F.R.D. 11 (S.D.N.Y. 1943), a nonconstruction case, does not discuss the burden of proof. Rather,
in the context of a motion to quash a subpoena, the court affirms the Master's ruling that du Pont's
cost records were relevant to the dispute. *Id.* at 14. In coming to this conclusion, the court states:
"[t]he contract sued upon is a cost plus contract and the correct rule of law with reference to such
contracts, in an action by the contractor for payment, is that he must show 'that the moneys which
he claims to have expended were necessarily paid for materials and work upon the job, * * *. If

Having read the cited decisions, to the extent a general theme can be found, it is that in order to prove its affirmative case, a contractor must itemize each and every cost it seeks to recover and show that the costs were incurred on the project.[198] It is only when the owner proves negligence, fraud or bad faith that the contractor must show its fees were "reasonable" or "proper."[199] Here, Transco asserts Welded failed to properly plan certain

the contractor fails to do this he should only be allowed the reasonable cost and his percentage.'" *Id.* (quoting *Title Guarantee & Tr. Co. v. Pam*, 155 N.Y.S. 333, 337 (N.Y. Sup. Ct. 1915)).

[198] The contractor's burden arises when an owner disputes its indebtedness to the contractor. *See American Plumbing Co., Inc. v. Hadwin*, 483 So. 2d 169, 171–72 (La. Ct. App. 1986) ("When a contractor asserts a claim on a cost plus contract and the owner denies being indebted to the contractor, the contractor has the burden of proving each item of expense in connection with the job and he must itemize each expenditure made by him."); *Burdette v. Drushell*, 837 So. 2d 54, 59 (La. Ct. App. 2002); *Kerner v. Gilt*, 296 So. 2d 428, 431 (La. Ct. App. 1974) ("where the owner denies being indebted to the contractor the latter has the burden of proving each and every item of expense in connection with the job."). The contractor's burden is low. *See M. Carbine Restoration, Ltd. v. Sutherlin*, 544 So. 2d 455, 459 (La. Ct. App. 1989) ("Presentation of invoices and statements of accounts, accompanied by proof of payment, is the proper method of proving the costs of improvements. . . . At trial, [the contractor] offered numerous invoices and other documents to prove the value of the work done on the property. All were marked paid. Therefore, he met his burden of proving each and every item of expense in connection with the job. The burden therefore shifted to the [owner] to rebut [the contractor's] evidence.") (citations omitted). Contractors can fail to meet that burden. *See Robison v. Madsen*, 516 N.W.2d 594, 598 (Neb. 1994) (holding that the contractor did not meet its burden when the contractor "testified that neither he nor his employees verified that the items on the invoices had been installed in the [owners'] residence or that the work on the invoices had been performed. [The contractor] testified that he had reviewed the invoices generally for accuracy, but that it was possible he had billed the [owners] for items they did not receive."); *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 223 (Tenn. Ct. App. 2009) ("the problem is that [the owner] received from [the contractor] a two-foot-thick pile of disorganized papers, many of which pertained to expenses [the contractor] incurred at other jobs during the same time period, wholly unrelated to the construction of the [owners'] home.").

[199] Contractors must, of course, perform work in good faith. On a showing of gross negligence or fraud, the contractor then bears a burden to show the reasonableness of its work. *See Knott v. Moore-Lamb Constr. Co.*, 144 N.E. 697, 700 (Ohio 1924) ("*when it has been shown that the work has been done in reckless disregard of this obligation* [to perform work in good faith], the burden rests upon the contractor to prove that the moneys which he claims to have expended were necessarily paid for materials and work upon the job[.]") (quoting *Title Guarantee & Tr. Co. v. Pam*, 155 N.Y.S. 333, 337 (N.Y. Sup. Ct. 1915) (emphasis added). *See also Hitt v. Smallwood*, 133 S.E. 503, 506 (Special Va. Ct. App. 1926) ("If the aggregate cost upon the face of the account is so excessive and unreasonable as to suggest gross negligence or fraud, the law would impose upon the contractor the duty of establishing the *bona fides* of his performance of the work."); *Shaw v. Bula Cannon Shops*, 38 So. 2d 916, 919 (Miss. 1949) (en banc) (affirming a lower court judgment for owner because "[t]here is in the record a great

aspects of the Work and was inefficient. But, Transco is suing on breach of contract; it does not assert negligence, fraud or bad faith. More importantly, there is no evidence to back such a contention. Indeed, there is evidence that the ASR Project was run like a "hard bid" job and that Welded "[was] managing in a proper way."[200]

Welded has met its burden to prove its outstanding costs and expenses under the Contract. Welded introduced into evidence the underlying invoices, including the unpaid invoices, each of which itemizes the estimated and/or actual costs by category and spread.[201] The invoices detail the labor force (direct labor costs, Field labor costs), Specialty Equipment, materials, mats and Subcontractors. Mr. Hood, who approved and signed all invoices, testified regarding how the invoices were prepared—including the Cash Call component and the reconciliation component.[202] He testified generally with respect to the compilation, collection and submission to Transco of the backup invoices and documentation underlying the reconciliation portion of the invoices.[203] He testified that he

---

deal of testimony offered by defendant establishing that the jobs were not reasonably supervised and that reckless extravagance and waste ran rampant. The overwhelming weight of the evidence establishes these facts."); *Romine v. Rex Darnall, Inc.*, 541 S.W.2d 50, 52 (Mo. Ct. App. 1976) ("Absent some claim on the part of [the owner] indicating [the contractor] was guilty of fraud or gross negligence, it was not incumbent upon [the contractor] to prove that his charges for labor and material were reasonable."). Fraud must be shown to be pervasive. *Union Supply Co. v. Morris*, 30 P.2d 394, 396 (Cal. 1934). Mismanagement must be gross. *See J.E.T. Dev. v. Dorsey Constr. Co., Inc.*, 642 P.2d 954, 955 (Idaho Ct. App. 1982) ("The owners invite our attention to alleged incidents of mismanagement . . . in an effort to show that the contractor did not reasonably control costs. We need not join the owners in second-guessing each of the contractor's management decisions.").

[200] Schoenherr Dep. 81:23–82:22, Mar. 23, 2021.

[201] *See* PX124, PX140, PX150, PX151, PX182, PX207, PX329, PX394, JX021, JX030, JX034, JX060, JX067, JX068, JX071, JX085, JX103 (Cash Call and reconciliation invoices).

[202] Aug. 23, 2023 Trial Tr. (Hood) 467:9–469:17.

[203] Aug. 23, 2023 Trial Tr. (Hood) 474:5–16.

determined what costs to bill based on Section VIII of the Contract.[204]  He testified that he

conducted a kickoff meeting in September, 2017, which included instruction on the

reimbursable activities under the Contract and covered all the various components in

Section VIII.[205]   He walked through the June 2018 Cash Call/March 2018 reconciliation

invoice in detail discussing Union labor costs and the components thereof (e.g., pay,

deductions, per diem, truck allowance, rig pay) and Field Personnel costs, including PTAG

and Bechtel arrangements.[206]

    Mr. Gray, Welded's cost expert, audited a sample of the invoices to verify whether

the amounts invoiced were accurate according to the supporting documentation.[207]  He

sampled nine invoices, which included 62% of the total amount invoiced on the ASR

Project, excluding the invoice for the final installment of the Fixed Fee.[208]  Mr. Gray

testified that this sample size is significantly higher than the acceptable range for an audit of

this type.[209]

    Mr. Gray ultimately reviewed supporting documentation for 100% of the sample.[210]

He did identify one "formula bust" in the spreadsheets and a few "keypunch errors" totaling

---

[204] Aug. 23, 2023 Trial Tr. (Hood) 474:18–25.

[205] Aug. 23, 2023 Trial Tr. (Hood) 474:18–480:22; JX14.

[206] Aug. 23, 2023 Trial Tr. (Hood) 505:21–520:8.

[207] Aug. 25, 2023 Trial Tr. (Gray) 845:20–24, 862:6–863:6.

[208] Aug. 25, 2023 Trial Tr. (Gray) 863:7–863:12.

[209] Aug. 25, 2023 Trial Tr. (Gray) 866:16–22.

[210] Aug. 25, 2023 Trial Tr. (Gray) 863:24–865:6 (originally, Mr. Gray identified 99.5% of the supporting documentation; thereafter, Welded supplied the missing documentation).  The backup documentation was admitted into evidence.  By my count, it consists of at least forty-five 3.5" binders.

approximately $1 million, which he then deducted from his calculations.[211]  Based on his

audit, Mr. Gray concluded that Welded billed Transco $769,572,514 for the period covered

by the Contract.[212]  As Transco paid $693,120,596 for this period, after Mr. Gray's

additional adjustments for both the identified errors and this court's rulings on summary

judgment, Mr. Gray concluded that Welded is owed $56,191,324.[213]

Based on Mr. Hood's and Mr. Gray's testimony as well as the admitted exhibits, I

conclude that Welded has met its affirmative burden to show what is outstanding on its

unpaid invoices and thus what it is owed.

### 2.  Transco's General Defenses Do Not Defeat Welded's Claims

Transco first argues that Welded has not proven its right to recovery because Welded

did not perform in accordance with the Contract.[214]  Transco cites Oklahoma law for the

proposition that "in order to recover upon a contract, the contractor complaining of his

contractee's nonperformance must first establish his own performance or a valid excuse for

his failure to perform."[215]  Even accepting this description of the law does not lead to

Transco's desired result.  Transco asserts that Welded failed to perform under the Contract

because Welded's invoices contained inaccuracies and because Welded failed to timely

submit reconciliation invoices and weekly reports.[216]  Transco also asserts that Welded

---

[211]  Aug. 25, 2023 Trial Tr. (Gray) 865:6–866:15.

[212]  Aug. 25, 2023 Trial Tr. (Gray) 867:5–868:22.

[213]  Aug. 25, 2023 Trial Tr. (Gray) 869:15–872:11.

[214]  Transco Br. 14.

[215]  *Miller v. Young*, 172 P.2d 994, 995 (Okla. 1946).

[216]  Transco Br. 15–16.

breached the Contract by failing to meet the target Mechanical Completion date and by failing to timely pay subcontractors.[217] Assuming these are breaches of the Contract, Transco has still not shown that Welded is not entitled to relief.

Oklahoma law recognizes the doctrine of substantial performance. The Oklahoma Supreme Court has stated that "when a contractor and builder has in good faith endeavored to comply with the terms of a contract, literal compliance in all details is not essential to recovery . . . ."[218] In the same vein: "[s]ince the rule of exact or literal performance has been relaxed, literal compliance with a building contract is not *essential to a recovery thereon, but a performance thereof in all its material and substantial particulars is sufficient.*"[219] Oklahoma law finds a material breach exists where it "(a) *defeats* the object of the contract or (b) *concerns* a matter of such importance that the contract would not have been made if default in that particular had been expected."[220]

Welded has substantially complied with the Contract in all material aspects. While certain of Welded's reconciliation invoices were untimely,[221] those slight delays in providing the reconciliation were not material breaches excusing Transco's performance under the Contract. These breaches were not material as evidenced by Transco's continued

---

[217] Transco Br. 23–24.

[218] *Collins v. Baldwin*, 405 P.2d 74, 81 (Okla. 1965).

[219] *Id.* (quoting *Robinson v. Beaty*, 181 P. 941, 942 (Okla. 1919)).

[220] *Polymer Fabricating, Inc. v. Emps. Workers' Comp. Ass'n*, 980 P.2d 109, 115 (Okla. 1998).

[221] *See, e.g.*, JX050 (December 2017 reconciliation nine days late when received on February 9, 2018); JX060 (February 2018 reconciliation invoice twelve days late when received on April 12, 2018); JX067 (March 2018 reconciliation invoice five days late when received on May 5, 2018); JX068 (April 2018 reconciliation invoice eight days late when received on June 8, 2018); JX071 (May 2018 reconciliation invoice thirteen days late when received on July 13, 2018) (note the email on this exhibit mistakenly refers to the April reconciliation invoice).

engagement with Welded despite the delayed reconciliation invoices.[222] Likewise, that Transco waited until Welded had achieved Mechanical Completion before withholding payment despite the late submission of reconciliation invoices evidences a lack of material breach.

The alleged breach by Welded because of billing inaccuracies is also a nonmaterial breach. While Transco makes ado about errors in Welded's invoicing process that led to inaccuracies, the Contract specifically anticipated these problems. Appendix G provides procedures by which Welded and Transco were to reconcile disputed verifications of actual costs. This gives rise to the necessary inference that Transco was verifying actual expenses and comparing them with Welded's estimated and actual costs.[223] The presence of the audit provision likewise evidences the Contract's anticipation of billing errors and inaccuracies, rendering that "breach" by Welded nonmaterial. Additionally, the invoiced amounts have been refined and cleansed throughout this litigation, resulting in a valuation of unpaid invoices agreed to by both parties.[224]

Transco also asserts that Welded materially breached the Contract by failing to achieve Mechanical Completion by June 14, 2018.[225] Once again, the Contract

---

[222] *See* Restatement (Second) of Contracts § 202(4) (Am. Law Inst. 1981) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").

[223] *See also* D0356; Aug. 28, 2023 Trial Tr. (Sztroin) 1164:12–1165:18.

[224] Aug. 25, 2023 Trial Tr. (Gray) 843:22–24; Aug. 31, 2023 Trial Tr. (Slavis) 1691:11–16 ("I believe we are in agreement with what's been billed and what's been paid.").

[225] Transco Br. 23 (citing *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 199–200 (Tex. 2004)). *Mustang Pipeline* involves a contract which specified that time was of the essence. That is not the case here.

contemplates that Welded's performance might be late when it provides for a disincentive to Welded for delayed performance.[226]  Accordingly, failure to meet the target Mechanical Completion date is not a breach, much less a material one.

Finally, Transco argues that Welded materially breached the Contract because it failed to timely pay certain subcontractors.[227]  The Contract specifies "[Welded] shall promptly and satisfactorily settle and pay all claims and bills" related to the Contract "unless [Welded] reasonably and in good faith contests the validity and reasonableness of any such claim or bill."[228]  The evidence shows that Welded was behind in paying its subcontractors.[229]  Once again, the Contract anticipates this possibility.  Under the Contract, Transco can withhold monies related to outstanding claims against Welded by third parties.[230]  Moreover, because all subcontractors were ultimately paid by Welded's surety, Transco has not suffered any damages.[231]

Welded substantially performed the Contract by constructing and delivering a working product to Transco.  Accordingly, Welded's alleged breaches of contract do not relieve Transco of its duty to perform its obligations under the Contract.  Moreover, having

---

[226]  JX001.0835–36, 42–44.

[227]  Transco Br. 23–24.

[228]  JX001.0026.

[229]  Aug. 28, 2023 Trial Tr. (Pometti) 1077:11–15 (admitting that "there was a lot of past due payables at that point in time[]" when Zolfo Cooper was retained in March 2018).

[230]  Transco Br. 23; JX001.0043.

[231]  Aug. 22, 2023 Trial Tr. (Hawkins) 157:22–158:16.  In a footnote, Transco also argues that Welded's delay in paying subcontractors was a violation of Oklahoma law.  *See* Transco Br. 24 n.175 (citing Okla. Stat. tit. 42, §§ 152–153 (2024)); *Stevens v. Harris (In re Harris)*, 49 P.3d 710, 716–19 (Okla. 2002).  Transco did not bring a cause of action under this statute.

determined to continue with the Contract notwithstanding the alleged breaches, Transco's remedy is to sue for damages.[232]  It cannot be a reason to withhold payment of legitimate bills for services provided.   Accordingly, Welded has proven it is entitled to payment of its unpaid invoices subject to Transco's specific challenges as discussed below.

B.  *Transco's Affirmative Claims*

Transco's proofs of claim, counterclaims and defenses amount to a series of contentions that Welded invoiced Transco for categories of costs that Transco was not required to pay under the Contract.  Whether Transco is obligated to compensate Welded for services and equipment provided on the ASR Project is governed by the Contract.  In the first instance, contract interpretation is a matter of law.  The court first looks to the four corners of the contract to see if the plain language provides an answer to the disputed issue. If the contract is ambiguous, the court may look to outside evidence.  The court may also look to outside evidence to support its interpretation if it does not derogate from the contract.

Section VIII of the Contract, titled Compensation, provides the governing language. Article 1 of Section VIII determines what is properly charged to Transco for construction of the pipeline:

> As full and complete compensation for constructing the facilities and appurtenances in accordance with the scope of Work, the specifications, the drawings, and the terms and conditions of this Contract, [Transco] agrees to pay and [Welded] agrees to accept remuneration set out herein as payment in full.  Work shall be paid on an actual cost-basis in accordance with the components and methods of payment outlined under Article 2 below.[233]

---

[232] *See, e.g., Sitlington v. Fulton*, 281 F.2d 552, 555 (10th Cir. 1960) (a contract party can choose to rescind upon counterparties' breach, but if it does not, it is relegated to a cause of action for damages).

[233] JX001.0825.

Within this construct, I will address each of the specific items identified by Transco.

Before I do, however, I want to address the defined term "Labor Costs." Throughout this adversary proceeding, Welded and Transco (as well as certain experts) often look to the definition of Labor Costs when addressing what is compensable for Work performed by NPLA Personnel and Field Personnel.  This misuse carried through to the posttrial briefing.

"Labor Costs" is not the starting point for a determination of compensation for labor on the ASR Project.  The starting point for that determination is Section VIII Article 2.D. Paragraph D addresses Welded's compensation for work by NPLA Personnel, Field Personnel and Subcontractors.

> o Paragraph D.1 provides that Welded is compensated for Work performed by union labor in accordance with the respective Union Agreements listed on Exhibit 3.
>
> o Paragraph D.2 provides that Welded is compensated for Work performed by Field Personnel based on the Rates and Benefits listed on Exhibit 1.[234]
>
> o Paragraph D.5 provides that Welded is compensated by Transco for actual amounts CIF (costs including freight and taxes) invoiced by Subcontractors.

The term "Labor Costs" does not appear in Paragraph D at all.  Rather, it is a defined term included in Paragraph A.

> Labor Costs means i) the actual wage rates and benefits paid to NPLA Personnel pursuant to the NPLA for actual Work performed, ii) the actual wages and benefits, in accordance with Exhibit 1 paid to Field Personnel for actual Work performed and iii) for both i and ii above, to the extent however not already addressed by or covered under the NPLA with respect to NPLA Personnel, fringe benefits, employee vehicle rental/pay, travel pay, per diem, fuel pay, payroll taxes and insurance in accordance

---

[234] As set forth *infra*, Exhibit 1 was subsequently revised/updated as to both rates and labor classifications when the parties executed the Book Contract Amendment.

with Exhibit 1 actually paid to NPLA and Field Personnel in connection with payment for actual Work.[235]

It serves one purpose: to determine the baseline of the Equipment Fee multiplier. The Equipment Fee compensates Welded for Included Equipment, which includes, for example, the twenty-four Cat 564 pipelayers and other equipment that Welded committed to the ASR Project. The Equipment Fee is 50% of the defined term Labor Costs.[236]

The decision to choose the term "Labor Costs" as the metric for the Equipment Fee multiplier appears (at least in retrospect) to be a poor decision. If nothing else, it creates unnecessary confusion as evidenced by this dispute. Here, "little l" labor as used in Article 2.D is the relevant term for a determination of whether Transco must compensate Welded for categories of expense paid to NPLA Personnel and Field Personnel. "Capital l" Labor Costs has no bearing on this determination. As will be seen, this distinction is critical to a determination of multiple claims asserted by Transco.

1. Rig Rental Costs Are a Labor Benefit

Transco contends that Welded has improperly invoiced Transco for welding and mechanic rigs that were supplied by NPLA Personnel. Transco asserts that rig rental costs are Included Equipment and as such are not separately invoiced, but instead covered by the Equipment Fee. Welded asserts that rig rental costs are benefits provided for under the Union Agreements compensable as labor under Section VIII Article 2.D.

---

[235] JX001.0826.

[236] The first two components of Labor Costs reflect paragraph D— they reference the actual rates and benefits paid to NPLA Personnel pursuant to the applicable union agreements (sub i)) and they reference the actual rates and benefits paid to Field Personnel in accordance with Exhibit 1 (sub ii)). Subparagraph iii) then adds to union-mandated compensation certain categories of compensation in accordance with Exhibit 1 (i.e., "to the extent however not already addressed or covered under the NPLA."). In other words, subparagraph iii) expands the categories of compensation included in the definition of Labor Costs, it is not in any way a limiting factor. *See* JX001.0826.

The Contract specifically references compensation for "rigs" in two exhibits to Section VIII. First, Exhibit 1 to Section VIII is a chart of Indicative Wages & Benefits by Labor Classification.[237] Exhibit 1 reflects that "rig rental" is payable to Master Mechanics, Welder Foremen, Stewards and Welders "per [the applicable] NPLA." Second, Exhibit 4 to Section VIII is titled "Benefit Codes." The attached chart includes in its categories of "payroll definitions" the following:[238]

| Category | Code | Description | Notes |
|---|---|---|---|
| EARNINGS | RIGMT | TAXABLE MECHANIC RIG RENTAL | Standard Wages |
| EARNINGS | RIGWT | TAXABLE WELDER'S RIG RENTAL | Standard Wages |
| DEDUCTIONS | RIGMN | NON-TAXABLE MECHANIC RIG RENTAL | Add to Net |
| DEDUCTIONS | RIGWN | NON-TAXABLE WELDER'S RIG RENTAL | Add to Net |

The categories contained in Exhibits 1 and 4 are corroborated by the applicable Union Agreements. For example, the Plumbing and Pipefitting Union Agreement has extensive provisions regarding rig pay. It provides that "the hourly wage rates, per diem and fringe benefits" for welders includes rig pay[239] and the associated Pre-Job Agreement sets the rate at $17.00/hr. wet.[240] The Plumbing and Pipefitting Union Agreement also provides that rig

---

[237] Exhibit 1 is titled "Rates and Benefits For Field Personnel." While NPLA Personnel are not Field Personnel, the Labor Classifications listed in the attached chart clearly identify union labor.

[238] That rig pay is a "benefit" is also confirmed in Paragraph H of Section VIII, which provides that "[t]he list of *benefits* which may apply to personnel who are paid pursuant to the NPLA are defined and set forth in Exhibit 4." JX001.0835 (emphasis added).

[239] JX001.0904.

[240] JX018.0002 (Plumbing and Pipe Fitting Pre-Job Agreement). It also provides that the welder needs a driver's license and proof of insurance for his welding rig. *Id.*

rental is subject to collective bargaining and pegs rig rental to the relevant IRS revenue procedure:

> (B)     The Parties agree to treat rig rental rates as a mandatory subject of bargaining within the meaning of the National Labor Relations Act, with all of the rights and obligations that attach to such a subject of bargaining.

> (C)     Employers who rent rigs from Welder Journeymen who perform work covered by this Agreement shall pay such Welder Journeymen the maximum hourly rate determined by the Internal Revenue Service ("IRS") to be non-taxable pursuant to IRS Revenue Procedure 2002-41, as periodically increased by the IRS.  The Parties shall agree at the pre-job conference whether the applicable rate shall be a "wet" rate or a "dry" rate.  The rig rate will not be included in calculating total package annual increase.  Payment for the rig rental shall be separate from the check or other payment for regular payroll.

> (D)     If the IRS eliminates or issues a procedure or ruling that adversely affects the favorable tax status of rental payments for welding rigs currently provided for in IRS Revenue Procedure 2002-41, the Parties agree that they will reopen this Agreement for the limited purpose of renegotiating rig rental rates.[241]

Finally, the characterization of rig pay as a "benefit" is confirmed in Paragraph H of Article 2 which provides that "[t]he list of *benefits* which may apply to personnel who are paid pursuant to the NPLA are defined and set forth in Exhibit 4."[242]

As a benefit, rig rental is properly invoiced to Transco under Paragraph D.  It also is included in the calculation of the Equipment Fee as it is a benefit paid to NPLA Personnel pursuant to a Union Agreement.[243]

---

[241] JX001.0908 (Plumbing and Pipe Fitting Union Agreement).  *See also* JX001.0942 (Plumbing and Pipe Fitting Union Agreement) (setting Welder Technician rig pay); Rev. Proc. 2002-41, 2002-23 I.R.B. 1098.

[242] JX001.0835.

[243] The Operating Engineers Union Agreement provides that mechanics are required to provide usable rigs. JX001.0970 ("Mechanics will be required to provide a usable rig which is in full compliance with federal and state laws as a condition of employment, but will not be required to furnish special tools as a condition of employment.").  *See also* PX126.0006 (Operating Engineers Pre-Job Agreement) (providing for daily truck pay of $65 for groups 1 & 2, $45 for group 3 and $100 per day plus gas for leads and stewards).

Transco argues that rig rental is compensable under Paragraph E of Article 2 (not paragraph D) as Included Equipment.[244] Included Equipment is defined as "materials, equipment, supplies, tool vehicles, machines, offices, office equipment, furnishings, communications and utilities typically owned, leased and/or provided by contractors performing work similar to this Work."[245] The definition includes an enumerated list of categories as well as specific equipment listed on Exhibit 2 to Section VIII.  Neither mechanic rigs nor welding rigs appear on either list.

Perhaps recognizing that rigs are not a category of equipment specifically named in the two extensive lists, Transco argues that rigs are the type of equipment or tools typically owned, leased or provided by contractors.  This position is belied by the NPLAs, which provide that mechanics "will be required to provide a usable rig"[246] and "a Welder Journeyman who is dispatched to a project as a rig Welder will be required to provide a usable rig as a condition of the dispatch."[247]  Further, the IRS Revenue Procedure to which welder rig pay is pegged is premised on the fact that the welder owns the rig and the

---

[244] Transco did not take this position in its October 4, 2018 withholding letter, its Proof of Claim or its Counterclaims.  Transco's previous position—based on the OGCS audit—was only that rig rental was improperly included in the Equipment Fee multiplier because it was the provision of equipment and not for "actual work performed."  This new position (that it is not billable at all) appears in Mr. Slavis's May and June 2022 expert report, which was issued after Judge Sontchi's June 8, 2020 decision expressing serious doubt about Transco's attempt to distinguish between active and passive Labor Costs. *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, 616 B.R. 649, 665 (Bankr. D. Del. 2020), ECF No. 120.

[245] JX001.0827.

[246] JX001.0970 (Operating Engineers Union Agreement).

[247] JX001.0908 (Plumbing and Pipe Fitting Union Agreement).  Under this agreement, "Journeyman" includes all persons seeking employment as welders and includes Stewards. Foremen are also welders.  JX001.0895–96.

employer requires the welder to supply the rig as a condition of employment.[248] This Revenue Procedure, which applies only to welding rigs and mechanic rigs, was adopted by the IRS to provide guidance to the pipeline construction industry on the proper treatment of amounts paid for rigs.[249]

In support of its position, Transco points to the testimony of Mr. Pew, Mr. McDowell and Mr. McNabb. Mr. Pew, Transco's construction manager, described both a welding rig and a mechanic rig and testified that they are common on construction pipeline sites, including the ASR Project. But, he was not asked who typically owns, provides or leases them and his testimony suggests that the rig is supplied by the welder or mechanic.[250] The testimony provided by certain Welded employees is mixed. In one-word responses, both Mr. McDowell, Welded's CFO, and Mr. McNabb, manager of project controls, testified that rigs are typically provided by a contractor on pipeline projects.[251] But, the most fulsome discussion of rigs is more nuanced. Scott Schoenherr, Welded's general superintendent, testified (under questioning by Transco's counsel):

> Q: And, similarly, were welding rigs provided by some of the craft union members?
>
> **A: Yes. So –**
>
> Q: And.
>
> **A: Go ahead.**

---

[248] *See, e.g.*, Rev. Proc. 2002-41, 2002-23 I.R.B. 1098, 1100 (Question 3 and Answer 3).

[249] The request for this IRS guidance was made at the behest of "representatives of the pipeline construction industry . . . ." Rev. Proc. 2002-41, 2002-23 I.R.B. 1098.

[250] *See* Aug. 30, 2023 Trial Tr. (Pew) 1583:24–1584:6.

[251] Sept. 6, 2023 Trial Tr. (McDowell) 2039:12–15 (referencing McDowell Dep. 115:9–12, Dec. 9, 2020); Sept. 6, 2023 Trial Tr. (McNabb) 2054:14–16 (referencing McNabb Dep. 165:6–9, Nov. 6 2020).

Q: I was just going to say, what comprises a welding rig for purposes of a pipeline project or pipeline construction like this one?

**A: So, if you – if you were to look in the PLC, it's spelled out very, very well in there, what comprises of that. And, I'll just take a stab at it.**

**It's a – it's a welding – a truck with a welder, you know, with the – a four-wheel drive crew cab, dually – I mean they're most generally dually trucks – not always – but, you know, to carry the machines and the small tools that they have. Most generally they're a flatbed dually truck, crew cab, single cab, you know, equivalent of a 1-ton or ¾ ton pickup.**

Q: And I might get this wrong, but is the operators – operators, welders that provide these welding rigs?

**A: So it would be the – so as far as the welding rigs go, that would be the – it would be the welders. You know, from the – at each – each welder on the job is supposed to provide a rig and get paid for their rig.**

Q: And, was the purpose of the payment to the welders to cover the expense of the equipment they were providing, i.e. the welding rigs?

**A: Yes.**

Q: And is that – is it typical that the welders provide their own rigs on these types of pipeline projects?

**A: Most definitely.**

Q: And in instances where the welding rigs aren't provided by the craft labor, are they typically rented by the contractor?

**A: Yes.**

Q: And I would presume on pipeline projects such as the ASR project, welding rigs are used on every project correct?

**A: That is correct. [252]**

Based on the evidence presented, I find that a mechanic or welder typically owns and/or provides his rig when working on a pipeline construction project similar to the ASR Pipeline Project. The requirements in the Union Agreements, the

---

[252] Schoenherr Dep. 67:10–68:24, Mar. 23, 2021. Mr. Pew also described the rig as including the individual welder or the individual mechanic and his respective tools. Aug. 30, 2023 Trial Tr. (Pew) 1584:1–1585:4.

adoption of a special IRS revenue ruling for rigs used on pipeline construction projects and the testimony of Mr. Schoenherr, which I find to be the most credible on this issue, all lead to this conclusion. It follows, then, that I find that contractors do not typically own or provide rigs on a pipeline construction project similar to the ASR Project. At most, contractors provide welding and mechanic rigs when the mechanic or welder does not. My conclusion is also buttressed by the fact that mechanic rigs and welding rigs, which are ubiquitous on pipeline construction sites, are not listed in the extensive and detailed list of Included Equipment.[253]

Given these conclusions, rigs can only be Included Equipment under the Contract if a contractor on a pipeline construction project similar to the ASR Project typically leases mechanic rigs and welding rigs. Transco contends that rigs are leased based on Mr. Slavis's reading of the Contract.[254] Apparently, both Mr. Slavis and Transco believe that the use of the term "rental" is definitive. But, Mr. Slavis's interpretation of the Contract is not entitled to any weight[255] and Transco provides no legal authority for Mr. Slavis's conclusion.

Black's defines the verb "lease" as "[t]o grant the possession and use of [real or personal property] *to another* in return for rent or other consideration."[256] This definition

---

[253] "Tack rigs," a specialized type of Welding Rig, is on this list.

[254] Mr. Slavis testified that under the NPLA the employers rent rigs from welding journeymen and that this rig rental is separate from the regular payroll check. Aug. 31, 2023 Trial Tr. (Slavis) 1700:4–12.

[255] Mr. Slavis's position on this point is not based on any experience he might have but simply on his reading of the Contract, which I have rejected.

[256] *Lease*, Black's Law Dictionary (12th ed. 2024) (emphasis added).

necessarily involves the granting of a property interest—i.e., a leasehold interest. The Union Agreements do not contemplate any transfer of a property interest in the rigs to contractors. Rather, the mechanic or welder provides his own rig for his own use on a given day in exchange for compensation set at an hourly rate (either wet or dry).

Because I find that a contractor performing work similar to the work performed on the ASR Project does not typically own, lease or provide mechanic rigs or welding rigs, I conclude that these rigs are not Included Equipment.

Accordingly: (1) Transco is not entitled to recover monies previously paid for rig rental, (2) Welded is entitled to recover the costs of unpaid rig rental detailed in its unpaid invoices and (3) rig rental is included in the calculation of Equipment Fee.

2. Field Personnel Costs and Exhibit 1

Transco presents two separate theories of recovery relating to costs invoiced for Field Personnel. First, Transco argues that Welded invoiced for workers that did not qualify as Field Personnel under the Contract, either because they were Home Office Personnel or because their work was not performed "in the Field." Second, Transco argues that for employees properly categorized as Field Personnel, Welded improperly charged for their service because the rates exceeded Exhibit 1's rates by more than 7.5%. Transco also seeks the Equipment Fee markup of these costs.

Welded responds that "Field Personnel" is defined expansively to cover nonunion employees. Welded also asserts that it informed Transco of updated staffing and rates, which Transco approved when the Book Contract Amendment was executed.

> a.  *Transco cannot recover for rates in excess of Exhibit 1 because those rates were updated and approved by Transco*

Section VIII Article 2.D provides that "[c]ompensation for Work performed by Field Personnel shall be paid in accordance with the actual wages and benefits paid to Field Personnel as set forth in Exhibit 1."[257]

The Original Contract contains an Exhibit 1 to Section VIII, titled "Rates and Benefits for Field Personnel," which is a chart containing rows of job titles and columns of rates and benefits. The cover sheet thereto reads:

> Company shall compensate Contractor for Work performed by Field Personnel in accordance with the rates, rate ranges and benefits set forth in this Exhibit. Contractor shall issue notification to Company before submitting an invoice for Work performed by any Field Personnel which exceeds the rates or rate ranges herein. Contractor must seek approval from Company before implementing any changes to wages and benefits for any Field Personnel member in excess of 7.5% above the values shown herein for any individual labor classification. No such increase shall be given retroactive effect.[258]

Following execution of the Original Contract, the NTP was delayed such that Welded's original cost estimate was no longer viable.[259] Transco requested a complete re-estimate and Welded ultimately presented an updated cost estimate of $454 million on August 17, 2017 as reflected in a new Exhibit 8 to Section VIII.[260] The updated cost estimate includes detailed staffing plans for Field Personnel priced at current salaries.[261] Transco was aware of the updated cost estimate and the buildup to it.[262] Transco accepted the updated staffing

---

[257] JX001.0829.

[258] JX001.0499.

[259] Aug. 24, 2023 Trial Tr. (Hood) 520:19–521:1.

[260] Aug. 24, 2023 Trial Tr. (Hood) 522:17–523:10; PX121; JX001.845.

[261] PX121.0035; JX008.0004; Aug. 24, 2023 Trial Tr. (Hood) 524:16–525:11.

[262] *See* Aug. 24, 2023 Trial Tr. (Hood) 528:9–16:
    Q:  Did Transco know the wages and benefits and salaries were updated since 2016?
    A:  Yes. That's one of the – the basis estimate we looked at earlier.

plan and revised rates for Field Personnel when it executed the Book Contract

Amendment.[263] Because Transco requested, received and approved the updated rates and

---

> Q:  And did you and your team tell Transco that directly in your meetings?
> A:  Yes.  That's part of the presentation, part of the assumptions of the estimate . . . .

*See generally* Aug. 24, 2023 Trial Tr. (Hood) 527:7–23; *see also* Aug. 29, 2023 Trial Tr. (Sztroin) 1351:11–21:

> Q:  And you accepted the $454 million number from Welded after it updated its estimate, true?
> A:  Yes.
> Q:  And, that became the central budget for the contract, correct?
> A:  That's correct.
> Q:  And you knew when that became the central budget for the contract, that Welded was using current salaries and benefits and wages that existed at the time of this estimate, correct?
> A:  That's what the presentation showed, yes.

*See generally* 1348:19–1351:20 (Sztroin acknowledging Transco's awareness of current rates).

Aug. 24, 2023 Trial Tr. (Hood) 599:19–600:19:

> Q:  And this estimate summary doesn't have a list of labor classifications, correct?
> A:  Well, this is just a summary page.  The details of the estimate would have all the stabbing [sic] plan with the rates for the people and their names that signed.  They had – all the details would be behind – for example, this 41 million number in field management supervision is built up on a stabbing [sic] plan of months worked and names or positions.
> Q:  And that detailed estimate that you just described was not incorporated into the contract in Amendment 1, correct?
> A:  It's the backup to this.  I mean, by association, I guess, that's how you get to the 41 number is through the backup.
> Q:  And that detailed estimate was never provided to Transco, correct?
> A:  Oh, yes, it was.
> Q:  The detailed estimate?
> A:  I'm sure it was.  It was provided back in – in August of '17.
> Q:  Was it provided through the presentation that you testified about in your direct testimony?  Is that what you're saying?
> A:  It was provided through – you know, from our project controls guys.  All the details were provided to – to Priya and her team to roll into the baseline of the project.  So, all of that information was available.

Aug. 29, 2023 Trial Tr. (Sztroin) 1353:4–6:

> Q:  So Welded's cost estimate and the buildup to the cost estimate became part of Amendment 1, right?
> A:  Yes.

---

[263] Aug. 24, 2023 Trial Tr. (Hood) 529:5–11; JX001.0529–30, 845.

benefits in Welded's revised staffing plan, these revised rates govern charges for Field Personnel.

Unfortunately, the Book Contract Amendment does not include an updated Exhibit 1 to reflect the revised staffing plan and rates.[264] Nevertheless, based on the evidence presented, I conclude that Welded charged for Field Personnel consistent with the updated staffing plan and/or that any charges for Field Personnel in excess of 7.5% of the rates contained in the Original Contract Exhibit 1 were approved by virtue of the execution of the Book Contract Amendment.

Mr. Slavis did not testify that the rates charged for Field Personnel were in excess of the revised rates. Nor did he testify that he even considered the revised rates. Rather, Mr. Slavis focused solely on the outdated Exhibit 1. He used the payroll database and the outdated Exhibit 1 rates to determine on a person-by-person basis the amounts paid to Field Personnel, which exceeded the outdated Exhibit 1's rates by 7.5%.[265] He opined that the correct amount, when considering the Equipment Fee multiplier, was $1,415,410.[266] While I accept Mr. Slavis's testimony that Welded invoiced Transco for $1,415,410 in excess of Exhibit 1, I nevertheless find that Transco cannot recover. As set forth above, the rates on Exhibit 1 were superseded by the rates supporting the Book Contract Amendment. Thus, Mr. Slavis's analysis is inapposite.

At oral argument, Transco's counsel made two arguments. First, counsel seemed to suggest that Exhibit 1 could only be changed through a contract amendment. But, Exhibit 1

---

[264] JX001.0838 (including only cover page).

[265] Aug. 31, 2023 Trial Tr. (Slavis) 1713:17–1714:6.

[266] Aug. 31, 2023 Trial Tr. (Slavis) 1714:7–12.

provides only that Welded must seek approval of any changes to wages and benefits for Field Personnel that exceed 7.5%. It does not provide that any such approval must be the subject of an amendment to the Contract.[267] The testimony is clear that Transco knew of the buildup to the $454 million revised estimate, including rates for Personnel, and approved it.

Second, counsel argued that because the Book Contract Amendment did not include the updated staffing plan in a revised Exhibit 1, any revised rates were not approved and the original Exhibit 1 continues to govern. This is a misreading of the Book Contract Amendment, which states: "Section VIII shall be replaced *in its entirety* with the attached revision."[268] In the Book Contract Amendment, some of the Exhibits to Section VIII (like Exhibit 1) contain only the cover sheet; others are complete. A literal reading of this provision would mean that those Exhibits without a referenced backup schedule would be blank. In the case of Exhibit 1, it would result in no specified rates and benefits for Field Personnel. Transco does not take the position that it owes nothing for this labor, rather, it defaults to the Exhibit 1 in the Original Contract. I reject this reading. The evidence is that the revised rates were approved and compensation under the Contract is on an actual cost basis. Further, the $454 million cost re-estimate is specifically included in the Book Contract Amendment as Exhibit 8 to Section VIII. Finally, I heard no testimony to suggest that Transco thought it was not obligated to pay current rates for Field Personnel.

### b. *Transco is entitled to recover only $264,960 for labor not compensable as Field Personnel*

---

[267] This is exemplified by Welded's ability to generally change wages and benefits without notice to the Company. JX001.0503 ("Wages and benefits shown above are indicative as of February 1, 2016 and are subject to change without notice to the Company. Contractor will seek approval from Company for any changes to wages and benefits for Field Personnel in excess of 7.5% above values shown herein for any individual labor classification.").

[268] JX001.0529 (emphasis added).

Article 2.A defines Field Personnel as "any Contractor direct employees and/or Agency Personnel,[269] excluding Home Office Personnel,[270] who perform Work in the Field."[271] Essentially, being "in the Field" means being on-site in Pennsylvania as compared to being in Welded's Perrysburg, Ohio office.[272]

As above, the starting point is Article 2.D, which provides that "[c]ompensation for Work performed by Field Personnel shall be paid in accordance with the actual wages and benefits paid to Field Personnel as set forth in Exhibit 1."[273] Again, relying on Exhibit 1, Mr. Slavis identified the labor classifications of each nonunion personnel invoiced by Welded.[274] He then looked at the payroll database to identify the job of nonunion personnel

---

[269] Agency Personnel are employees hired to supplement Welded's direct workforce. JX001.0827.

[270] "Home Office Personnel" encompasses Welded's executive management team as well as other direct employees in the following categories: human resources, controller, facilities, equipment, information security and technology, project controls, quality, contract administration, business development and estimating and labor relations. JX001.0826.

[271] JX001.0826.

[272] JX001.0825. "Field" is defined as

> any Company Work site where the pipeline is to be installed, including any and all Company controlled or provided access roads, staging areas, valve sites and compressor stations associated therewith and any Company-approved site associated with the Work including Contractor yards, Subcontractor yards, mat yards, satellite yards and pipe yards.

[273] JX001.0829.

[274] Aug. 31, 2023 Trial Tr. (Slavis) 1706:14–23.

and compared it to those listed in Exhibit 1.[275]  Through this process, Mr. Slavis identified

twenty-seven job titles that do not appear to be related to those listed on Exhibit 1.[276]

Additionally, Mr. Slavis analyzed whether an individual worked "in the Field."  For

this, he reviewed the payroll database and identified individuals billed as Field Personnel

that did not receive a per diem; he reasoned that if an employee does not receive a per diem,

he works in the Home Office rather than the Field.[277]  Mr. Slavis quantified this category of

overbilling at $176,640 plus $88,320 in the corresponding Equipment Fee charge.

Once again, Mr. Slavis starts from an improper place.  As I have already found,

Exhibit 1 was revised as to both staffing and rates.  Here, he ignored the updated staffing

plan.  Mr. Hood credibly testified that the new detailed staffing plan contained new

positions and accounted for all the Field Personnel positions that were eventually invoiced

to Transco.[278]  Accordingly, to the extent Transco seeks to recover money based on unlisted

positions, it fails.

---

[275]  Aug. 31, 2023 Trial Tr. (Slavis) 1706:14–1707:6.

[276]  Aug. 31, 2023 Trial Tr. (Slavis) 1708:23–1709:4, 1832:16–1833:11.

[277]  Aug. 31, 2023 Trial Tr. (Slavis) 1834:23–1835:12.

[278]  Aug. 24, 2023 Trial Tr. (Hood) 598:23–599:9:
  Q: And you did not submit a request for approval in advance of billing that to Transco
  as provided – or as required by Note 1, correct?
  A: Well, I guess, as I said before, this entire list was subsequently changed by the new
  list people, the new rates that would have went into the amendment.  So, there's a new
  list and new rates.
  Q: So, the information set forth on Exhibit 1 was not utilized in any way by Welded
  in its billing to Transco, correct?
  A: Not in this format, no.  This Exhibit 1 was from past history.  It was revised in the
  new estimate.
*See also* Aug. 24, 2023 Trial Tr. (Hood) 599:19–600:25.

Nonetheless, the Contract provides that to qualify as Field Personnel one must work "in the Field." I am convinced that whether an employee received a per diem is, absent evidence or explanation to the contrary, indicative that the employee did not work in the Field (regardless of whether a classification appears on the original Exhibit 1 or the updated staffing plan). Welded provided no evidence to counter this assertion; rather, Welded simply elicited from Mr. Slavis an acknowledgement that the definition of Field Personnel does not reference per diem.[279] This is not enough.

Accordingly, Transco is entitled to recover $264,960 for improper charges for Field Personnel.[280]

### 3. PTAG Fees Generally and Rates in Excess of 7.5%

Project Talent Acquisition Group ("PTAG") is a well-known staffing agency in the pipeline construction business that provides individuals for roles as "technical engineers, project managers, safety guys [and] quality reps."[281] Welded hired some Field Personnel

---

[279] Aug. 31, 2023 Trial Tr. (Slavis) 1835:4–12.

[280] While Mr. Slavis did not differentiate between improper charges in paid invoices versus outstanding invoices, because of the outcome here, where Transco still owes Welded under the Contract, this failure to differentiate does not make a difference.

[281] Aug. 24, 2023 Trial Tr. (Hood) 519:9–12.

from PTAG.[282] In exchange for supplying personnel, PTAG received a fee.[283] Welded passed the costs from PTAG (including the fee) through to Transco without any markup.[284]

Transco asserts two overbillings with respect to PTAG personnel. First, Transco contends that $765,084 (inclusive of an Equipment Fee charge) of the amounts billed for PTAG Field Personnel was an "agency fee," or premium, not properly chargeable under the Contract. Second, Transco asserts that $811,935 (inclusive of an Equipment Fee charge) of the amounts charged for PTAG personnel exceeded the rates listed on Exhibit 1 by more than 7.5%.

Welded responds generally that PTAG personnel labor is reimbursable under the Contract. On Transco's first contention, Welded does not direct me to any specific provision allowing it to pass through an "agency fee," rather it simply argues that Transco has failed to identify any PTAG agency fee charged to it. On Transco's second contention, Welded, again, argues that Exhibit 1 is the incorrect starting point because Transco agreed to the revised rates for Field Personnel in the Book Contract Amendment.

Under the Contract, Welded may hire Agency Personnel, such as those hired from PTAG, to work on the ASR Project.[285] Agency Personnel are also directly referenced in the definitions of both Home Office Personnel and Field Personnel. Aside from these

---

[282] Aug. 24, 2023 Trial Tr. (Hood) 519:13–19; D0325; D0326; JX040.009–78.

[283] Aug. 24, 2023 Trial Tr. (Hood) 520:4–8:
  Q: Would you have any agency personnel if you didn't pay the agency for its people?
  A: Well, the agency's – the agency's got to make something. They're not going to be in business without receiving some monetary amount.
See also Aug. 25, 2023 Trial Tr. (Gray) 896:3–8.

[284] Aug. 24, 2023 Trial Tr. (Hood) 519:20–520:3.

[285] JX001.0827.

references, Agency Personnel are not generally discussed elsewhere in the Contract. Neither does the Contract separately address Welded's compensation when using Agency Personnel.

    a.    *The Contract does not permit passing through an "Agency Fee"*

Field Personnel[286] are compensated under Section VIII Article 2.D and Exhibit 1, which I have already found was revised in connection with the execution of the Book Amendment Contract. Notwithstanding the revision, nothing in the original Exhibit 1 allows an agency fee to be part of the wages and benefits billed to Transco. Unlike categories of staff and rates, Welded did not provide any testimony that this additional category of fees was included in its buildup to the new cost estimate in the Book Amendment Contract. I will not, therefore, conclude that the revised staffing plan and rates include this additional category of fees.

I reject Welded's argument that Transco's failure to identify the exact amount of the agency fee means none was charged. As shown above, Mr. Hood testified that Welded passed through all PTAG charges. But, Welded is correct that Mr. Slavis did not directly quantify the fee, using instead a proxy to make an approximate calculation. Mr. Slavis relied on an email containing PTAG's standard transition fee for circumstances in which Welded sought to hire a PTAG employee directly.[287] This fee is the cost Welded would pay

---

[286] Mr. Slavis's calculations with respect to PTAG employees only implicate Field Personnel and not Home Office Personnel.

[287] D0325.0002; Aug. 31, 2023 Trial Tr. (Slavis) 1715:5–10:
> A: What we have here is an email exchange that had with it a supporting schedule of by individual, a fee to be charged for that individual. So what we did is we took – again, they had a different percent for each person – we took the percent that was allocated to that individual and used that as a proxy for the fee that was billed for these people.

to permanently hire a PTAG employee and transition that employee away from PTAG.[288] Mr. Slavis applied the relevant percentage to each PTAG-supplied employee to arrive at his estimate of $510,056 as the Agency Fee (plus the Equipment Fee of $255,028).

I am not convinced that this proxy is the best substitute for the Agency Fee as a transition fee serves an entirely different purpose. Nonetheless, my review of the PTAG invoices[289] does not permit me (or anyone else) to determine the Agency Fee nor did Welded present any evidence or other approximation of the fee charged by PTAG.[290] As the only evidence I have of the Agency Fee is from Mr. Slavis, I accept his number. The alternative would be to disallow all compensation sought for PTAG Agency Personnel, which is not relief that Transco sought nor would it be fair. Accordingly, I conclude that Welded has overbilled for Agency Fee in the amount of $765,084.

     *b.*     *Welded can charge rates in excess of 7.5%*

Transco's claim for wages paid in excess of 7.5% greater than Exhibit 1 fails for the same reasons it did before. I have already found that the rates set forth in Exhibit 1 were updated as part of the Book Contract Amendment. Because Transco sought and approved rates different from Exhibit 1, Transco cannot now complain about those rates. Accordingly, Transco's second claim related to PTAG compensation is denied.

     4. Bechtel Labor Costs

Similar to PTAG, Welded used employees of affiliate Bechtel Oil, Gas and Chemicals, Inc. ("Bechtel") to perform certain Work on the ASR Project. Specifically,

---

[288] D0325.0002.

[289] *See, e.g.*, JX040.0009–78.

[290] Apparently, neither Welded nor Transco sought this information from PTAG.

Bechtel seconded employees to Welded pursuant to that certain Request for Services (effective January 1, 2017) as per a Continuing Services Agreement dated as of May 29, 2015.[291]

First, Transco contends that it does not owe Welded $4,342,365 (inclusive of the Equipment Fee) for services actually performed by Bechtel-seconded employees on the ASR Project because Bechtel wrote off the underlying invoices for those services. If those costs were not "paid" by Welded, the argument goes, then Transco has no obligation to pay them. Second, Transco contends that $107,634 (inclusive of the Equipment Fee) of the Bechtel invoices that were paid included a 1.5 multiplier, which is not for actual wages or benefits delineated on Exhibit 1 and so are not compensable under the Contract.

Welded counters that Transco is responsible for payment for the services of Bechtel-seconded employees regardless of payment of the underlying invoices. It also argues that the 1.5 multiplier is to compensate Bechtel for benefits provided to seconded employees.[292]

Bechtel-seconded employees were hired pursuant to a staffing agreement to supplement Welded's workforce.[293] As such, they are Agency Personnel and their services are compensable as Field Personnel pursuant to Section VIII Article 2.D, Exhibit 1 and the updated staffing and rates buildup supporting the Book Contract Amendment. Except as discussed below, Transco does not argue that the rates charged are inconsistent with or exceed the listed rates. Rather, Transco's main argument is that because Welded did not

---

[291] JX003.

[292] This is an entirely new claim having not been asserted in either Proof of Claim or Transco's counterclaims.

[293] Aug. 24, 2023 Trial Tr. (Hood) 517:11–18; *see also* JX007.

actually pay certain Bechtel invoices as they came due, Welded cannot charge Transco for these services.

Bechtel invoiced Welded $3,381,735.56 over the course of the ASR Project.[294] Ultimately, Welded paid $486,825.67 in the ordinary course, leaving a balance of $2,894,909.89.[295] Thereafter, and as part of a Settlement Agreement executed by Welded, the Official Committee of Unsecured Creditors in the Welded bankruptcy case, numerous Bechtel entities, including Bechtel Oil, Gas and Chemicals, Inc., and certain McCaig entities,[296] the Bechtel entities resolved all of their claims against Welded and its estate. The resolution included a payment by the Bechtel and McCaig entities of $2 million to the estate and the grant of reciprocal, general releases among all parties. In particular, the Bechtel entities waived any and all claims of any nature that had been or could be asserted against Welded and its estates. This Settlement Agreement (defined as the Plan Settlement Agreement) was approved by the Court as part of confirmation of the Amended Chapter 11

---

[294] D2045.

[295] D2045.

[296] McCaig holds certain partnership units in Welded. Complaint 3.

Plan of Welded Construction, L.P. and Welded Construction Michigan, LLC.[297]

Thereafter, Bechtel wrote off the unpaid invoices for its seconded employees.[298]

Based on the Settlement Agreement's broad releases and the testimony of Welded's

CRO, Frank Pometti, I find that Bechtel was compensated for its claims related to the

seconded employees. Bechtel's claim against Welded for unpaid invoices related to the

ASR Project was released through the Settlement Agreement and chapter 11 plan.[299] As the

Settlement Agreement states, the releases were provided for good and valuable

consideration. The Settlement Agreement also enabled the confirmation of a plan.

Accordingly, I find that the Bechtel invoices do not remain unpaid; rather, they were settled

as part of a compromise. Thus, Transco's argument is not well taken.

Transco's second argument regarding the Bechtel 1.5 multiplier is a closer call.

Transco seeks to claw back $107,634 from Welded invoices dated August 5, September 12

and October 9, 2017 based on Mr. Slavis's calculation.[300] The sole basis for Mr. Slavis's

---

[297] Aug. 28, 2023 Trial Tr. (Pometti) 1054:20–1058:2; PX529.0082:

> Effective as of the Agreement Effective Date, the Partner Settlement Parties, on behalf of themselves and any person or entity claiming by or through the Partner Settlement Parties, except as provided in section 8 below, (i) waive any and all claims and/or requests for payment, whether administrative, priority or unsecured in nature, that have been, could have been, or could be asserted by the Partner Settlement Parties (or any person or entity claiming by or through the Partner Settlement Parties) against the Debtors and their Estates . . . .

PX529.0080 defines Bechtel as one of the "Partner Settlement Parties." These were incorporated into the Plan at PX529.0072–73, 76. The sole exception does not relate to the ASR Project or Transco.

[298] Aug. 23, 2023 Trial Tr. (Wall) 431:13–433:23; Sept. 6, 2023 Trial Tr. (Slavis) 1870:9–1871:8; D2045.

[299] That Bechtel wrote off amounts for claims it had already released does not affect my finding.

[300] D2047U.

"opinion" is that he viewed the multiplier as nonchargeable because it "was a markup that went directly to Bechtel" and was not paid directly to an employee.[301] He testified that: (1) the testimony he heard during the trial "clarified" that position for him and (2) the documents he looked at "appear to have benefits in it and then markup after that."[302] His view, therefore, is that if a benefit is not directly paid to an employee in a weekly paycheck, it is not compensable.

During the trial, Mr. Hood testified that the multiplier was used to provide benefits (such as 401(k), vacation and paid time off) to the seconded employees, not as profit or a markup fee to Bechtel.[303] His testimony is supported by the Bechtel invoices that delineate in broad terms the categories of labor charged to Welded.  The categories include standard and overtime wages, other wages (i.e., double/triple overtime, incentive payments, temporary assignments, living allowance, goods and services, housing and transportation allowances, statutory compensation, per diems, relocation allowance, wages and shift premium), payroll additives, multiplier amounts (1 and 2), markup and fee.  While the

---

[301] Aug. 31, 2023 Trial Tr. (Slavis) 1720:10–25.  Mr. Slavis's testimony was not based on any specialized knowledge, but simply his read of the Contract and view of the evidence.

[302] Aug. 31, 2023 Trial Tr. (Slavis) 1720:10–25.

[303] Aug. 25, 2023 Trial Tr. (Hood) 702:11–22:
    Q:  And with regard to the Bechtel multiplier that we have heard about, the 50 percent
    multiplier, that amount was not paid to you, Mr. Hood, on your wages and payroll
    additives, correct?
    A:  In a – in a roundabout way, some of it could have been through – you know,
    because that – that multiplier, again, covers a lot of – a lot of things like – like vacation
    time, like, you know, paid time off, holidays, 401(k) benefits, so – so that – they're not
    paid directly in a – in a – in a weekly paycheck, but they are employee benefits.  And
    that's – that's – that's – the multiplier is how that is recouped.

Bechtel invoices include charges in the multiplier columns, there is no charge for either a markup or a fee.[304]

I reject Mr. Slavis's conclusion and, based on the evidence presented, find that the Bechtel multiplier is to pay for benefits to seconded employees. Unlike the PTAG agency fee, the Bechtel multiplier is not a markup or a fee, but rather a way to charge for benefits. The question, therefore, is whether the multiplier is properly chargeable to Transco. I conclude that it is. The distinction drawn by Mr. Slavis/Transco is not internally consistent. Nowhere else does Transco challenge benefits/pay not paid directly to employees. For example, Welded billed Transco for state and federal taxes as well as health and welfare benefits; Transco does not take issue with these charges. Further, these types of benefits are on Exhibit 1 to Section VIII and, as already stated, I accept the testimony that the Book Contract Amendment contains updated rates and benefits.

As Field Personnel, wages and benefits paid for services provided by Bechtel seconded employees are chargeable under the Contract. These charges are also Labor Costs which attract the Equipment Fee. This conclusion comports with the underlying principle of the Contract that Welded is paid on an "actual cost-basis."[305]

5. General Liability Insurance

Transco asserts that Welded billed Transco for general liability insurance costs that the Contract allocates to Welded. Welded responds that general liability costs are a

---

[304] Because neither Mr. Slavis nor Transco referred to an admitted exhibit number, I reviewed Bechtel invoices in other months to determine what was invoiced. In each instance, the form of Bechtel invoice was the same and reflected no charge for markup or fee. *See, e.g.*, JX021.0439; JX030.0030.

[305] JX001.0825.

compensable cost under Section VIII of the Contract. The parties direct my analysis to Sections I and VIII of the Contract.

Section I of the Contract, titled "General Contract," contains provisions on a myriad of topics from the definition of Work to confidentiality to force majeure and damages. Article 8 requires that Welded carry certain types of insurance throughout the Contract period.[306] Article 8 then enumerates several types of insurance required by Transco, including Worker's Compensation and Employer's Liability, General Liability, Pollution Liability and Excess Liability policies.[307] With one exception not relevant here, the Contract also provides that Transco must be an additional insured on all policies and that the "policies will respond as primary to any other insurance available to" Transco.[308] Article 8 also provides that "[a]ll costs and deductible amounts will be for the sole account of Contractor."[309] Finally, Section I also directs the court to look to Section VIII to determine compensation for Work under the Contract.[310]

---

[306] JX001.0014 ("Contractor will carry or cause to be carried and maintained in force throughout the entire term of this Contract . . . insurance . . . . The limits set forth below are minimum limits and will not be construed to limit Contractor liability. All costs and deductible amounts will be for the sole account of Contractor.").

[307] JX001.0015–18.

[308] JX001.0015.

[309] I have already found this language to be awkward. *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, Adv. Pro. No. 19-50194, 2023 WL 4853146, at *6–7 (Bankr. D. Del. July 28, 2023), ECF No. 394.

[310] JX001.0009.

Section VIII of the Contract dictates Welded's compensation for Work under the Contract.[311]  General liability insurance appears here in Exhibit 4.[312]  Specifically, general liability insurance is listed and characterized as an "employer paid benefit" as this excerpt from Exhibit 4 shows:[313]

| Category | Code | Description | Notes |
|---|---|---|---|
| Earnings | ER4KF | Manual 401K FUND | Employer Paid Benefits |
| Earnings | ERANN | Manual Annuity | Employer Paid Benefits |
| Earnings | ERAPP | Manual Apprenticeship | Employer Paid Benefits |
| Earnings | ERBEN | Manual Retiree Benefits | Employer Paid Benefits |
| Earnings | ERDNT | Non-Manual Paid Dental | Employer Paid Benefits |
| Earnings | ERGLB | General Liability Insurance | Employer Paid Benefits |
| Earnings | ERGTL | Non-Manual Group Term Life/AD&D | Employer Paid Benefits |
| Earnings | ERHW | Manual H&W (Hourly) | Employer Paid Benefits |
| Earnings | ERHW1 | Manual H&W (%) | Employer Paid Benefits |

It is surrounded by other common "employer paid benefits" like dental, vision, life insurance and 401K matching.[314]  Additionally, the term "insurance" is found in the definition of Labor Costs.  "Labor Costs" includes "fringe benefits, employee vehicle rental/pay, travel pay, per diem, fuel pay, payroll taxes *and insurance* in accordance with Exhibit 1 actually paid to NPLA and Field Personnel in connection with payment for actual Work."[315]

Prior to trial, Transco moved for summary judgment on this issue.  Relying on the language in Section I of the Contract, as well as the definition of Fixed Fee[316] in Section

---

[311] JX001.0825.

[312] Section VIII's Paragraph H contains a miscellaneous provision instructing that Exhibit 4 is incorporated into Section VIII and that Exhibit 4 is a list of benefits which may apply to NPLA personnel.  JX001.0835.

[313] JX001.0512.

[314] JX001.0512–13.

[315] JX001.0826 (emphasis added).

[316] "Fixed Fee" is defined to cover:

VIII, Transco sought judgment as a matter of law. Welded contested Transco's motion, relying on Section VIII and Exhibit 4. I denied Transco's summary judgment motion because I concluded that the Contract was ambiguous on whether general liability insurance costs were reimbursable. I expected the parties to present evidence at trial to resolve this ambiguity.

Only Transco adduced any evidence on general liability insurance at the trial.[317] First, Mr. Slavis testified that Welded did in fact bill for the cost of general liability insurance as part of payroll.[318] Second, he testified that general liability insurance covers bodily injury and property damage for third-party claims (i.e., nonemployee claims) while worker's compensation insurance covers claims by employees.[319] Third, he testified that in his experience with other cost-plus contracts, general liability insurance is a home office cost.[320] When asked whether he had ever seen general liability insurance costs "paid to" an employee, Mr. Slavis responded no.[321] Nevertheless, Mr. Slavis admitted that he does not

---

(i) Contractor cost and expenses attributable to Contractor's Home Office overhead and management in connection with the Project; (ii) profit payable to Contractor in connection with the Project; and (iii) all income, revenue, rates, overtime, premium pay, taxes, benefits and expenses (including any business, travel, or living expenses) in connection with Work performed by Home Office Personnel.
JX001.0825.

[317] Welded did not adduce any testimony from Scott Gray along the lines it submitted in opposition to summary judgment.

[318] D2047L (Mr. Slavis's schedule backup of nearly 2,800 pages identifying General Liability Insurance costs charged per employee per week); Aug. 31, 2023 Trial Tr. (Slavis) 1711:1–5; *see also* Aug. 24, 2023 Trial Tr. (Hood) 504:10–505:2 (explaining the labor recap of an invoice). No one produced evidence of how other required insurance coverages were (or were not) billed to Transco.

[319] Aug. 31, 2023 Trial Tr. (Slavis) 1709:16–1710:25.

[320] Aug. 31, 2023 Trial Tr. (Slavis) 1711:1–13; *see* D2047L (Schedule 6.1).

[321] Aug. 31, 2023 Trial Tr. (Slavis) 1712:1–6.

know whether the amounts charged to Transco for general liability insurance were actually "paid to" the employees.[322]

Transco also cites to a board book from October 26, 2016.[323] The cited section reads:

> Welded SG&A spend has historically not included property casualty and liability insurance, an expense that will reach ~$4M this policy year. This spend has been buried in General Equipment, Leases, and repairs in the past. In 2017, this spend will be shown as a component of SG&A.[324]

Based on the language of the Contract and this evidence, Transco contends that, fundamentally, general liability insurance is overhead and not "paid to" an employee. Thus, it is not compensable under the Contract.

Welded does not point to any new evidence from trial. Rather, Welded points to Proof of Claim Number 636 to show that Transco previously only contested the Equipment Fee portion of insurance costs and did not oppose the actual payment for general liability insurance.[325] Based on the language of the Contract and this evidence, Welded contends that Transco's newly developed claim was waived as it does not appear in the proof of claim

---

[322] Aug. 31, 2023 Trial Tr. (Slavis) 1711:17–25:
Q: So, when you say, "to me, it's not a benefit paid directly to employee," right, in your review of the payroll information here, the underlying data, were you able to confirm whether or not that was money that was paid to these employees?
A: I don't know that it is directly paid to the employee, but it's listed in their payroll build-out. But I don't have checks to see, but I would imagine it wasn't because it's not-

[323] Exhibit D0029 was one subject of Welded's Motion in Limine regarding documents related to its cash management system. I previously admitted this exhibit for a limited purpose. Aug. 23, 2023 Trial Tr. (Hawkins) 300:5–302:22. Transco now seeks to use it to support its argument regarding general liability insurance. Because I find that the cited portion is, arguably, relevant to the issue, and because I find that it is not being admitted for the reasons opposed in Welded's Motion in Limine, I also admit the cited portion of Exhibit D0029.

[324] D0029.0012.

[325] *See* Transco Claim 636.

or counterclaims. And, in any event, Exhibit 4 explicitly contemplates payment of general liability insurance as a benefit and, as it appears in the Compensation section, trumps the more general language in Section 1.

Based on the Contract, I conclude that general liability insurance may be billed to Transco. Mr. Slavis's testimony that general liability insurance is to cover third-party injuries that occur in the Field (rather than injuries occurring in the Home Office) suggests that this coverage is project-specific. This conclusion is also bolstered by the requirement that Welded obtain general liability insurance coverage for the benefit of the ASR Project, including Transco. Because it is not solely for the benefit of Welded or Home Office Personnel, general liability insurance does not fit naturally in the definition of Fixed Fee,[326] which is the means to recover for expenses attributable to Home Office overhead. Rather, as Welded notes, general liability insurance is specifically referenced on Exhibit 4 as an employer-paid benefit. Further, because Transco requires Welded to obtain general liability insurance and this is a cost-plus contract, common sense as well as Section VIII permit the cost to flow through to Transco.

While Mr. Slavis testified as to his experience with cost-plus contracts, he did not expound upon any particular provisions in those contracts, including those such as Exhibit 4. Further, Transco's reference to Welded's board book is unhelpful as I have been provided no context and Transco cites me to one paragraph of a twenty-three-page

---

[326] Fixed Fee is "the . . . $50,500,000 lump sum fixed fee price, payable to Contractor in installments as further set forth in this Contract, covering all: (i) Contractor cost and expenses attributable to Contractor's Home Office overhead and management in connection with the Project; (ii) profit payable to Contractor in connection with the Project; and (iii) all income, revenue, rates, overtime, premium pay, taxes, benefits and expenses (including any business, travel or living expenses) in connection with the Work performed by Home Office Personnel." JX001.0825.

document. While the final sentence of the cited paragraph notes that, going forward, Welded will account for general liability insurance in its SG&A category, I have no evidence on why Welded is choosing to categorize it that way. Moreover, the first two sentences appear to indicate that, prior to 2017, Welded did not categorize general liability insurance as overhead. I note (almost parenthetically) that the Original Contract was executed in August 2016, before Welded moved general liability insurance costs to SG&A. Finally, I am unconvinced that a benefit is only compensable if directly "paid to" the employees.[327] Field Personnel and NPLA Personnel under the Contract receive many benefits that are not "paid to" them directly. Exhibit 4 lists several, including employer-paid medical, non-manual vision and non-manual paid dental that are listed as "employer paid benefits" and are presumably not paid directly to the employees.[328] Nevertheless, Transco has not argued, nor could it credibly, that such benefits are noncompensable under the Contract.

Accordingly, I conclude that Welded can charge Transco for general liability insurance under the Contract and given the definition of Labor Costs, general liability insurance is included in the calculation of Equipment Fee.[329]

---

[327] *See* Aug. 31, 2023 Trial Tr. (Slavis) 1711:1–25 ("But to me, it's not a benefit paid directly to the employee; it's paid by the main company.").

[328] JX001.0512–13.

[329] The Contract determines this issue. But, this would not be the first construction contract to permit reimbursement of general liability insurance. *See Olmstead Constr., Inc. v. Otter Creek Invs., LLC*, 940 N.W.2d 44, 2019 WL 4678167, at **6 (Iowa Ct. App. 2019) ("It is important to carefully define which construction costs incurred by the contractor are to be reimbursed. It is typical to provide reimbursement for wages paid for labor and taxes; benefits; insurance costs based on those wages; rented equipment; subcontract costs; insurance costs; bonding costs; building permit costs; costs of contractor-owned equipment (which can be controversial to determine); and costs of material.") (quoting *Constructive Consultants, Inc., v. Banwart*, 829 N.W.2d 589, 2013 WL 988637, at

6.  Vehicle Allowance Costs

Welded invoiced Transco for vehicle rental paid to NPLA Personnel who performed work on the ASR Project.  Relying on the definition of "Labor Costs" and Exhibit 1, Transco contends that vehicle rental is only payable to specified NPLA Personnel.  This excerpt from Exhibit 1 is helpful to explain Transco's position:

| Labor Classification | Vehicle Rental |
| --- | --- |
| LBF1 | Yes |
| LBF2 | Yes |
| LAF1 | |
| LAF2 | |
| LBST | Yes |
| LB01 | |

Transco admits that NPLA Personnel classified as LBF1, LBF2 and LBST are entitled to vehicle rental, but contends that NPLA Personnel classified as LAF1, LAF2 and LB01 are not.  Mr. Slavis reviewed Welded's payroll information for invoiced labor costs and identified eight classifications that were improperly invoiced under this theory.  Mr. Slavis quantified this as an $867,447 issue.[330]

Welded counters that compensation for NPLA Personnel, including for vehicle rental, is governed by Article 2.D of the Contract.  Welded further argues that Exhibit 1 is not referenced in this paragraph with respect to NPLA Personnel, so it is irrelevant to this issue.[331]

---

*4 n.2 (Iowa Ct. App. 2013) (quoting 2 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 6:81 (Dec. 2012)) (Table)) (Table).

[330]  Aug. 31, 2023 Trial Tr. (Slavis) 1712:17–1713:12.

[331]  Welded's Post-Trial Br. 37, ECF No. 433.

As discussed above, Transco starts from an improper premise. The definition of "Labor Costs" and Exhibit 1 do not control whether vehicle allowance costs can be billed to Transco. Accordingly, Mr. Slavis's analysis is inapplicable.

Article 2.D governs Welded's compensation for wages and benefits for services provided by NPLA Personnel. It provides that the Union Agreements are the governing documents. Transco does not contend that the Union Agreements do not provide for vehicle rental/allowance to NPLA Personnel for the eight challenged classifications. Neither does it contend that vehicle allowance costs were unnecessary or unreasonable.

Accordingly, I conclude that Transco owes Welded for vehicle allowance/rent.

7. Included Equipment Costs

Transco next argues that Welded improperly invoiced Transco for seven categories of equipment that constitute Included Equipment. Mr. Slavis quantifies this as a $7,696,160 issue.

Welded responds that it properly invoiced Transco for the challenged equipment as either Specialty Equipment or Subcontractor costs. Essentially, the question presented for each invoiced category is whether it falls within the Contract's definition of Included Equipment. If it does, Welded's separate invoicing was improper. Otherwise, Welded's invoicing was proper.

*a. Mr. Slavis's calculation and Welded's Motion in Limine*

To quantify the alleged improper Equipment Costs, Mr. Slavis reviewed every invoice to identify those that contained charges for equipment Mr. Slavis categorized as

Included Equipment.[332] Mr. Slavis admits that he is not an expert in pipeline construction equipment.[333] Rather, he relied upon an FTI co-worker's (Mr. Gilhooley) expertise.[334] Mr. Gilhooley is a "field guy" who worked on the construction of pipelines.[335] Together, Mr. Slavis and Mr. Gilhooley looked up each piece of equipment by the model number contained in the invoice, and Mr. Gilhooley identified the type of equipment invoiced.[336] Mr. Slavis then shared the results with Mr. Sztroin and Mr. Triche to verify that the equipment was properly identified.[337] When confirmed, Mr. Slavis then opined on whether each piece of equipment was Included Equipment or Specialty Equipment.

Prior to and at trial, Welded objected to Mr. Slavis's testimony to the extent he opined on the Included Equipment/Specialty Equipment categorization, contending he was not qualified to render that opinion because he has no specialized expertise or industry knowledge related to construction equipment and that this opinion is a legal conclusion.[338] Welded did not object, however, to Mr. Slavis's identification of each piece of equipment.

At trial, I ruled that I would accept Mr. Slavis's quantification of the different types of equipment, but I would not accept his conclusion of whether a piece of equipment is

---

[332] Aug. 31, 2023 Trial Tr. (Slavis) 1738:17–1739:8.

[333] Aug. 31, 2023 Trial Tr. (Slavis) 1787:11–20.

[334] Aug. 31, 2023 Trial Tr. (Slavis) 1738:17–1739:8.

[335] Aug. 31, 2023 Trial Tr. (Slavis) 1685:11–18.

[336] See Aug. 31, 2023 Trial Tr. (Slavis) 1745:17–24, 1783:20–1784:3.

[337] Aug. 31, 2023 Trial Tr. (Slavis) 1738:17–1739:8.

[338] Welded's Mot. in Lim. to Preclude Joseph Slavis from Offering Legal Conclusions and Unreliable Ops., ECF No. 357; Aug. 31, 2023 Trial Tr. (Slavis) 1735:3–12, 1746:20–1747:4.

Included Equipment (or not).[339]  To expound, the determination of whether a piece of equipment is Included Equipment is a legal issue, which I must determine based on the terms of the Contract.  Further, this is a bespoke contract and I have no evidence that the terms "Included Equipment" or "Specialty Equipment" as defined in the Contract are boilerplate terms or within some sort of industry standards.  Nevertheless, I do conclude that the process by which Mr. Slavis identified each piece of equipment was robust and reliable.  Further, Welded did not challenge any identification of any piece of equipment.[340] Accordingly, as I stated at trial, I accept Mr. Slavis's testimony for purposes of quantifying the amounts invoiced for specific types of equipment.  To be clear, then, I overrule Welded's objection to Mr. Slavis's reliance on Mr. Gilhooley and Mr. Sztroin.

In this context, I consider each type of equipment challenged by Transco.  As a general proposition, if the type of equipment is listed on Section VIII, Exhibit 2, I conclude that this equipment is Included Equipment absent some other controlling provision in the Contract.

*b. Dump Trucks*

The definition of Included Equipment includes trucks.  Exhibit 2 further lists "On-road Dump Trucks" as Included Equipment.[341]  Mr. Slavis looked through Welded's invoices and identified on-road dump trucks used for intra-site hauling charged as either Subcontractor costs or materials.[342]  He then approximated the costs related to labor (also

---

[339] Aug. 31, 2023 Trial Tr. (Slavis) 1737:5–1738:10, 1748:15–17.

[340] As opposed to the classification of types of equipment.
[341] JX001.0506.

[342] Aug. 31, 2023 Trial Tr. (Slavis) 1732:16–1733:18.

supplied by the Subcontractor) by analyzing the hourly cost of an operator and deducting it from the invoice.[343] The remainder of the invoiced amount, or $1,212,433, Mr. Slavis attributes to the lease of the on-road dump trucks.[344]

Welded asserts that the costs for on-road dump trucks are properly billed to Transco because that equipment was obtained through Subcontractors. As the definition of Subcontractors makes clear that they can provide both services and equipment (as well as materials, supplies and consumables) Welded argues that it is improper to parse out the equipment costs and pass only the remainder of the Subcontractor invoice through to Transco. Transco does not dispute that the identified on-road dump trucks were supplied via Subcontractors. Instead, it argues that because on-road dump trucks are Included Equipment, the party supplying them is irrelevant because compensation for Included Equipment is via the Equipment Fee. Given these contractual provisions, the question is whether Included Equipment provided by a Subcontractor is covered by the Equipment Fee or is invoiced as a Subcontractor cost? I conclude that Included Equipment is compensated solely through the Equipment Fee.

The definition of Included Equipment generally describes categories of equipment which are paid for through the Equipment Fee. It also directs the parties to Exhibit 2, which is a list of sixty-nine specific pieces of equipment within those categories. "On-road Dump Trucks" falls in the general category "vehicles, trucks and machinery including spare and replacement parts therefor." "On-road Dump Trucks" also appears on Exhibit 2.

---

[343] Aug. 31, 2023 Trial Tr. (Slavis) 1733:25–1734:11.

[344] Aug. 31, 2023 Trial Tr. (Slavis) 1733:25–1734:24. At trial, Transco's Senior Construction Manager for the ASR Project, Mr. Pew, testified about the difference between tri-axle (on-road) and articulated (off-road) dump trucks. Aug. 30, 2023 Trial Tr. (Pew) 1579:18–1582:17.

Section VIII Article 2.E further provides that the Equipment Fee "shall cover the cost, expense, overhead, profit and all compensation due and payable to Contractor in connection with the provision and supply of Included Equipment."[345]

Subcontractors are defined as third parties contracted to provide services and/or equipment.[346] Section VIII Article 2.D.5 provides that Subcontractor services are compensated at actual cost CIF.[347] Neither the definition of Subcontractor nor the compensation provision lists types of services or equipment that are compensated under Paragraph D.5. Similarly, neither provision specifies what types of services can be subcontracted (i.e., it does not provide that dump trucks can be subcontracted). Rather, the compensation provision lists four types of services that *cannot* be subcontracted or outsourced. The fact that the exclusions do not include dump trucks simply means that Welded can hire Subcontractors to obtain them.

Looking at this through the lens of a cost-reimbursable contract, one might conclude that any actual out-of-pocket cost for services or equipment provided by a third party should be passed through to the owner. But, the overall nature of this Contract also includes Welded's provision of Included Equipment—a term that does not appear to be industry

---

[345] JX001.0833.

[346] JX001.0827 ("'Subcontractor' means any third party contracted by Contractor (excluding however Agency Personnel) to provide Work, services and/or equipment, materials, supplies or consumables to the Project. For the avoidance of doubt, the term 'Subcontractor' includes third parties with whom Contractor has entered into leases or rental agreements for equipment, machinery and other project/construction items.").

[347] JX001.0831 ("Compensation for actual Work performed by Subcontractors shall be invoiced and paid in accordance with actual amounts CIF (costs including freight and taxes) invoiced by any such Subcontractors.").

standard and may even be unique to this Contract.[348]  Exhibit 2 does contain certain

exclusions that qualify the inclusion of a piece of listed Included Equipment.  For example,

Exhibit 2 provides, in relevant part:

| Description | Equivalent/Exclusion |
|---|---|
| Pipe Bending Machines | (excludes rented mandrels and dies) |
| Pickup Trucks | (excludes those that appear under Labor Cost) |

There is no such exclusion for on-road dump trucks.  Moreover, accepting Welded's

position would mean that Welded could subcontract for all Included Equipment and charge

the cost to Transco, thereby subverting entirely the purpose of the Equipment Fee.  That

cannot be what the parties intended.  Had the parties meant to exclude subcontracted

equipment from the Equipment Fee, the Contract could so provide per the examples set

forth above.  It does not.

Because on-road dump trucks are Included Equipment, such costs were improperly

invoiced to Transco.

c. *Pickup Trucks*

Transco argues that pickup trucks rented from Subcontractors are not properly billed

to Transco because they are Included Equipment listed on Exhibit 2, subject to an exception

for those pickup trucks "charged as a Labor Cost."  Mr. Slavis testified that he looked

through each invoice and pulled out pickup trucks procured through Subcontractors.[349]

Those invoices totaled $3,107,699.  He accounts for the exception found in Exhibit 2 by

excluding pickup trucks paid for via a vehicle allowance as captured in Welded's payroll

---

[348] *See* Aug. 31, 2023 Trial Tr. (Slavis) 1790:7–14.

[349] Aug. 31, 2023 Trial Tr. (Slavis) 1731:8–21; Sept. 6, 2023 Trial Tr. (Slavis) 1874:21–23.

data (that he quantified at $7.6 million).[350]  On cross-examination, Mr. Slavis admitted that he did not know for which Personnel Welded rented these vehicles.[351]

Welded argues that because pickup trucks are acknowledged in the definition of Labor Costs they fall within the exclusion contained in Exhibit 2 and thus are properly chargeable to Transco.  Because Welded rented the pickup trucks at issue, Welded charged Transco for them under the Subcontractor payment provision.  Welded relies on Mr. Hood's testimony.  As to NPLA Personnel, they receive truck pay or vehicle allowance in accordance with the Union Agreements.[352]  As to Field Personnel, they could elect to receive a stipend and provide a personal vehicle or to receive a rented vehicle.[353]  Mr. Hood further testified that those pickup trucks were rented from Subcontractors.[354]  On cross-examination, Mr. Hood testified that Field Personnel were provided a vehicle pursuant to a Welded internal policy.[355]

Because Included Equipment excludes pickup trucks that "appear under Labor Costs,"[356] the question is whether the pickup trucks that Mr. Slavis identified—i.e., pickup trucks provided to Field Personnel—fall within that exception.  Because the Contract uses the defined term "Labor Costs," I look to that definition.

---

[350] Aug. 31, 2023 Trial Tr. (Slavis) 1731:22–1732:11.

[351] Sept. 6, 2023 Trial Tr. (Slavis) 1874:24–1875:1.

[352] Aug. 24, 2023 Trial Tr. (Hood) 510:11–18.

[353] Aug. 24, 2023 Trial Tr. (Hood) 510:19–511:1.

[354] Aug. 24, 2023 Trial Tr. (Hood) 511:2–5.

[355] Aug. 24, 2023 Trial Tr. (Hood) 598:1–11.

[356] JX001.0506.

> "Labor Costs" means i) the actual wage rates and benefits paid to NPLA Personnel pursuant to the NPLA for actual Work performed, ii) the actual wages and benefits, in accordance with Exhibit 1 paid to Field Personnel for actual Work performed and iii) for both i and ii above, to the extent however not already addressed by or covered under the NPLA with respect to NPLA Personnel, fringe benefits, employee vehicle rental/pay, travel pay, per diem, fuel pay, payroll taxes and insurance in accordance with Exhibit 1 actually paid to NPLA and Field Personnel in connection with payment for actual Work.[357]

For Field Personnel, I look to Exhibit 1. Exhibit 1 contains a column labeled "Vehicle Rental." While this column reflects such benefits for certain union workers, Vehicle Rental is "N/A" for all Field Personnel except for assistant superintendents. As I have already ruled, Exhibit 1 was subsequently revised and adopted in the Book Contract Amendment. But, unlike updated rates and staffing, I have no evidence that Welded's internal policy with respect to paying Vehicle Rental changed between the execution of the Original Contract (August 10, 2016) and the adoption of the Book Contract Amendment when the updated cost estimate was generated. Thus, Vehicle Rental does not fall within the definition of Labor Costs.

Accordingly, I find such trucks were Included Equipment and were improperly invoiced to Transco in the amount of $3,107,699.

### d. Trench Boxes

Transco contends that Welded improperly billed $1,336,176 for conventional trench boxes because they are Included Equipment. Welded counters that trench boxes are Specialty Equipment, and that Transco voluntarily paid for Specialty Equipment, including trench boxes, through October 2018 without disputing this cost.[358]

---

[357] JX001.0826.

[358] Welded also argues that Mr. Slavis lacks the necessary knowledge to provide an opinion on this issue. But, Welded did not seek to exclude Mr. Slavis's calculations performed as a damages expert. Welded's Reply in Further Supp. of Its Mot. in Lim. to Preclude Joseph Slavis from Offering Legal

Exhibit 2 lists "conventional trench boxes" as a piece of Included Equipment, but also specifically excludes "modular 'slide rail' systems" in the listing.[359] Similarly, the definition of Specialty Equipment includes "modular trench-shoring systems;" it does not include conventional trench boxes.[360] Mr. Slavis reviewed each invoice for trench boxes and identified the type of trench box by model number with the help of those familiar with construction equipment.[361] Mr. Slavis determined that Welded invoiced Transco for $1,336,176 for conventional trench boxes.[362]

Based on the clear language of the Contract, I conclude that conventional trench boxes are Included Equipment, which is compensated through the Equipment Fee. Welded's argument that all trench boxes are Specialty Equipment is wrong. Further, the argument that this claim/defense comes too late because it was not identified in the October 4, 2018 letter is unavailing. In Proof of Claim Number 636, Transco claimed $7,387,643 as damages for "Included Equipment Charged as Specialty Equipment." While this category does not list the specific types of equipment, it placed Welded on notice of this claim,

---

Conclusions and Unreliable Ops. 5 n.16, ECF No. 381. *See also* Aug. 31, 2023 Trial Tr. (Slavis) 1737:5–17:

> The Court: Why can't he quantify the amount that was billed for Morookas and I can decide whether it's permitted or not?
> Mr. Burwood: That's what we intend to do, Your Honor.
> The Court: Well, I'm asking –
> Mr. Guerke: If that's what they were doing, I probably wouldn't have an objection. But that's not what they're doing. He's calling balls and strikes on what's a piece of included equipment or specialty equipment. He can't – I mean, this opinion was given May 2022 and now he's relying on testimony from yesterday.

[359] JX001.0507.

[360] JX001.0827.

[361] Aug. 31, 2023 Trial Tr. (Slavis) 1745:8–1746:19.

[362] Aug. 31, 2023 Trial Tr. (Slavis) 1752:1–3.

particularly because Welded billed for these items as Specialty Equipment and defends the billing on these grounds.

    *e. Morookas*

    Transco contends that Welded improperly billed it for $1,424,152 for Morookas and certain attachments because they are Included Equipment. Welded again responds that the contested items are Specialty Equipment under the Contract and that Transco voluntarily paid for Specialty Equipment, including Morookas, through October 2018 without disputing this cost.

    Exhibit 2 lists "Morookas (or similar rubber-tracked carriers)" as Included Equipment.[363] Morookas are rubber-tracked carriers with a large bed which can be used to host various attachments.[364] Welded used Morookas with mulching attachments, vacuum excavation attachments and crane attachments on the ASR Project.[365] "Mulching machines" and "small vacuum excavation units" are also included on Exhibit 2.[366] Exhibit 2 excludes from Included Equipment larger excavation units.[367]

    I conclude that Morookas (and their generic equivalents), mulching machines and small vacuum excavation units are Included Equipment and are not separately invoiceable to Transco because they are specifically listed on Exhibit 2. However, I conclude that

---

[363] JX001.0506. "Morooka" is a brand name commonly used for "track type of equipment that's a material mover." Aug. 24, 2023 Trial Tr. (Hood) 554:8–18.

[364] *See* Aug. 30, 2023 Trial Tr. (Pew) 1563:22–24, 1567:4–1568:7, 1568:14–1569:7.

[365] Aug. 30, 2023 Trial Tr. (Pew) 1563:22–24, 1567:4–1568:7, 1568:14–1569:7; Aug. 24, 2023 Trial Tr. (Hood) 554:8–18.

[366] JX001.0506–07.

[367] JX001.0507.

cranes and therefore crane attachments are not Included Equipment. While the definition

of Included Equipment contains the generic term "lifting aids,"[368] it does not specifically

include "cranes." On the other hand, "cranes" are plainly listed within the Contract's more

limited and nonexclusive list of Specialty Equipment.

Because "cranes" are specifically listed as Specialty Equipment, I decline to read

"cranes" into the more general category of "lifting aids." Thus, I conclude that Transco is

entitled to recover only $1,209,085.

*f. Deckhands, Tack Rigs, Excavators and Motor Graders*

Transco contends that deckhands ($239,643), tack rigs ($137,039), excavators

($35,351) and motor graders ($29,998) are Included Equipment and so are improperly billed

by Welded. Welded again responds that the contested items are Specialty Equipment under

the Contract and that Transco voluntarily paid for Specialty Equipment, including these

types of equipment, through October 2018 without disputing the cost.

Three of these categories of equipment, tack rigs, excavators and motor graders, are

specifically listed as Included Equipment on Exhibit 2.[369] Consistent with my previous

rulings, I conclude that these categories of equipment are Included Equipment.

Deckhands are not listed on Exhibit 2. Mr. Pew testified that a deckhand is a piece

of equipment used to lift pipe and other heavy loads.[370] Based on this unchallenged

---

[368] JX001.0827–28 ("'Included Equipment' means . . . (vii) Fasteners, cable, lifting accessories and lifting aids . . . .").

[369] JX001.0506. More specifically, "Excavators (CAT 314 thru 349 or equivalent) . . . Motor Grader[s] (up through CAT 14/140 or equivalent) . . . [and] Tack Rigs[.]" *Id.* Mr. Slavis's reconciliation accounted for the size qualifiers. Aug. 31, 2023 Trial Tr. (Slavis) 1751:6–15, 1752:9–11.

[370] Aug. 30, 2023 Trial Tr. (Pew) 1571:18–1573:7.

testimony, I conclude that deckhands are a "lifting aid" encompassed in the general definition of Included Equipment.[371]

Accordingly, each of these pieces of equipment was improperly billed under the Contract and these costs, totaling $442,031, are not chargeable under the Contract.

   *g. Miscellaneous Items*

In a catch-all category, Mr. Slavis testified that through his review of Welded's invoices, he identified dozens of one-off charges for equipment listed on Exhibit 2 or within the definition of Included Equipment.[372] The aggregate amount invoiced for these items is $173,669. Given that I have already concluded that equipment listed on Exhibit 2 is Included Equipment, any pieces of equipment appearing on that exhibit are Included Equipment.

Mr. Slavis's testimony is that he quantified equipment using both Exhibit 2 and the definition of Included Equipment. While I have accepted Mr. Slavis's testimony as a damages expert, which includes the specific identification of types of equipment, I have not accepted his testimony as it relates to the characterization of that equipment as either Included Equipment or not. His quantification of this "miscellaneous" category does not provide me with the factual information necessary to conclude that the unidentified miscellaneous equipment falls within the definition of Included Equipment.

Further, as already concluded *supra*, Welded has met its burden to show, absent evidence to the contrary, that all invoiced amounts are properly billed as the invoices were itemized and the costs were incurred on the ASR Project. As to this category of

---

[371] Unlike cranes, deckhands are not specifically listed in the definition of Specialty Equipment.

[372] Aug. 31, 2023 Trial Tr. (Slavis) 1752:16–1753:18; *see* D2047AA.

miscellaneous equipment, Transco has not asserted that the charges were the result of negligence, fraud or bad faith.  Transco does argue that in the December 2017/January 2018 period, Welded changed its billing practice with respect to certain pieces of equipment in connection with the examination of the profitability of the Equipment Fee.  At that time, Mr. Hood accessed the SmartSearch database, Welded's expense system, and identified $600,000 of vendor invoices improperly labeled as nonbillable.[373]  He instructed the cost engineers to "scrub[] this Smartsearch data weekly for necessary corrections."[374]  I reject Transco's argument that an examination of the database and necessary corrections to billable items somehow imply intentional overbilling.  As Mr. Hood testified, all costs and billing were examined and retraining was directed as necessary.[375]

For the foregoing reasons, Transco is not entitled to $173,669 on account of invoicing for Miscellaneous Items.

8. Warehouse and Site Office Costs

Similarly, Transco challenges separate invoice amounts for improper office and warehouse charges in the amount $142,940 as Included Equipment.  Welded responds that these rentals and services were obtained through a Subcontractor and are thus reimbursable under the Contract.

The minimal testimony proffered by Transco is that the invoices are for "office trailers, warehouse trailers" and "things of that nature."[376]  Welded asserts in its Post-Trial

---

[373] *See generally* Aug. 25, 2023 Trial Tr. (Hood) 756:17–764:18; D0701.0002; D0713.

[374] Aug. 25, 2023 Trial Tr. (Hood) 756:17–764:18; D0701.0002; D0713.

[375] Aug. 25, 2023 Trial Tr. (Hood) 756:17–764:18; D0701.0002; D0713; *see also* Aug. 25, 2023 Trial Tr. (Hood) 746:8–747:25.

[376] Aug. 31, 2023 Trial Tr. (Slavis) 1756:6–25.

Brief (without citation to the record) that these invoices are, in part, for cleaning services and leases of warehouse space. A review of the supporting schedule for this category confirms that some of the challenged invoices are for cleaning services.[377] A review of one actual invoice shows that it is a month-to-month lease of a 19,850 square foot building to be used for storage.[378]

The definition of Included Equipment includes: "trailers and site offices, office furnishing, office equipment, office supplies and paper products, communication and telecommunications, electronics, computers and utilities for offices."[379] Exhibit 2 lists office trailers, utility trailers and warehouse trailers as Included Equipment.[380] Neither Welded nor Transco directs me to any portion of the Contract that specifically addresses compensation for cleaning services, and I am aware of none. But, these services are not outside the scope of services that can be provided by a Subcontractor.

I have already concluded that simply because Welded subcontracted for equipment does not dictate how Welded is compensated for that equipment. If the equipment is Included Equipment, Welded cannot pass that charge along to Transco. Similarly, simply because Welded subcontracted for services does not dictate how Welded is compensated for those services. Here, I conclude that the rent payable for warehouse/storage facilities is Included Equipment that cannot be separately charged to Transco. But, Transco makes no mention of cleaning services in its Post-Trial Brief.

---

[377] D2047AF; D2047AG.

[378] JX037.0972–78.

[379] JX001.0827.

[380] JX001.0506.

Under these circumstances, I conclude that Welded has properly invoiced Transco for cleaning services, but Transco is entitled to recover prepetition charges of $39,316.57 for improper office and warehouse charges.[381]

9. Duplicate Costs

Transco also contends that costs resulted from certain invoicing errors. Mr. Slavis identified five invoices that he alleges were double-billed or contained an "invoice error" or an "incorrect amount." Mr. Slavis quantified this overbilling error at $49,323.[382] The specific invoices are listed in Mr. Slavis's supporting schedules.[383]

Welded did not cross examine Mr. Slavis on these alleged invoicing errors. Rather, Welded simply asserts that Transco has not presented sufficient evidence to call into question Welded's affirmative case.

I agree with Welded. I cannot discern from the two minutes of testimony, a review of the supporting schedule and the near lack of briefing whether there are accounting errors or double billing. Neither Mr. Slavis's testimony nor the schedules (as far as I can ascertain) actually identify the duplicative invoices or the billing errors. Thus, I find that through Mr. Gray's testimony Welded has met its burden to show, by a preponderance of the evidence, that all items appearing in its invoices are proper.

---

[381] D2047AG.0001–02.

[382] Aug. 31, 2023 Trial Tr. (Slavis) 1757:1–10.

[383] D2047AH.

10. Standby Equipment Costs

As reflected in Welded's December 8, 2017 invoice, Welded billed Transco $6,095,894 in standby charges for equipment to be used on the ASR Project.[384] As backup for these charges, Welded provided an excel sheet titled "Pre NTP Equipment Standby Reconciliation." The spreadsheet contains a description of each piece of equipment, the number of units, the rate charged per unit, the length of time on standby and the total amount invoiced for NTP delay.[385] The delay period spans from February through September 2017.[386] Payment was due on January 5, 2018.

On December 9, 2017, Mr. Sztroin reviewed and approved the invoice.[387] Transco paid the invoice without requesting any additional documentation to substantiate the costs.[388] These costs were not disputed in Transco's October 4 withholding letter, claimed in Proof of Claim Number 636, or asserted in Transco's counterclaims in this adversary proceeding.[389]

Nonetheless, Transco now asserts that Welded's backup is insufficient to support the standby costs, that the standby costs were not the actual costs incurred for the equipment and that certain of the equipment was not actually on "standby." Welded replies that it

---

[384] PX656.002.  $1,575,695.64 was invoiced during that period and $4,520,200 was previously invoiced.

[385] PX171.0002.

[386] The Restricted Notice to Proceed was issued on September 25, 2017.  PX135.

[387] PX656; Aug. 29, 2023 Trial Tr. (Sztroin) 1356:12–1359:2.

[388] Aug. 29, 2023 Trial Tr. (Sztroin) 1359:6–19.

[389] JX094.0002–03; Transco Claim 636; Counterclaim.

submitted appropriate backup, that the invoice was reviewed and paid by Transco, that it was included in the Book Contract Amendment and that it was never the subject of an objection prior to Mr. Slavis's engagement. Welded contends, therefore, that it is not required to return Transco's previous voluntary payment. The burden of proof is on Transco.

Welded's right to invoice for NTP delay is found in Section I Article 26 of the Original Contract, which provides in full:

> In the event the NTP for mobilization of main line production crews is delayed beyond March 1, 2017, Contractor shall be entitled to a change order for payment of Contractor's demonstrable costs associated with the NTP delay. For purposes of this provision, "demonstrable costs" means Contractor's substantiated direct actual costs incurred due to NTP delay such as: Contract rates for personnel and equipment who are placed on stand-by as a result of NTP delay. "Demonstrable costs" excludes, and Contractor shall have no claim against Company for any, Contractor Group damages or losses for: missed business opportunities, loss of business, loss of revenue, loss of profit and/or damages incurred, or claims, by any other client of Contractor in connection with or arising out of NTP delay.[390]

There is no definition of the term "stand-by" nor is there any definition of "substantiated."

Well after the payment of the invoice, NTP delay costs were included in the buildup of the revised cost estimate agreed to in the Book Contract Amendment.[391] Specifically, Exhibit 8 to Section VIII of the Contract contains a line item ratifying the "Equipment – NTP Delayed" cost in the amount of $6,250,313.[392]

---

[390] JX001.0027.

[391] Welded signed the Book Contract Amendment on March 30, 2018. Transco signed the Book Contract Amendment on May 18, 2018. JX001.0530.

[392] JX001.0845.

I am not persuaded that Transco has proven that it is entitled to recover amounts it voluntarily paid and subsequently ratified for NTP delay. OGCS did not identify this category as recoverable and Transco did not assert a claim for NTP delay in either its proofs of claim or its counterclaims. This category is clearly an after-the-fact reach by Transco to enhance its claim. And, it comes too late, having baked this specific cost into the Book Contract Amendment.

Regardless, Mr. Slavis's testimony is not persuasive. He first contends that a one-page spreadsheet is insufficient support.[393] He testified that he would have preferred to see invoices for leased equipment and rate buildouts. He also wants to know whether the stated rates represent a standby rate, operating rate or an ownership rate.[394] However, the spreadsheet clearly provides the type of equipment being invoiced, the quantity of each type of equipment, the rate (either daily or monthly) and the total duration during which the equipment was on standby.[395] One could also reasonably infer that since the invoice was for standby delay, Welded charged the appropriate rate. In any event, Transco never asked for any additional backup (as it did on other occasions) so it is logical to conclude that Transco was satisfied with the information it received at the time. And, it is telling that OGCS did not flag standby costs as suspect during its audit. Under these circumstances, while additional information might have been helpful, the information provided in the invoice itself adequately substantiates the listed costs.

---

[393] Aug. 31, 2023 Trial Tr. (Slavis) 1723:3–1724:11.

[394] Aug. 31, 2023 Trial Tr. (Slavis) 1724:5–11.

[395] PX171.0002.

Transco next contends that it proved that the equipment invoiced was being repaired and so was not on "standby."[396] Transco argues that in order to charge for standby, the equipment must be available for use. For this proposition, Transco cites one case, *H.J. Lyness Construction, Inc. v. United States,* for the proposition that standby means "availability to perform immediately and at full speed."[397]

*H.J. Lyness Construction* is wholly distinguishable. The court in *H.J. Lyness Construction* considered whether a plaintiff-contractor as a party to a federal contract can recover "unabsorbed overhead" as a cost of termination.[398] The "strict prerequisites" for recovery of unabsorbed overhead in this context require the contractor to show three conditions, including that the contractor was required to remain on standby during a period of delay. If the government issued a written order suspending the work of uncertain duration and required the contractor to remain ready to resume work "immediately or on short notice" then the contractor has proven it is on standby. If not, then indirect evidence

---

[396] Aug. 23, 2023 Trial Tr. (Hawkins) 297:14–22:

Q: That equipment was not ready to perform the work, 42-inch diameter work on Welded as of February 2017; was it?
A: That's – I would say no.
Q: Okay. Was it ready in March?
A: I don't know when they were ready.
Q: Do you know if they were ready in April?
A: I don't know.
Q: Okay. How about May?
A: I don't know.

*See also* D0029.0012 (October 2016 Board Meeting); D0063.0018 (February 2017 Board Meeting).

[397] Transco Br. 33–36 (citing *H.J. Lyness Constr., Inc. v. United States*, 121 Fed. Cl. 287, 293 (2015)).

[398] *H.J. Lyness Constr.*, 121 Fed. Cl. at 292.

is required. The indirect evidence should show that the contractor is "required to return to work at full speed and/or full strength . . . ."[399]

The Contract is not a government contract and Welded is not seeking "unabsorbed overhead." Neither are there "strict prerequisites" that Welded must prove in order to recover NTP delay standby costs. The Contract anticipates project delays and, specifically, delays in issuing the Notice to Proceed; in fact, a seven-month delay occurred. Further, contract rates for equipment placed on standby are specifically a "demonstrable cost" compensable under the Contract. Thus, *H.J. Lyness Construction* is unhelpful particularly in this case where Transco, not Welded, has the burden to show that the NTP delay charges were improper.

Moreover, a premise of the Contract was to lock down Welded's equipment so that it would be used for the ASR Project and nothing else, foregoing other opportunities, most notably, the Spectra project.[400] While lost opportunity cost is not compensable under the Contract, costs incurred due to NPT delay are. In this setting, there is no question that Welded was required to provide the equipment on the excel spreadsheet to the ASR Project as needed following the NTP. Had it not done so, Transco may have a claim for disgorgement of standby costs. But, Transco presented no evidence that Welded failed to provide the invoiced equipment in a timely fashion. At best, Transco elicited testimony that certain of the invoiced equipment may have been undergoing repairs at some time during

---

[399] *H.J. Lyness Constr.*, 121 Fed. Cl. at 293.

[400] Mr. Hawkins testified that Article 26 of the Contract "was the deal. If they were on standby waiting for the NTP that we would be able to invoice for those pipelayers." Aug. 23, 2023 Trial Tr. (Hawkins) 296:4–11. Mr. Hawkins also testified that being on standby did "[n]ot necessarily" mean being ready to perform, but rather that Welded was using that time to upgrade the equipment for the ASR project. Aug. 23, 2023 Trial Tr. (Hawkins) 297:3–7.

the February to September period and attempted to show that certain invoiced equipment was coming from another project in November 2017.[401]

The testimony elicited failed to establish by a preponderance of the evidence that the invoiced equipment was not on standby or unavailable when the equipment was needed.[402] Indeed, there was no testimony on when the invoiced equipment was needed on the ASR Project or that the equipment in the repair shop or located on any other project could not be made available on short notice.

Finally, Transco raises an argument not made by Mr. Slavis. Transco attempts to use a Zolfo Cooper presentation to prove that the standby costs were inflated. Transco points to page sixty of the presentation slide deck to argue that the "actual cost" of one piece of equipment—the Cat 594 sideboom—is $480.60, while the amount invoiced to Transco for that same piece of equipment on standby is $943.50.

Exhibit D1382 is the Zolfo Cooper slide deck embodying a presentation Zolfo Cooper made to the Welded Board at an August 1, 2018 board meeting. The slide deck is titled "As Bid vs. As Performed Analysis."[403] Frank Pometti, of Zolfo Cooper, testified that this slide deck embodies a "random math comparison" of the original bid packages of multiple Welded construction projects and the actual cost of those projects.[404] Mr. Pometti

---

[401] This attempt failed when Mr. Hawkins had no knowledge on this issue. Aug. 23, 2023 Trial Tr. (Hawkins) 297:14–298:6.

[402] Again, the testimony was mainly the witness reading a document and having little, if any, actual knowledge regarding the document or its contents. *See* Aug. 23, 2023 Trial Tr. (Hawkins) 300:5–304:23.

[403] D1382.

[404] Aug. 28, 2023 Trial Tr. (Pometti) 1089:9–14.

testified that the slide deck was created by taking Welded's original bid packages and assumptions and comparing those numbers with the actual costs incurred in Welded's various projects.[405] While Transco's counsel questioned Mr. Pometti on other aspects of the presentation, counsel did not ask him any questions about page sixty or rates for equipment.[406]

I can discern nothing from the Zolfo Cooper presentation that is relevant to the standby equipment dispute. This document, and particularly this page, is presented out of context. Mr. Pometti was not asked why the report was generated, how it should be used, how it should be read or what the court should take away from it relative to standby costs. For example, no one explained why the presentation reflects a "bid rate" for Included Equipment, such as the 594 CAT. Under the Contract, Included Equipment is not separately billed to Transco, but captured in the Equipment Fee, which is based on Labor Costs. I also note that the "actual cost" column on page sixty is sometimes higher and sometimes lower than the standby rate charged by Welded for similar equipment. Without explanation from the author of the report, I cannot conclude that Transco is using it appropriately.

In sum, Transco cannot recover for standby costs. Because Transco seeks recovery of funds already paid to Welded, Transco must affirmatively prove that the charges were unreasonable or unnecessary. Despite its multiple arguments, Transco fails to persuade me that the charges invoiced and paid were not in conformance with the Contract.

---

[405] Aug. 28, 2023 Trial Tr. (Pometti) 1089:9–22.

[406] Counsel did ask Mr. Hawkins questions on page sixty, but he essentially read numbers off a page. Aug. 23, 2023 Trial Tr. (Hawkins) 309:6–310:20.

11.  Hauling of Included Equipment

Transco seeks to recover monies charged by Welded for the hauling of Included Equipment as well as the costs of associated hauling permits.  Welded responds that all hauling costs are properly chargeable to Transco under the Contract.

Transco hangs its claim on language found in Section VIII Article 2.E, which reads: "[t]he Equipment Fee shall cover the cost, expense, overhead, profit and all compensation due and payable to Contractor in connection with the provision and supply of Included Equipment."[407]  Transco argues that hauling costs (including permits) are within the ambit of "provision and supply."

This is familiar territory.  In its motion for summary judgment, Welded sought a ruling that Work performed by mechanics on Included Equipment was properly invoiced to Transco under the Contract.  In response, Transco argued that this same language— "provision and supply"—includes the costs of mechanics to maintain and repair Included Equipment.  I granted Welded's motion for three reasons: first, Paragraph E concerns the compensation of equipment costs, not labor; second, "maintaining and repairing" do not appear in Paragraph E.1 and cannot comfortably be read into "provision and supply" and third, compensation for NPLA Personnel (which undisputedly includes mechanics) is treated in Paragraph D.[408]

While a closer call, these same three reasons lead me to reject Transco's claim for hauling costs.  First, Paragraph E only concerns the costs of equipment, materials, supplies

---

[407] JX001.0833.

[408] *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, Adv. Pro. No. 19-50194, 2023 WL 5010429, at *4 (Bankr. D. Del. Aug. 4, 2023), ECF No. 404.

and/or consumables.[409]  Second, the words "haul and transport," like the words "maintain and repair," are found nowhere in Paragraph E.1.  Third, "hauling and transporting" are services, not equipment, which were provided by subcontractors and hauling services. Hauling services fall squarely within the type of Work that subcontractors can provide. Paragraph D.5 contains the governing language for compensation of subcontractors and provides that Work performed by subcontractors can "be invoiced and paid in accordance with actual amounts CIF (costs including freight and taxes)" as invoiced by the subcontractor.  There is no allegation that the amount invoiced departs from this provision or that this type of work cannot be subcontracted.[410]  This more specific provision, thus, governs here.

Finally, Transco points out that Included Equipment includes "sleds for transporting equipment" and suggests that this supports the position that hauling services are part of the "provision and supply" of Included Equipment.[411]  But, Welded points out that the definition of Included Equipment itself does not include hauling.  I conclude that the inclusion of sleds as Included Equipment does not mean that the labor necessary to use the sleds or otherwise transport equipment is not compensable.

12.  Hauling Permit Costs

Transco also relies on the "provision and supply" language to recover hauling permit costs.  But, Transco also references Section I Article 19, titled Legal and Governmental

---

[409] JX001.0833.

[410] JX001.0831.  The Contract defines "Subcontractor" as "any third party contracted by Contractor . . . to provide Work, services and/or equipment, materials, supplies or consumables to the Project." JX001.0827.  The Contract compensates Welded at actual cost for subcontractors.

[411] There was no testimony that charges for hauling services included charges for sleds.

Requirements.  This section divvies up the responsibility for the acquisition and cost of obtaining necessary permits.  Transco is required to obtain all necessary government licenses or permits for the project site.  Welded is required to "obtain at its own expense all other permits and licenses required for the performance of the Work . . . ."[412]  Welded does not refute this language, but rather contends that permitting services on the ASR Project were obtained through subcontractors and are compensable under Section VIII Article 2.D.5 because Welded is not prohibited from subcontracting to acquire hauling permits.  Welded also looks to the Letter of Intent that lists hauling permits as an example of a subcontractor expense.

Transco has the better argument.  First, for reasons consistent with my decision with respect to hauling services, I conclude that "provision and supply" of Included Equipment does not encompass hauling permits.  Nonetheless, Section I Article 19 explicitly and unambiguously provides that Welded, not Transco, bears the costs of obtaining permits not related to the site of construction.  Welded does not dispute that hauling permits are "not

---

[412] JX001.0022 (Article 19):

> Company will obtain all necessary certificates, permits and licenses relating to sites or places for which a governmental certificate, permit or license is required.  Contractor shall familiarize itself with all certificates, permits and licenses obtained by Company and comply with all requirements of the same.  **Contractor shall defend (at Company's option), indemnify and hold harmless Company Group from and against all costs, expenses, fines and levies imposed by any agency or other governmental body on Company or any member of Company Group based upon Contractor's activities that are not in compliance with the requirements of Company's certificates, permits and licenses.**

> Contractor shall obtain at its own expense all other permits and licenses required for the performance of the Work from the applicable state, county and/or local governmental body.  Contractor shall pay all charges and fees and give all notices necessary and incident to the due and lawful prosecution of the Work.  Contractor shall pay all royalties and license fees on equipment, materials and supplies furnished by Contractor.

related to the site of construction." Rather, as stated above, Welded relies on Section VIII for compensation due based on subcontracted services.

While it is natural to turn to Section VIII for purposes of determining Transco's compensation obligations, here, Section I cannot be ignored. The express language in Section I is not counteracted by the language in Section VIII. Section VIII does not specify what types of services can be subcontracted (i.e., it does not provide that obtaining hauling permits can be subcontracted), rather it lists four types of services that cannot be subcontracted or outsourced. But, the fact that the exclusions do not include hauling permits simply means that Welded can hire subcontractors to obtain them. Given Section I, however, Welded must pay for this service. Because this dispute is resolved on the face of the Contract, I decline to look to extrinsic evidence such as the Letter of Intent.

Mr. Slavis reviewed Welded's invoices and quantified the costs of obtaining hauling permits as $865,602.[413] He then adjusted that amount down by 50% to exclude hauling permits for Included Equipment resulting in a final quantification of $432,801.[414] Welded does not challenge this number. Accordingly, I conclude that Transco is entitled to $432,801 for permitting fees improperly billed.[415]

13. Safety Stand Down Costs

Transco contends that Welded is responsible for costs arising from safety-related work stoppages (or stand-down costs). Welded responds that it is responsible for safety

---

[413] Aug. 31, 2023 Trial Tr. (Slavis) 1754:24–1755:14.

[414] Aug. 31, 2023 Trial Tr. (Slavis) 1755:25–1756:5.

[415] I recognize that the logic of this analysis would support a conclusion that the entire $865,602 was improperly billed. But, as Mr. Slavis quantified this number and was not questioned about the reduction, I will award what Transco sought.

stand down costs only if Transco instructed Welded to stop work, which Transco did not do. Welded also argues that even if it were responsible for such costs, Transco has not proven damages.

Safety was clearly an important aspect of the Contract and is referenced throughout. Costs associated with safety stand downs are discussed in two places. Section I (General Contract) Article 12 provides:

> If Company issues Contractor a stop work notice due to (i) Contractor's failure to remediate a previously reported unsafe action, (ii) Contractor's willful disregard of Company's safety standards as set forth in the Williams Onshore Contractor Safety Handbook, as attached in Section VII of the Contact or (iii) Contractor's involvement in a severe safety incident such as life-threatening injury or death, then all resulting costs of associated corrective actions, safety meetings, safety stand down, and/or safety training sessions will be at Contractor's sole cost and expense.[416]

Section II (Scope of Work) Article 3.G (Site Safety) provides:

> Contactor will provide full time Safety Inspectors during construction to ensure that all work is constructed in accordance with all applicable Federal, State, and Local laws and regulations. Company has the authority to shut down work in the event work is not constructed in accordance with applicable Federal, State and local Laws and regulations. Any stoppage in work as a result of Contractor's willful, repeated, or unaddressed safety-related actions or inactions will be at the sole expense of Contractor."[417]

Transco relies on the last sentence of Section II Article 3.G to argue that *any* work stoppage—including those initiated by Welded—is on Welded. On the other hand, Welded cites Section I Article 12 for the proposition that it is responsible for costs associated with work stoppages only if initiated by Transco. Neither party discusses the interplay between these two provisions.

---

[416] JX001.0019.

[417] JX001.0080.

104

These two provisions can be harmonized. Section I Article 12 unequivocally provides that if Transco issues a stop work notice because of a safety event, the resulting costs of a shutdown are at Welded's sole cost and expense. While the last sentence of Section II Article 3.G provides that a work stoppage because of Welded's repeated wilful or unaddressed safety-related incidents is at Welded's sole expense, this sentence must be read together with the previous sentence, which gives Transco permission to shut down work for safety-related reasons. Thus, Section II Article 3.G also requires Transco to shut down work in order for Welded to pick up the expense. Reading the last sentence alone takes it out of context.[418]

Applying this conclusion is straightforward. There is no evidence that Transco issued a stop work notice or otherwise caused work to be shut down because of willful, repeated or unaddressed safety. While there was some evidence of work stoppages due to safety concerns (e.g., a piece of equipment tipping over), it is not clear that these work stoppages were required by Transco (as opposed to Welded) and there is no evidence that a stop work notice was issued. Moreover, Mr. Slavis's backup includes numerous costs for "Rainout/Safety Training" and "Safety stand down & rainout" as well as where the duration of the stand down is "None." Accordingly, I cannot conclude that these costs are recoverable.

For these reasons, Welded is not required to absorb the costs of any safety stand downs.

---

[418] *See Commonwealth ex rel. Kane v. UPMC*, 129 A.3d 441, 463–64 (Pa. 2015).

14. Early Mobilization Costs

Transco claims that Welded incurred unnecessary and unreasonable expenses at the outset of the project by mobilizing labor and equipment before adequate work was available. Welded counters that this claim was not raised until 2022 and that, in any event, no provision in the Contract permits Transco to recoup these costs. Because all costs relating to mobilization were previously paid by Transco, it has the burden of proof on this issue.

Mobilization means the activities necessary to get equipment, personnel and materials to the Field. Section VIII Article 2.C, titled "Mobilization/Demobilization," provides that mobilization is "included in the Work and compensated under the terms of this Section VIII."[419] There is only one circumstance under which mobilization is not compensated— i.e., if Welded proceeds with mobilization before Transco provides written authorization to proceed.[420] This did not occur. Rather, Transco issued the Notice to Proceed on September 25, 2017, a week earlier than planned and Welded began mobilization at that time.[421]

Transco does not look to Section VIII to determine that it can receive damages for mobilization charges. Instead, Transco attempts to cobble together the disjointed language of Section I Article 7.A[422] and Section II Article 3.A. Section I Article 7.A permits Welded to seek alteration of the scope of work and/or compensation under the Contract as follows:

---

[419] JX001.0828.

[420] JX001.0828.

[421] PX135; Aug. 22, 2023 Trial Tr. (Hawkins) 75:14–21.

[422] Transco mistakenly cites to Section I Article 7.B. *See* Transco Br. 51. However, the language Transco references regarding acts or omissions of Contractor are found in Article 7.A.

106

> Notwithstanding the provisions set forth herein, no change, modifications, or addition to any part of the Work or the materials and equipment shall result in adjustment of the compensation or an extension of the completion date when the change, modification or addition is due to Contractor's or its subcontractor's acts [sic] omissions including, but not restricted to, noncompliance with the terms and conditions of the Contract or Contractor's or its subcontractors; errors, poor engineering practice, poor workmanship, or failure to conform to the approved detailed drawings, specifications and data sheets.[423]

Section II Article 3 describes in broad terms various components of the Work under the Contract.[424] Article 3.A provides:

> Contractor shall commit expertise to the ASR Project Team to assist in final planning and scheduling of progress needed for the defined Mechanical Completion deadlines. Company and Contractor will work together ahead of the Notice to Proceed to jointly determine the execution plan to achieve the lowest capital cost to build the Project in the allotted schedule.[425]

From these two provisions, Transco contends that Welded's failure to plan and/or inefficient execution caused extra expenditure for mobilizing NPLA Personnel.

Neither of these provisions, alone or together, supports Transco's position. First, work attributable to mobilization is specifically compensable under Section VIII. Nothing in Section I Article 7.A or Section II Article 3 changes this. Section 1 Article 7.A addresses changes or additions to the Work under the Contract and requires the submission of a request. Transco does not point to any request submitted by Welded to change the scope of the Work related to the early mobilization costs. Transco's reliance on Article 7.A is, therefore, misplaced.

---

[423] JX001.0014.

[424] JX001.0052.

[425] JX001.0053.

Article 3.A likewise fails to support Transco's claim. This provision required the parties to work together prior to Transco's issuance of the Notice to Proceed to "***jointly determine*** the execution plan to achieve the lowest capital cost . . . ."[426] This provision does not place sole responsibility on Welded nor permit Transco to recover from Welded for their joint failure. Mr. Sztroin did testify to some concerns about Welded's lack of planning. But, he provided no explanation for why Transco issued the Notice to Proceed a week early if the lack of planning was a real concern.

Further, any remedy for inefficiency concerns is captured in two other places in the Contract. First, the Incentive Program has both a cost and schedule component.[427] The cost incentive, which provides Transco relief for significant cost overruns, was limited to $10 million as set forth in the Contract and was previously awarded to Transco as part of my earlier summary judgment decision.[428] The schedule incentive also accounts for inefficiencies and is the subject of Transco's separate request for a schedule penalty.

Second, Section I Article 27 gives Transco the absolute right to terminate the Contract for cause on five days' notice if Welded does not remedy any noticed failure. Cause is defined to include:

- circumstances in which Welded is unable to provide equipment and/or labor "necessary to carry on any part of the Work in an efficient, workmanlike, skilled and careful manner or to the complete satisfaction of [Transco];"

- "if the Work is not proceeding with the promptness, diligence or speed [Transco] reasonably deems necessary to complete the Work in the time provided by this Contract;" and

---

[426] JX001.0053 (emphasis added).

[427] JX001.0835–36 (Section VIII Article 2.I.).

[428] JX001.0842–44; *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, Adv. Pro. No. 19-50194, 2023 WL 4853146, at *5–6 (Bankr. D. Del. July 28, 2023), ECF No. 394.

- "if Contractor fails to comply with any requirements of this Contract."[429]

For all of its complaints about Welded's lack of planning, inefficient work and overall performance, at no time did Transco avail itself of its broadly defined termination rights. Had it done so, Article 27 provides that Transco could take over the Work itself (or hire a new contractor) and recover damages, including for Welded-caused delays and inefficiencies in completing the Work.

Finally, Transco argues that Welded is required to show that the early mobilization charges are reasonable and necessary. Again, Transco has not pled, much less shown, negligence, fraud or bad faith necessary to put Welded to this task. Here, Transco is a joint player in the ASR Project and is also tasked with achieving the lowest capital cost. There is no evidence Welded overcharged Transco for early mobilization.

15. Defective and Deficient Work

Transco groups together what it characterizes as defective and deficient work for which it either seeks damages or recoupment. These categories are dent remediation, re-work costs and weld repairs and cutouts.

    a. *Dent Remediation*

After Mechanical Completion, Transco conducted inspections of the entire pipeline and identified dents in the pipe. Transco seeks to pass 76% of the cost of both the investigation and the remediation to Welded.[430] Welded replies that: (1) there is no basis in

---

[429] JX001.0027–28 (Article 27).

[430] Transco seeks to recover 76% of the cost of the investigation from Welded because Spreads 5, 6 and 7 accounted for 76% of the pipeline on which the work was performed. Aug. 31, 2023 Trial Tr. (Slavis) 1761:13–1762:20.

the Contract to require it to pay for investigation costs and (2) Transco offered no "causation" evidence to prove that any dents in the pipeline were caused by Welded rather than natural causes. Transco has the burden of proof on this issue.

Transco first points to the final sentence of Section I Article 7.A, which provides that no modification to the Work will result in increased compensation to Welded if such modification is caused by Welded's "errors, poor engineering practice, poor workmanship, or failure to conform to the approved detailed drawings, specifications and data sheets."[431] As discussed previously with respect to early mobilization costs, this section of the Contract addresses changes to the scope of Work and related adjustments to compensation. It is inapplicable to situations, such as this one, which do not involve a request by Welded to perform additional Work or receive additional compensation.

Next, Transco points to Section I Article 22, titled Contractor Warranties, Guarantees and Correction of Defects. Defective Work (for purposes of Article 22) is defined as "all defective, deficient, improper, unsound or nonconforming (i) Work; or (ii) Contractor provided materials."[432] Transco has the right to reject Defective Work and require Welded to correct that Defective Work at Welded's own cost and expense any time prior to completion and final acceptance.[433]

---

[431] JX001.0014.

[432] JX001.0023 (Article 22.B).

[433] JX001.0023 (Article 22.C). While Transco does not note this, Transco "may retain any monies due or which may become due to Contractor that Company deems necessary and sufficient to meet the expenses of correcting Defective Work until the same is corrected." JX001.0024. And, if Welded does not timely correct such errors, Transco can employ a third party to correct such defects using the retained monies. *Id.* For at least one year following final acceptance, Welded must correct all Defective Work discovered that is directly attributable to its failure to adhere to Contract specifications. If Welded does not do so, Transco "may have the defect remedied, repaired or

Next, Transco points to Section VI of the Contract, titled Code, Standards and Specifications, which provides the specifications and plans for construction of the pipeline. Specifications 12 and 13 are provisions for the lowering-in, padding and backfilling of the pipeline, respectively. Specification 12.2 requires that "[r]ock, large clods of dirt, stumps, projecting rocks, skids, trash, and other foreign material that may damage the pipe or coating must be removed from the ditch prior to lowering the pipe into the ditch."[434] Similarly, Specification 13.1.5 requires that the pipe be padded with a minimum of six inches of "rock free soil" on the bottom and sides and twelve inches on the top.[435]

Finally, Transco references Section II (Scope of Work) Article 3.C.10.7 to show that Welded was contractually obligated to supervise (and retain) an approved vendor to test for anomalies in the pipeline once in the ground. This provision also mandates that the vendor provide a report of its testing to Welded and Transco, concurrently, and that "[u]nacceptable anomalies . . . shall be removed and replaced."[436] These are the costs that Transco is seeking.

The undisputed evidence shows that Transco hired three firms (Mears Group, Inc., Rosen USA and Whitetail Oil Field Services, LLC) to investigate the pipeline for anomalies, that anomalies were found and that Transco hired one firm (The Hillis Group) to correct these anomalies.[437] It is also undisputed that the anomalies were discovered in

---

replaced at Contractor's sole cost and expense." *Id.* (Article 22.D).

[434] JX001.0604.

[435] JX001.0605.

[436] JX001.0067.

[437] Aug. 29, 2023 Trial Tr. (Sztroin) 1269:9–1270:19; *see also* Aug. 29, 2023 Trial Tr. (Sztroin) 1279:4–7.

2019.[438]  Finally, it is undisputed that Welded's final invoice was sent on October 30,

2019.[439]  Given this evidence, the only question is who must pay for this work?

Welded contends that it is not liable for payment of these costs because Transco has

not proven that Welded caused the anomalies/dents.  Article 22.C contains no causation

requirement.  And, Welded points to no other provision of the Contract that requires

Transco to prove causation.  This is consistent with Section II of the Contract, which

requires Welded, as part of the Work, to remove and replace unacceptable anomalies found

during the required testing.[440]  Accordingly, all costs for remediation by Hillis are

recoverable under the Contract.[441]

But, the costs for the investigation to determine whether there are anomalies in the

pipeline are not recoverable under the Contract.  Transco does not point to any section of

---

[438] D2015–D2016 (Rosen invoices); D2017–D2020 (Whitetail invoices); *see also* Aug. 29, 2023 Trial
Tr. (Sztroin) 1282:8–14.

[439] PX497.

[440] By way of contrast, Article 22.D, which governs correction of defective work after final
acceptance, contains a causation element:

> D.  Correction of Defective Work Following Final Acceptance
> Contractor shall remedy, repair or replace, at its sole cost and expense, all Defective Work
> that is discovered prior to the expiration of one (1) year after final acceptance of Work by
> Company, or such longer time allowed by terms of any special guarantee or warranty
> required, provided or acquired in connection with this Contract and is directly attributable
> to Contractor's failure to adhere to Company's specifications as set forth in Section VII of
> the Contract.  If Contractor does not promptly remedy, repair or replace Defective Work,
> Company may have the defect remedied, repaired or replaced at Contractor's sole cost and
> expense.

JX001.0024. As discussed elsewhere, because final acceptance does not occur before submission of
a final invoice, Article 22.D is inapplicable.

[441] Unlike with Welded's objection to Transco's claim for "rework," here, Welded does not argue
that the Defective Work was not rejected by Transco.  In any event, Transco did file Proof of Claim
Number 632 on account of anomalies/defects discovered on the pipeline.

the Contract that specifically provides that Welded must pay for these costs. And, as Transco points out, Welded was required to perform the investigation as part of the scope of the Work.[442] This provision suggests that these costs are not recoverable. Had Welded performed the investigation as required by the Contract, Transco would have borne the cost. Transco therefore suffers no damages by paying for the investigative work done by Rosen, Whitetail and Mears.

Mr. Slavis quantified the costs associated with the dent remediation as $1,395,931.55.[443] This is the amount that Transco can recover.

### b. *Defective and Nonconforming Work/Rework*

Transco seeks damages for the costs of defective and nonconforming Work. Transco directs me to Section I Article 22.C, which provides: "Company may reject Defective Work and require Contractor at its sole cost and expense to correct Defective Work at any time prior to completion and final acceptance."[444] Welded correctly points out that this section has two prerequisites to recovery: Transco must reject the Work and Transco must require that Welded correct the Work. Welded also argues that Mr. Triche's testimony should not be credited because he simply took numbers from a weekly report without any examination of the underlying data and performed simple addition to quantify this category of damages.

The Contract places the burden of proof on Transco to show Defective Work. The underlying premise of the Contract is that Welded is paid for Work. Article 22.C requires

---

[442] JX001.0067 (Section II Article 3.C.10.7).

[443] Aug. 31, 2023 Trial Tr. (Slavis) 1761:16–1763:12; D2047AM–D2047AN.

[444] JX001.0023. Transco also directs me to Section 1 Article 7. As set forth above, this section is inapplicable to Defective Work.

113

Transco to take affirmative action if it does not want to pay for Defective Work. So, Transco must prove that: (1) the Work is defective, (2) it rejected the Defective Work, (3) it required Welded to correct the Defective Work and (4) Welded invoiced Transco for the correction of that Defective Work.

The evidence is scarce. The primary support comes in the form of two documents: (1) a Non-Conformance Log kept by Welded[445] and (2) one weekly progress report for the week ending September 23, 2018 ("Weekly Report").[446] Mr. Hood identified the Non-Conformance Log and testified that as of July 2018, Welded had estimated the cost of rework at $1,355,000.[447] Mr. Sztroin identified the Weekly Report and testified that this report reflects that Transco identified issues during the project.[448] He also testified that the Weekly Report quantifies the estimated cost of rework on the ASR Project up to the date of the report.[449]

Finally, Mr. Triche testified that he reviewed both the Non-Conformance Log and the Weekly Report, which were the only two documents he could find identifying nonconforming or defective Work.[450] He testified that the estimated costs shown on the Non-conformance Log and the Weekly Report were "pretty close" and that the total

---

[445] D1320B.0006–19.

[446] D1530.

[447] Aug. 25, 2023 Trial Tr. (Hood) 806:1–807:13.

[448] Aug. 29, 2023 Trial Tr. (Sztroin) 1263:4–25.

[449] Aug. 29, 2023 Trial Tr. (Sztroin) 1264:1–6.

[450] Sept. 6, 2023 Trial Tr. (Triche) 1959:25–1960:12.

identified by Welded on the Weekly Report was $2,018,000.[451] On cross-examination, Mr. Triche admits that he did not hear Mr. Hood or Mr. Sztroin testify that Transco rejected any Work or that Transco directed Welded to correct any Work.[452] He is also unaware of whether Welded performed any corrective work: "I wasn't there, I don't know if this work was ever corrected."[453] On re-direct, Mr. Triche testified that in his experience on pipeline work a non-conformance log is "pretty much on every construction project" because of the required specifications in the contract.[454] He testified that a notation of "closed" on a non-conformance log typically means the correction has been made and a notation of "open" typically means the correction has not been made.[455]

I conclude that Transco has failed to meet its burden. The two fact witnesses with actual knowledge of the underlying dispute—Mr. Hood and Mr. Sztroin—were not meaningfully examined. Mr. Hood was on the stand for almost two days and Mr. Sztroin for over a day. Neither of them was asked any detailed questions about the contents of the Non-Conformance Log, such as: Who kept it? Who decided what events would be entered on the Log? What were the criteria for recording an event on the Log? Was any rework done? Whether the estimated costs shown on the Log approximate the actual costs of any rework done? Whether Transco rejected any Work as Defective? How to read the "open" and "closed" columns on the Log?

---

[451] Sept. 6, 2023 Trial Tr. (Triche) 1960:20–1961:23.

[452] Sept. 6, 2023 Trial Tr. (Triche) 2008:8–17, 2009:9–15.

[453] Sept. 6, 2023 Trial Tr. (Triche) 2010:3–7.

[454] Sept. 6, 2023 Trial Tr. (Triche) 2026:12–18.

[455] Sept. 6, 2023 Trial Tr. (Triche) 2026:19–2027:2.

Mr. Triche did not fill these gaps in the evidence. He has no firsthand knowledge. And, as Welded points out, he did nothing to educate himself on the particulars of the Non-Conformance Log or the Weekly Report, which form the basis of his opinion. While he testified (albeit briefly) that in his experience these types of reports are routinely kept on construction projects, he did not expound on these experiences. Even if he did, given the bespoke nature of this Contract, I do not know that other experience is applicable. More importantly, Mr. Triche did not offer an opinion that any Work was defective nor base his opinion on others who found the Work to be defective. As such, his testimony is not a proper subject of expert testimony and is unhelpful. At bottom, Mr. Triche reviewed two documents, took numbers from one of them and presented that as his "opinion" on the category of "Defective Work." The finder of fact—in this case me—does not need assistance in drawing the conclusions Mr. Triche would like to be drawn from the evidence.[456]

In any event, I am not convinced his inferences should be drawn from the evidence actually presented. I cannot infer that Transco rejected defective Work simply because the Non-Conformance Log reflects that Transco initiated certain of the reports reflected on the log.[457] And, I certainly cannot infer that Transco rejected defective Work where the report was initiated by Welded. Further, I cannot infer that a matter that is "closed" means that

---

[456] Welded's Motion in Limine with respect to Mr. Triche's opinion on Defective and Non-Conforming Work is granted.

[457] For example, NCR No. 51, which was not "Client" initiated, describes seventeen Welds. In the column titled Issue/Concern, the report reads "Welds Rejected." D1320B.0009 (NCR No. 051). As another example, NCR No. 24, which was not "Client" initiated, describes "gouge/dent" on pipe. In the column titled Issue/Concern, the report reads "Pipe may be rejected due to dent/gouge." D1320B.0007 (NCR No. 24). These entries undercut entirely the idea that placement on the Log equates to rejection.

rework was performed. Perhaps a matter was "closed" because, after investigation, it was determined that no action was required.[458] And, I cannot infer that the "estimated cost" reflects the actual cost of any rework that was performed.

Accordingly, Transco has not shown by a preponderance of the evidence that it is entitled to recover for the estimated cost of rework.

### c. Weld Repairs and Cutouts

Transco asserts that Welded bears the cost of weld repairs and weld cutouts that exceed 5% of the total welds made on the ASR Project. At trial, Transco's expert testified to two different liquidated damage calculations for this category based on different assumptions. Welded does not dispute its liability for weld repairs and cutouts up to $987,500, the lower number. In its posttrial brief, Transco accepts this lower number.

Accordingly, as the parties are now in agreement, I conclude that Transco is entitled to $987,500 for weld repairs and cutouts.

### 16. Schedule Incentive/Penalty

Transco asserts that because Welded did not complete the ASR Project by the target Mechanical Completion date of June 14, 2018 ("Target Mechanical Completion Date"), Welded has incurred a schedule penalty. Welded counters that certain Transco-caused delays in the ASR Project should result in a modification of the Target Mechanical Completion Date such that it is owed a schedule incentive.

This dispute is governed by Section VIII Article 2.I, titled Incentive Program. It establishes an Incentive Program with three components—cost, schedule and safety. The

---

[458] Certain entries on the Non-Conformance Log appear to state actual issues (e.g., "pipe dented and coating damaged") while many are hypothetical (e.g., "possible coating damage" or "pipe may be damaged"). *Compare* D1320B.0006 (NCR No. 10) *with* D1320B.0011–12 (NCR Nos. 68–76).

incentive/penalty is measured against the Target Mechanical Completion Date and the Final Construction Cost of $454,500,000.[459] These metrics are based on the Contract Control Estimate attached as Exhibit 8 to Section VIII of the Contract and the Baseline Construction Schedule attached as Exhibit 9 to Section VIII of the Contract.[460] I have already ruled that Welded incurred a $10 million cost penalty because it exceeded the Final Construction Cost.[461] And, the safety component has not been raised as an issue. The only remaining dispute with respect to the Incentive Program is the schedule incentive/penalty.

While the target values are provided in Section VIII Article 2.I, the actual mechanics of the Incentive Program are explained in the worksheets attached as Exhibits 5–7 to Section VIII.[462] With respect to the schedule incentive/penalty, if Welded finishes on time, it receives $5,000,000. For every week which Welded finishes ahead of time, Welded receives an additional $1 million. For every week behind the target date, Welded's $5 million payment is reduced by $500,000. Accordingly, if Welded is ten weeks late in achieving Mechanical Completion, its incentive payment is reduced to $0; beyond that, Welded begins to incur a penalty measured at $500,000 per week, prorated.

Under the Contract, the Target Mechanical Completion Date can be modified. Section I Article 7 governs modifications to the Contract. When Welded seeks changes to compensation or schedule, it does so by submitting to Transco an Extra Work Request

---

[459] JX001.835–36.

[460] JX001.0842–44 (Exs. 5–7). These metrics were updated through the Book Contract Amendment.

[461] *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, Adv. Pro. No. 19-50194, 2023 WL 4853146, at *6 (Bankr. D. Del. July 28, 2023), ECF No. 394.

[462] JX001.0842–44.

("EWR")/Change Order.[463]  The process by which EWRs are approved is set forth in the Construction Management Plan.[464]  EWRs/Change Orders that affect the Baseline Construction Schedule must be approved by the Construction Committee (as defined in the Construction Management Plan).[465]  Shortly after the ASR Project began, Welded submitted EWR 12 which was approved; it extended the Target Mechanical Completion Date by six days.[466]

Welded achieved Mechanical Completion on September 19, 2018.  Because this is ninety-seven days after the Target Mechanical Completion Date, Welded incurred an incentive deduction of $1,928,571.43 unless that date is extended.[467]  When taking into account the six-day extension provided by EWR 12, Welded is only ninety-one days late and the penalty drops to $1,500,000, again, unless the Target Mechanical Completion Date is further extended.

Each party proffered an expert in schedule analysis to determine whether Welded is entitled to a schedule incentive or incurred a schedule penalty.  Initially, I questioned the

---

[463] JX001.0014 ("Contractor shall submit an 'Extra Work Request' (EWR) form . . . to Authorized Company Representative within forty-eight (48) hours before starting work which Contractor believes entitles them to a claim for extra compensation.  The EWR form shall include schedule and cost impacts.").  EWRs are also referred to as Change Orders in the worksheets and in the Construction Management Plan in Section VII of the Contract.  JX001.0817–24.

[464] JX001.0817–24.

[465] JX001.0842–44.  Further, "[i]f Company and Contractor cannot agree to Change Orders that re-baseline cost and/or schedule, those affected scope items may be omitted from the Incentive Plan."  *Id.*  Neither Transco nor Welded suggested that this sentence is implicated in the determination of the schedule incentive/disincentive.

[466] D0860.0003.

[467] PENALTY = $5,000,000 – [$500,000 x (# of days late/7)].  If the result is negative, Welded owes money to Transco.  $5,000,000 – [$500,000 x (97/7)] = ($1,928,571.43).

parties at oral argument regarding the necessity of any testimony, expert or otherwise, on this issue. As above, the Contract is clear. The only way to adjust the Target Mechanical Completion Date is through amendment to the Contract or an approved EWR/Change Order. It is undisputed that the only approved EWR extending the schedule is EWR 12.

But, both parties also analyzed the impact of "Trends" on the Target Mechanical Completion Date. "Trends" do not appear anywhere in the Contract, but were used throughout the ASR Project, with at least 250 submitted by Welded to Transco.[468] A Trend is "a notice of change for any activity or any cost category."[469] Trends are reflected on what appears to be a Welded form.[470] When Welded sought such a change, it submitted a Trend for approval by Transco. The Trend form contains disposition options for Transco to choose, which permit acceptance, rejection or deferral.[471] Trends that Transco marked as approved were then resubmitted by Welded as EWRs in order to effect the requested change.[472]

Welded acknowledges that the only Trend that was resubmitted as an EWR to effectuate a schedule change is Trend 21, which turned into EWR 12. But, it offers a reason. Mr. Hood testified that Welded intended to submit EWRs for certain Trends seeking schedule extensions at the end of the project, but considered it a "sideline" concern

---

[468] *See* D2048A; Aug. 24, 2023 Trial Tr. 550:12–13 (Hood) ("there's a number of ways changes were handled. They all start with trends.").

[469] Aug. 24, 2023 Trial Tr. (Hood) 550:18–21.

[470] *See, e.g.,* D1987A (Trend 231).

[471] D0860.0004 (Trend 21); D1987A (Trend 231).

[472] Aug. 24, 2023 Trial Tr. (Hood) 550:24–551:5.

as Welded was focused on completing the project.[473]  He also testified that the filing of the bankruptcy overtook the submission of additional EWRs.[474]

Transco's expert on schedule analysis created a Trend Analysis report which reflects the status of two Trends notifying Transco of a schedule deviation.  On his report, Trend 163's status is "Proceed to EWR" and Trend 231's status is "Client Review."[475]  Further, in its posttrial submission Transco reduced its incentive reduction claim to $1,214,286 based on Mr. Sztroin's trial testimony that the Third Circuit Court of Appeals shut down the ASR Project for a period of time.[476]  With this concession, Transco looks beyond the contractual requirement that a schedule change can only be achieved through an approved EWR.  Accordingly, I will consider arguments regarding Trends.

As another initial matter, I also deny Transco's motion in limine to exclude the testimony of Welded's schedule analysis expert, Mr. Dennis Kakol.  Transco argues that Mr. Kakol employed an unreliable and unaccepted methodology to perform his schedule analysis.[477]  I disagree.  As described more fully below, Mr. Kakol used the "impacted as planned" methodology, which is recognized by the Association for the Advancement of

---

[473] Aug. 24, 2023 Trial Tr. (Hood) 550:3–8.

[474] Aug. 24, 2023 Trial Tr. (Hood) 551:9–12.  It appears that Trends with a schedule impact were pending disposition by Transco.  PX593; Aug. 28, 2023 Trial Tr. (Kakol) 951:10–13.

[475] D2048A.0003, 04.

[476] Transco Br. 45.  Transco's scheduling expert analyzed other schedule impacts on Spread 5 and determined that an additional four days of extension may be warranted if Trends are an appropriate method of submitting change orders and quantified this at $1,214,285.71.  Sept. 6, 2023 Trial Tr. (Triche) 1932:10–1934:5.

[477] Transco did not object to Mr. Kakol's qualifications.  *See, e.g.*, Aug. 28, 2023 Trial Tr. (Kakol) 915:16–21.

Cost Engineers ("AACE").[478] Transco contends that even if the AACE recognizes this

methodology, it does not recommend it for conducting a delay analysis. But, Mr. Kakol

testified that he is not engaging in a delay analysis. Rather, he is determining "how to do

the math for the schedule incentive portion of the Incentive Program"[479] when the contract

does not specify the appropriate methodology. The AACE does recognize the "impacted as

planned" methodology as appropriate for determining early bonus situations.[480] Finally,

Mr. Kakol points out that Transco used this same methodology in granting the six-day delay

under EWR 12.[481]

Given my initial thoughts discussed above, it would be hard for me to disagree with

Mr. Kakol's conclusion that the exercise before me is to calculate the schedule incentive/

reduction under the Contract. This is not an exercise to determine delay damages (e.g., lost

profit from inability to put the pipeline into service). Accordingly, I conclude that the

"impacted as planned" methodology is an accepted and reliable method for this exercise, as

recognized by the AACE. Because I so conclude, Mr. Kakol's testimony is accepted and

this is a battle of the experts.

*a. Welded's Position*

Welded argues that it is entitled to an incentive payout of between $2,000,000 and

$12,570,000 based on Mr. Kakol's "impacted as planned" analysis. To perform his

analysis, Mr. Kakol first reviewed the Contract to determine how the incentive

---

[478] Aug. 28, 2023 Trial Tr. (Kakol) 939:5–19.

[479] Aug. 28, 2023 Trial Tr. (Kakol) 939:24–941:2I; *see also* Aug. 28, 2023 Trial Tr. (Kakol) 917:8–14.

[480] Aug. 28, 2023 Trial Tr. (Kakol) 994:15–995:25.

[481] Aug. 28, 2023 Trial Tr. (Kakol) 941:3–18.

bonus/penalty is calculated. He concluded that two points in time are determinative: the Target Mechanical Completion Date, which is June 14, 2018 (per the text of Section VIII Article 2.I) and the actual Mechanical Completion date, which is September 19, 2018. Mr. Kakol then reviewed the Contract to determine whether the Baseline Construction Schedule, and hence the Target Mechanical Completion Date, could be changed. He determined that it could because changes to the Baseline Construction Schedule can be made through the EWR process (detailed above). Finally, Mr. Kakol opined that the Baseline Construction Schedule should be changed because Mr. Kakol's review of documents in the underlying transaction, particularly Mr. Sztroin's report to his superiors on the need for further funding for the ASR Project, acknowledges Transco-caused delays in the ASR Project and references the use of Trends.[482]

Having determined that the Baseline Construction Schedule, and thus the Target Mechanical Completion Date, can be changed under the Contract, Mr. Kakol identified three permitting delays that would have a significant impact on the schedule and were not attributable to Welded. He then quantified the effect on the Baseline Construction Schedule of each of these events.[483]

---

[482] Aug. 28, 2023 Trial Tr. (Kakol) 926:5–929:22l; PX271. This email and the accompanying document, titled Contract Amendment, was generated by Mr. Sztroin in order to obtain funding for the ASR Project beyond the spending authority (governance) previously approved. As such, it focuses on increases to the budget, not the schedule. Nonetheless, the report details many events on the ASR Project that were beyond Welded's control and that were recognized to impact the schedule (and/or to increase costs in order to attempt to meet the Baseline Construction Schedule). While in his live testimony Mr. Sztroin attempted to walk back certain of the statements in his report, I credit the contemporaneous statements he made in his report to his superiors over the after-the-fact statements he made in connection with this litigation.

[483] Each of the three below scenarios is an alternative argument.

Mr. Kakol first quantified the delay in obtaining a permit to cross certain Amtrak rail tracks on Spread 7. Per the Baseline Construction Schedule, work on the Amtrak crossing was scheduled to start on January 16, 2018.[484] The schedule allocated twenty-six days of "float" to this activity, meaning that delaying that activity would not impact Mechanical Completion until after twenty-six days of delay.[485] Using the "late start" column on the Primavera scheduling software (used on the ASR Project), Mr. Kakol determined the latest date each activity could begin without causing delay ("Late Start Date").[486] For the Amtrak crossing, the Late Start Date was February 14, 2018.[487] In order to begin working on the Amtrak crossing, a permit was required, but Transco did not acquire this permit until June 12, 2018—two days prior to the Target Mechanical Completion Date.[488] Because 118 days passed between the Late Start Date and when the permit was actually received, Mr. Kakol opined that the Target Mechanical Completion Date should be pushed out by 118 days, resulting in a revised Target Mechanical Completion Date of October 10, 2018.[489] This

---

[484] Aug. 28, 2023 Trial Tr. (Kakol) 942:23–943:12; JX001.0856 (Activity ID M1980).

[485] JX001.0856; Aug. 28, 2023 Trial Tr. (Kakol) 943:13–14, 936:2–16 (explaining "float" concept).

[486] The Primavera software generates a host of data which the user can choose to employ/display. While Transco objects to Mr. Kakol's methodology generally, it did not question the validity of the generation of the Late Start Date.

[487] Aug. 28, 2023 Trial Tr. (Kakol) 937:3–17, 946:4–15.

[488] Aug. 28, 2023 Trial Tr. (Kakol) 943:15–20, 946:16–18; PX604; PX605.

[489] Aug. 28, 2023 Trial Tr. (Kakol) 948:2–25.

target date results in an $8 million schedule incentive payment to Welded.[490]  Regarding this delay, Welded submitted Trend 231 to Transco; it is under review.[491]

Mr. Kakol next quantified the delayed permit variance for the Pequea Creek crossing, also on Spread 7, using the same methodology.  Per the Construction Baseline Schedule, the start date is December 13, 2017 with twenty days of float[492] and the Late Start Date is January 16, 2018.[493]  Transco needed to obtain a variance permit in order to begin the Pequea Creek crossing.  The variance was not obtained until June 15, 2018—one day after the Target Mechanical Completion Date—and 150 days following the Late Start Date.[494]  Thus, Mr. Kakol opined that the Target Mechanical Completion Date should be November 11, 2018, resulting in a schedule incentive bonus of $12,750,000.[495]  Welded submitted Trend 163 to inform Transco of the schedule and cost impacts of the delay; its status is listed as "Proceed to EWR."[496]

Finally, Mr. Kakol analyzed the delayed permit variance for the I-76 crossing activity on Spread 7.  Per the Baseline Construction Schedule, work on the I-76 road bore was slated to begin on February 19, 2018 and had forty-one days of float.[497]  Primavera's Late Start

---

[490]  BONUS = $5,000,000 + [$1,000,000 x (# of days early/7)].  $5,000,000 + [$1,000,000 x (21/7)] = $8,000,000.

[491]  D2048A.0004.

[492]  JX001.0855; Aug. 28, 2023 Trial Tr. (Kakol) 950:25–951:18.

[493]  Aug. 28, 2023 Trial Tr. (Kakol) 951:23–952:14.

[494]  Aug. 28, 2023 Trial Tr. (Kakol) 956:1–4.

[495]  Aug. 28, 2023 Trial Tr. (Kakol) 956:17–957:8.

[496]  D2048A.0003.

[497]  JX001.0856.

Date for the I-76 crossing was April 6, 2018.[498] Transco requested a permit variance, but did not receive that variance until May 31, 2018—fifty-five days past the Late Start Date.[499] Applying that fifty-five day delay to the Target Mechanical Completion Date pushes it out to August 8, 2018.[500] Using this revised date, Welded obtained Mechanical Completion forty-two days late, resulting in a $2,000,000 schedule incentive.

### b. *Transco's position*

Transco's scheduling expert, Mr. Triche, performed an "As-Planned versus As-Built" schedule analysis to quantify the time delays on the project. While Mr. Triche testified that he reviewed the Contract and multiple schedules, he did not testify that he attempted to determine what schedule analysis methodology most reflected the terms of the Contract. Rather, my takeaway from his testimony is that he would use the "As-Planned versus As-Built" methodology regardless of the task he was given because he thinks it is most reflective of an appropriate delay analysis.

In basic terms, the "As-Planned versus As-Built" methodology has two components. First, one determines the actual progress of the work as it unfolded on the project. Second, one reviews any delays on the project to determine whether the delay: (x) was caused by the contractor and (y) was on the "critical path." The "critical path" is a construction schedule analysis term of art. It is "the longest path through the network [of identified and logically sequenced construction activities] that establishes the minimum overall project duration."[501]

---

[498] Aug. 28, 2023 Trial Tr. (Kakol) 959:25–960:3.

[499] Aug. 28, 2023 Trial Tr. (Kakol) 960:4–13.

[500] Aug. 28, 2023 Trial Tr. (Kakol) 960:18–23.

[501] 6 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 15:5 (Nov. 2024) (alteration in original) (citation omitted); *see also* Aug. 28, 2023 Trial Tr. (Kakol) 925:15–926:4;

Delays that are caused by the contractor or are not on the critical path are not compensable.

To determine the actual progress of the Work, Mr. Triche looked to the monthly schedule updates provided by Welded to identify how much Work was done, when Work was started, and when it was finished.[502] Welded's final schedule update provides the "as-built" schedule, which shows how the work actually progressed and when activities began and were completed throughout the life of the project.[503] Mr. Triche used the "as-built" schedule to identify the planned and actual critical path. He identified Spread 5 as the critical path in the "as-planned" schedule (i.e., the Baseline Construction Schedule).[504] Mr. Triche also identified Spread 5 as the actual critical path on the ASR Project by reviewing the "as-built" schedule and cross-checking with other contemporaneous progress reports.[505]

---

Sept. 6, 2023 Trial Tr. (Triche) 1914:3–1915:5. Over the course of construction, the critical path may shift; consequently, maintenance of a regularly updated "as-built" schedule is essential to accurate time-impact analysis using the critical path method. 6 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* §§ 15:123–24 (Nov. 2024); *see also id.* at § 15:123 ("Proof of what activities were 'critical' to timely completion at any point in time is no easy task because the critical path is dynamic and accommodates and adjusts to ever-changing job conditions.").

[502] Sept. 6, 2023 Trial Tr. (Triche) 1915:6–1916:9.

[503] Sept. 6, 2023 Trial Tr. (Triche) 1915:6–1916:9.

[504] Sept. 6, 2023 Trial Tr. (Triche) 1913:25–1914:18; *compare* JX001.0846 (Mechanical Completion date of June 12, 2018, with float of three days, for Spread 5) *with* JX001.0849 (Mechanical Completion date of May 22, 2018, with float of twenty days, for Spread 6) and JX001.0853 (Mechanical Completion date of May 24, 2018, with seventeen days of float, for Spread 7).

[505] Sept. 6, 2023 Trial Tr. (Triche) 1915:6–1916:9, 1930:15–23. I accept Mr. Triche's testimony that Spread 5 was the actual critical path throughout the ASR Project, largely because Welded's expert provided no contrary opinion on the actual critical path. I do note, however, that given the float, the Mechanical Completion dates for each spread as reflected in the Baseline Construction Schedule are within days of each other.

Mr. Triche next reviewed the EWRs and Trends. With the exception of EWR 12, Mr. Triche "primarily reviewed" Trends on the critical path.[506] He attributed each delay he found on Spread 5 to Welded in some fashion. Mr. Triche then provided alternative conclusions. Considering only EWR 12, Mr. Triche opined that Welded incurred a $1,500,000 schedule disincentive. In doing so, Mr. Triche determined the actual delay of ninety-seven days (June 14-September 19), subtracted his permitted time extension to arrive at ninety-one days, converted days to weeks and then calculated the schedule disincentive based on the worksheets. Using the same methodology, but considering Trends 49 and 225, Mr. Triche opined that Welded incurred a $1,214,286 schedule disincentive. In its posttrial brief, Transco adopted the latter position.[507] No Trend is identified as associated with this delay.

### c. Discussion

My task is to determine whether a schedule incentive is due or a penalty is incurred under *this* bespoke contract—not any other. In the first instance, the worksheets provide the method of calculation. The schedule incentive/penalty is determined by "where the Contractor finishes relative to the target . . . schedule."[508] The target schedule is captured in the Baseline Construction Schedule agreed to by the parties and made a part of the Contract. It is a projection of the time necessary to complete the Work at the outset, as that

---

[506] Sept. 6, 2023 Trial Tr. (Triche) 1932:10–19.

[507] Transco Br. 45 ("However, Mr. Triche also took into account Mr. Sztroin's trial testimony regarding the Court of Appeals shutdown and calculated a reduced penalty of $1,214,286. Considering all the evidence, this revised penalty reflects the amounts due from Welded to Transco for its late performance.").

[508] *See, e.g.*, JX001.0843.

timeline was subsequently modified by the Book Contract Amendment.[509]  To the extent

Section VIII Article 2.I and the worksheets provide guidance with respect to the

methodology to be employed to modify the Target Mechanical Completion Date, there is

no suggestion that a continually evolving schedule or an "as-built" schedule is part of the

calculus.[510]

      The same holds true for the concept of "critical path."  While this concept is implicit

in the formation of the Baseline Construction Schedule, it is not implicit in the

determination of a revised Target Mechanical Completion Date.  A review of the Extra

Work Request form shows that Transco seeks no representation from Welded that the

requested schedule change is on the original critical path or any updated/actual critical

path.[511]  Rather, the form requires the contractor to indicate a Revised Contract Completion

Date and the number of days that it seeks as an increase or decrease—nothing else.  It could

have.[512]

---

[509]  JX001.0846 (Line 19: Mechanical Completion All Spreads).

[510]  Providing weekly/monthly progress reports can serve a valid purpose.  For example, it permits both Transco and Welded to know the actual progress on the ASR Project, to better understand when the Work will actually be completed and/or provide opportunities to make up time.  But, changing the Target Mechanical Completion Date serves only one purpose that I can discern—to determine the schedule incentive/penalty.

[511]  JX001.0039 (Appendix E).  The relevant portion of the form Extra Work Request reads:

Revised Contract Completion Date:  _____

☐    No Change
☐    Increase    Number of Days:  _____
☐    Decrease    Number of Days:  _____

_____    _____    _____    _____
Contractor Representative    Date    Company Representative    Date

[512]  *Compare Hensel Phelps Constr. Co. v. Gen. Servs. Admin.*, GSBCA No. 14744, 01-1 BCA ¶ 31249, *aff'd sub nom. Perry v. Hensel Phelps Constr. Co.*, 36 Fed. Appx. 649 (Fed. Cir. 2002):

Similarly, Transco approved EWR 12, including a six-day extension of the Target Mechanical Completion Date even though the delay was not on the critical path. Rather, a delay in commencing clearing activities occurred on Spread 6 because Transco did not provide sufficient notice to the appropriate Townships and Counties. The underlying Trend (21) contains the same information.

Given the permitted use of Trends on the ASR Project, to determine whether Welded is entitled to a schedule incentive or incurred a penalty, the question is whether either Trend 163 or 231 would have turned into an approved EWR had it been considered?

---

Some of the key contract provisions regarding time impact analysis which are relevant to this dispute are as follows:

3.12 TIME IMPACT ANALYSIS FOR CHANGE ORDERS, DELAYS, AND CONTRACTOR REQUESTS

A. When Change Orders are initiated, delays are experienced, or the Contractor desires to revise the Construction Schedule per 3.12C, the Contractor shall submit to the Government a written Time Impact Analysis, illustrating the influence of each Change Order, delay, or Contractor request on the current Contract Completion Date. The preparation of Time Impact Analysis shall include a Fragmentary Network (Network Analysis) of the new and existing activities directly affected by the change demonstrating how the Contractor proposes to incorporate the Change Order, delay or Contractor request into the Construction Schedule. The Time Impact Analysis shall demonstrate the time impact based on: (1) the date the Change Order is given to the Contractor or the date the delay occurred; (2) the status of construction at that point in time; and (3) the event-time computation of all affected activities. The event times used in the Time Impact Analysis shall be those included in the latest Construction Schedule Update or as adjusted by mutual agreement.

B. Activity delays shall not automatically mean that an extension of the Construction Duration is warranted or due the Contractor. It is possible that a Change Order or delay will not affect existing critical activities or cause non-critical activities to become critical. A Change Order or delay may result in only absorbing a part of the available total float that may exist within an activity chain of the Network, thereby causing no effect on the Contract Completion Date.

C. Float is not for the exclusive use or benefit of either the Government or the Contractor. Contract time extensions will be granted only to the extent the equitable time adjustments to the activity or activities affected by the Change Order or delay exceeds the total (positive or zero) float of a critical activity (or path) and exceeds the Contract Completion Date.

....

E. In cases where the Contractor does not submit a Time Impact Analysis within fourteen (14) calendar days, it is mutually agreed that the particular Change Order[, ] delay or Contractor request does not require a Contract time extension.

Appeal File, GSBCA 14744, Vol. 1, Exhibit 1 at 01311–15, 01311–16.

Trends flowed through a process starting with the recording of the Trend on the Trends log, internal review, submission to Transco and disposition.[513] The Log reflects the status of each Trend as either Recorded, Trend with PM (i.e., Project Manager), Trend with Client, Proceed to EWR or "Cancel/Close/Reject."[514] This mirrors to a large degree the Disposition line on the Trend, which seeks a decision of "Approved—Proceed with EWR," Defer, Reject or Other.[515] Here, according to Welded, both Trends 163 and 231 were in the "client review" stage and neither Trend specified the number of days requested.[516] Welded has not presented facts which would permit me to find, by a preponderance of the evidence, that Transco would have approved the trend and the resulting EWR had Welded submitted one.[517] Had it done so, I likely would have applied the impacted-as-planned analysis (despite the significant criticism of that method[518]) and chosen one of Mr. Kakol's alternatives. Mr. Kakol testified convincingly that this analysis is more consistent with the Contract, which measures the actual Mechanical Completion date against a hypothetical, planned date. It is also consistent with the only actual extension approved by Transco.

---

[513] PX593; Aug. 25, 2023 Trial Tr. (Hood) 829:8–830:13.

[514] PX593. Mr. Triche categorizes the Trends into one of eight categories: a) Recorded, b) internal review, c) client review, d) Approved-forecast only, f) Proceed to EWR, g) EWR submitted, h) EWR approved, z) Closed-EWR, z) Closed-in amendment and z) Cancelled. D2048A.0003.

[515] *See, e.g.,* D1987A.

[516] *But see* D2048A.0003, 04. I credit Welded's source document over Mr. Triche's report.

[517] Welded did not present any evidence of Transco's bad faith, generally, in the approval/disapproval of Trends or EWRs.

[518] 6 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 15:137 (Nov. 2024) ("The obvious flaw in this method is when it ignores completely the contractor's actual performance and all time impacts other than those selected . . . . Because the 'impacted as-planned' method is a theoretical approach that overlooks actual job history, it is recognized as a legally unacceptable method of proof.").

But, neither has Transco presented sufficient facts to permit me to conclude that Mr. Triche's methodology reflects the intent of the parties as manifested in the Contract. While the "As-Planned versus As-Built" methodology is an accepted one, it is not applicable in every circumstance. Mr. Triche failed to take into account terms of the Contract as well as Transco's own conduct in approving a six-day extension of the date for delay that did not occur on the critical path.

Accordingly, as I have concluded that neither party has convinced me of its position by a preponderance of the evidence, I conclude that Welded is not entitled to a schedule incentive nor has it incurred a penalty.

17. Excessive Tie-In Weld Costs

A "tie-in" weld is used to connect one section of the pipeline to another section of the pipeline. This type of weld is not done by the mainline crew; rather, it is done by a separate, smaller crew that works behind the mainline crew filling in the gaps. By its nature, it is more expensive to perform a tie-in weld than it is for the mainline crew to lay the pipe and perform welds in the ordinary course. Ultimately, the number of actual tie-in welds on the ASR Project exceeded the number reflected in Welded's initial and updated estimates.

Transco attributes the increase in tie-in welds to Welded's failure to effectively plan and execute the tie-in welds. It asserts that this resulted in increased costs which were improperly billed to Transco. In essence, Transco argues that Welded was inefficient and should bear the cost of its efficiency. Welded counters that no provision of the Contract provides that Welded must absorb the cost of tie-in welds that exceed the planned number. It also argues that to shift the cost would be fundamentally unfair.

Unlike with weld cutouts, Transco does not direct me to any Contract provision covering the cost of tie-in welds.  Instead, Transco cites to Sections I Article 7 and II Article 3.  Transco's reliance on Section I Article 7 is misplaced.  Specifically, Transco directs me to the following language:

> Notwithstanding the provisions set forth herein, no change, modifications, or addition to any part of the Work or the materials and equipment shall result in adjustment of the compensation or an extension of the completion date when the change, modification or addition is due to Contractor's or its subcontractor's acts [sic] omissions including, but not restricted to, noncompliance with the terms and conditions of the Contract or Contractor's or its subcontractors; errors, poor engineering practice, poor workmanship, or failure to conform to the approved detailed drawings, specifications and data sheets.[519]

While not entirely clear (because its posttrial brief provides no analysis), Transco appears to argue that the increased number of tie-in welds, and the concomitant increase in cost, are due to Welded's acts or omissions or perhaps poor engineering practice or poor workmanship, which is an adjustment to compensation.  This is a misreading of this provision.  Article 7 addresses requests for service and amendments to the Contract that increase the scope of Work with the potential for increased compensation for the additional Work.  To the extent that such additional Work is due to Welded's acts or omissions, it goes uncompensated.  But, this provision says nothing about compensation for Work within the original scope of the Contract.  Transco does not assert that the increased tie-in welds were outside the scope of the Work, nor could it.  Article 7 does not aid Transco.

---

[519] JX001.0014.

Section II Article 3 is likewise inapplicable. Transco relies on the second sentence of the following provision to argue that Welded's lack of planning prevented the achievement of the lowest cost for the Project:

> Contractor shall commit expertise to the ASR Project Team to assist in final planning and scheduling of progress needed for the defined Mechanical Completion deadlines. Company and Contractor will work together ahead of the Notice to Proceed to jointly determine the execution plan to achieve the lowest capital cost to build the Project in the allotted schedule."[520]

Transco appears to argue that because Welded never provided an accurate tie-in count or related schedule, Welded failed to adhere to this provision. This position ignores the Contract's dual allocation of responsibility—Welded alone was not responsible for planning; rather, it was to do so with Transco. In any event, this provision does not provide a means to recover for inefficient Work.

A review of the full Contract explains why. As just discussed in detail, the Contract contains an Incentive Plan that contemplates both cost overruns and late completion of the project. To the extent Welded performed inefficiently, the result could be that Welded would not earn a cost incentive or a schedule incentive and may even incur a schedule penalty. Transco's remedy for Welded's inefficiency was therefore built into the Incentive Plan.

Alternatively, Transco contends that Welded's failure to plan effectively demonstrates that costs associated with the increased number of tie-in welds were not "reasonably incurred" and as such are not reimbursable in a cost-plus contract setting. The primary problem with this theory of recovery is that Transco has not presented evidence that

---

[520] JX001.0053.

persuades me that Welded's tie-in welds were unreasonable or unnecessary. Transco

identifies Welded statements acknowledging the importance of tie-in management during

both the planning and execution phases of the ASR Project.[521]  Transco also points to a

presentation made for Welded by Zolfo Cooper, which identified tie-in welds as a

significant contributor to increased costs on all Welded projects.[522]

Welded does not dispute the critical nature of the tie-in welds to the ASR Project.

What is disputed, and what Transco fails to prove, is that Welded acted unreasonably in

performing more tie-in welds than originally planned.  In a cost-plus contract, the risk rests

with the owner, not the contractor.  As discussed, *supra*, the implied obligation in a cost-plus

contract that costs be reasonable requires the owner to show some element of fraud or bad

faith by the contractor.  No such showing was made here.

A review of the record and considerations of fundamental fairness further counsel

this outcome.  At trial, Mr. Sztroin admitted that he asked Welded to increase the number

of tie-in welding crews to hasten the completion.[523]  Having asked Welded to increase the

tie-in crews, Transco may not now avoid such costs.[524]

---

[521] D0187.0002; Aug. 23, 2023 Trial Tr. (Hawkins) 336:2–12; Aug. 24, 2023 Trial Tr. (Hood) 625:3–6.

[522] D1382.0005, 09–10.

[523] Aug. 29, 2023 Trial Tr. (Sztroin) 1209:3–1210:5; *see also* Sept. 6, 2023 Trial Tr. (Triche) 1981:11–17 (Mr. Triche acknowledging that Mr. Sztroin asked for increased tie-in crews).

[524] Welded's Motion in Limine also sought to exclude Mr. Triche's testimony with respect to tie-in welds.  Because of my conclusions, this aspect of the Motion is denied as moot.

18. Postpetition Costs

Transco seeks a refund of $2,097,087 paid to Welded under the three Commitment Letters approved by the Court post-bankruptcy. Transco employs the Contract payment terms to make several adjustments to the postpetition reconciliation invoices, largely invoking the Equipment Fee as the method of compensating for use of Included Equipment. Welded asserts that the Commitment Letters adopted an actual cost payment structure and that Included Equipment was to be compensated at cost. Under this structure, Welded contends that Transco is only entitled to a refund of overpayments of $335,997.92.

Welded had ongoing projects with multiple customers when it filed its bankruptcy petition and sought Court approval to complete those projects as beneficial to the estate.[525] The post-bankruptcy agreements entered into with Transco took the form of three Commitment Letters, which were approved by the Court.[526] Mr. Pometti—a restructuring professional and Welded's Chief Restructuring Officer—negotiated the Commitment Letters on behalf of Welded and explained to Transco (as he did to each customer) that Welded could not perform additional work on the ASR Project post-bankruptcy unless it was assured that all of its expenses would be paid.[527] As Mr. Pometti testified, he was very

---

[525] Welded entered into completion agreements with Columbia Gas and Consumers Energy, which were approved by the Court. Aug. 28, 2023 Trial Tr. (Pometti) 1006:24–1007:23. Those completion agreements provided for funding "in advance to cover all . . . administrative expenses or actual expenses that would be being incurred completing those contracts." Aug. 28, 2023 Trial Tr. (Pometti) 1007:10–13. They also included payment of certain prepetition critical vendors. Aug. 28, 2023 Trial Tr. (Pometti) 1007:14–17.

[526] Aug. 28, 2023 Trial Tr. (Pometti) 1008:3–10; PX421, PX428, PX434.

[527] Aug. 28, 2023 Trial Tr. (Pometti) 1011:19–1012:3. ("Well, generally, our discussion, you know, with regards to the ASR project, you know, consistent with all of the customers— Mr. Hawkins and I spoke with each customer and basically made clear we're filing for Chapter 11 protection, and the only way we could have crews show up to perform is if we had assurances and, you know, funding to guarantee that our actual expenses that would be incurred were, in fact, going to be paid because

136

clear that Welded could not be involved in an administratively insolvent estate.[528]  Thus, it was Mr. Pometti's understanding that the Equipment Fee did not apply postpetition; rather, Included Equipment would be compensated on an actual cost basis.[529]

The Commitment Letters reflect this different compensation arrangement.  For example, the First Commitment Letter provides that "Welded also requested pre-payment to cover Welded's internal costs and expenses of providing work."[530]  And, the Second Commitment Letter provides:

> Transco shall:
>
> (i)  pay $1,800,000 to the Debtors [sic] operating account as a prepayment for the forecast for all labor and equipment costs (for Included Equipment) attributable to the Week 2 Contract Work (Week 2 Contract Prepayment), and
>
> (ii)  directly pay all subcontractors, service providers and vendors attributable to the Week 2 Contract Work (but only to the extent not otherwise included in "equipment costs").[531]

Finally, in the Third Commitment Letter, Welded is required to provide Transco with a reconciliation of the prepayment made in accordance with the Second Commitment Letter with the "actual costs" incurred for that week.[532]  Nowhere in the three Commitment Letters

---

we did not have the ability to risk being administratively insolvent once filing for Chapter 11, and that this, generally, was saying that understanding.").

[528] Aug. 28, 2023 Trial Tr. (Pometti) 1011:19–1012:3.  *See also* Aug. 28, 2023 Trial Tr. (Pometti) 1013:3–16, 1015:9–1016:1, 11–21.

[529] Aug. 28, 2023 Trial Tr. (Pometti) 1013:3–20.

[530] PX421.0006.

[531] PX428.0006; *see also* Aug. 28, 2023 Trial Tr. (Pometti) 1013:3–20.

[532] PX434.0006.

is the term "Equipment Fee" found.  Reciprocally, Transco points to nowhere in the Contract where the term "equipment cost" is found.

Other variances from the Contract terms include that, in week 2, Transco paid subcontractors, subservicers and vendors directly, "but only to the extent not otherwise included in 'equipment costs,'"[533] and in week 3, Transco agreed to pay a fixed overhead cost of $25,000 per week from the Petition Date through December 8, which was available for general use and not subject to the reconciliation process.[534]

Transco contends that the intention was to bill in a manner consistent with the Contract with respect to Included Equipment by pointing to Welded's use of the Equipment Fee in providing its cost estimate to Transco for week 2 equipment costs.  As Mr. Pometti explained, however, Welded used the Equipment Fee to approximate the actual costs of the Included Equipment post-bankruptcy.[535]  He testified: "that was their best basis for providing that estimate, especially when we're on such a short time frame of proving these pre-funding forecasts."[536]

I find Mr. Pometti credible.  He is a restructuring professional and understands the need for a debtor to be administratively solvent.  As evidenced by his testimony, he understood his role in ensuring that continued work on the ASR Project (and all other projects) after the bankruptcy filing would be fully paid for by the owner of the project.  Notably, Transco put forward no witness to the discussions surrounding the three

---

[533] PX428.0006.

[534] PX434.0007 n.2.

[535] Aug. 28, 2023 Trial Tr. (Pometti) 1116:20–1118:16.

[536] Aug. 28, 2023 Trial Tr. (Pometti) 1116:23–1117:5.

Commitment Letters, their execution or the postpetition work on the ASR Project. Nor does Transco have an explanation for the insertion of a new term "equipment cost" into the three Commitment Letters. As importantly, Transco has no explanation for why the Bankruptcy Court (or any bankruptcy court) would approve continued work on the ASR Project that would result in a net negative for Debtor's estate. Indeed, during the first-day hearing, Welded sought approval of the First Commitment Letter and Welded's counsel represented to the Court that the agreement was for "Transco to fund the Williams ASR project for *all costs* incurred by the debtors from the petition date through, at least, October 28, 2018."[537] Transco's counsel was present at the hearing and did not object to this characterization of the agreement.

Based on the plain language of the three Commitment Letters, bolstered by Mr. Pometti's testimony, I conclude that the three Commitment Letters were executed on an actual cost basis. Accordingly, Transco is entitled only to $335,997.92 as the difference between funds paid and actual costs incurred.[538]

19. Failure to Competitively Bid Subcontracts

Transco asserts that Welded failed to competitively bid four large subcontracts in derogation of the Contract. In support of its position, Transco appended to its posttrial brief a document allegedly detailing contracts that fall into this category. This document was not admitted into evidence, was not the subject of testimony and appears to be attorney-generated for the purposes of putting before the court evidence that was not adduced at trial.

---

[537] Transcript of First-Day Hearing at 40:3–11, *In re Welded Construction, L.P.*, 18-12378, ECF No. 58 (emphasis added).

[538] PX654.0004; Aug. 28, 2023 Trial Tr. (Pometti) 1047:1–25.

While Transco believed it needed an expert to quantify all other categories of damages or costs, for some reason it did not feel compelled to have either Mr. Slavis or Mr. Triche quantify this category of costs. Instead, this attorney-generated document cites to pages of the voluminous backup documentation to Welded invoices as support for its numbers, but no witness testified to its generation or accuracy.

The only evidence Transco cites in support of this $20 million claim—its largest claim by multiples—is brief testimony from Mr. Hood that he did not competitively bid work done by United Rentals and brief testimony from Mr. Sztroin that he does not recall receiving correspondence about competitive bidding from Bedrock Environmental, Western Supply or CiaCie. Welded objected to this questioning and moved to strike this testimony on the basis that Transco did not identify this category as a challenged cost prior to trial. In its posttrial briefing and in argument, Welded contends that Transco waived any claim or defense related to competitive bidding of subcontracts because of this failure and/or is otherwise equitably estopped from raising this new issue.

In its posttrial brief, Transco contends that it properly asserted this claim in its Counterclaim and preserved the counterclaim in the Pretrial Order. Specifically, Transco cites to the language in its Counterclaim that Welded "breached the Contract by . . . (2) failing to follow policies and procedures . . . ."[539] Similarly, Transco cites to the Joint Final Pretrial Order for its allegation that "Welded breached its duty to reasonably control costs."[540]

---

[539] Counterclaim 52.

[540] Pretrial Order 40.

When a claim is raised for the first time at trial, that claim is properly barred if it prejudices the other party.[541]  A party is prejudiced by a late-raised claim when it lacks notice of the need to prepare a proper defense.[542]  While the pleading standard is generally liberal, a party may not wait until the eve of trial to present its theories of recovery.[543]  A rule to the contrary would encourage parties to keep their legal theories shrouded in mystery, hoping to surprise their opponent.[544]  Accordingly, courts have held that a party's failure to include claims in the final pretrial order precludes that party from raising the claim at trial.[545]

The Pretrial Order contains statements by both parties concerning which issues remain to be litigated.[546]  For its part, Transco contends that thirty-seven specified "issues of law" remain to be litigated.[547]  These issues of law include whether Welded breached the contract by improperly charging (among other things) for Bechtel markups, Agency Fees, hauling fees, Included Equipment that was covered by the Equipment Fee, general liability insurance, items covered by the Fixed Fee, maintenance and repair of Included Equipment

---

[541] *See Mid-Atl. Perfusion Assocs., Inc. v. Pro. Ass'n Consulting Servs., Inc.*, No. CIV. A. 93-3027, 1994 WL 418990, at *4 (E.D. Pa. Aug. 9, 1994) (Rendell, J.); *Gulf Oil Trading Co. v. M/V Caribe Mar*, 757 F.2d 743, 751 (5th Cir. 1985).

[542] *Mid-Atl. Perfusion Assocs.*, 1994 WL 418990, at *4.

[543] *See Evans v. McDonald's Corp.*, 936 F.2d 1087, 1091 (10th Cir. 1991).

[544] *Id.*

[545] *See, e.g., Gavrieli Brands LLC v. Soto Massini (USA) Corp.*, C.A. No. 18-462 (MN), 2020 WL 1443215, at *7 (D. Del. Mar. 24, 2020) (citing *Babby v. City of Wilmington Dep't of Police*, 614 F. Supp. 2d 508, 510–11 (D. Del. 2009)); *Carlson v. Northwell Health Inc.*, No. 20 CV 9852 (LAP), 2022 WL 1304453, at *1–2 (S.D.N.Y. May 2, 2022).

[546] Pretrial Order 33–42.

[547] Pretrial Order 35–42.

and rates charged for Field Personnel.[548]  What is noticeably absent from the long and

detailed list is any mention of Welded's failure to competitively bid subcontracts.[549]  The

closest Transco can get to arguing that the issue was raised and preserved for trial is found

in its allegation that "Welded breached its duty to reasonably control costs."[550]  This is

insufficient, especially in light of Transco's clarity with other claims.  Transco's citation to

its Counterclaim, which alleges breach of contract based on "failing to follow policies and

procedures," fares no better in preserving the issue.[551]

Under these circumstances, Transco failed to timely raise the issue.  Accordingly,

Welded's motion to strike the testimony of Mr. Hood and Mr. Sztroin on this topic is

granted and I conclude that Transco waived any claim (or defense[552]) based on any failure to

competitively bid subcontracts.

20.  Transco's Direct Payment of Subcontractor Claims

---

[548]  Pretrial Order 38–39.

[549]  *See* Pretrial Order 35–42.

[550]  Pretrial Order 40.

[551]  Counterclaim 52.

[552]  At argument, Transco's counsel characterized the issue as one of burden of proof, arguing that Welded had to prove it complied with the Contract, writ large.  As discussed, *supra*, this argument is flawed.  It is also inconsistent with the Counterclaim, which identifies the other alleged breaches for improper invoicing as counterclaims.  Further, it is contrary to Transco Claim 636 in which Transco seeks $45,611,991 for amounts Welded overbilled.  The listing of overpayments includes many of the costs that are the subject of this lawsuit, but does not include a claim based on failure to competitively bid subcontracts.  To the extent that Transco now seeks to characterize the subcontract issue as a defensive one, it fares no better.  *See, e.g.*, *Babby*, 614 F. Supp. at 511 (holding that defendant waived its statute of limitations defense by not including it in the final pretrial order); *Gavrieli Brands*, 2020 WL 1332215, at *7 ("Legal theories and issues not raised in the pretrial order are considered waived.") (quoting *Babby*, 614 F. Supp. at 510–11).  Having had multiple opportunities to assert its claims, Transco cannot assert a new one on the eve of trial.  Trial by ambush, whether through a claim or a defense, cannot be encouraged.

Transco asserts that it paid $187,593 directly to Subcontractors, but was then invoiced and paid these same costs to Welded.[553]  Welded responds that Transco's claim fails for utter lack of proof.  The record shows that Transco did pay certain costs directly to certain Subcontractors.[554]  However, Welded is correct that this is only half of what Transco must prove.  Transco is required to prove that Welded invoiced and was paid for these subcontractor amounts.  Despite the record containing reams and reams of substantiation for each subcontractor invoice, Transco fails to show that these costs were submitted to Transco.  Accordingly, Transco's claim fails.

C.  *Welded's Additional Claims*

1.  Final Fixed Fee

Welded seeks payment of the final installment of its Fixed Fee.  Transco responds that the Fixed Fee is not owed because Welded failed to finish the project according to the Contract or receive final acceptance.  Welded counters that the Scope of Work was narrowed by the Third Commitment Letter and then completed.

Section VIII defines the Fixed Fee as "the $50,500,000 lump sum fixed fee price, payable to Contractor in installments . . . ."[555]  The Fixed Fee is intended to cover Welded's

---

[553]  While Transco did not raise this in its Post-Trial Brief, it included a single slide addressing this issue in its posttrial oral argument exhibit.  I resolve it quickly.

[554]  Aug. 29, 2023 Trial Tr. (Sztroin) 1285:24–1286:11, 1287:17–1288:5; D1776; D2043.

[555]  JX001.0825.  The full definition is:

> "Fixed Fee" means the $50,500,000 lump sum fixed fee price, payable to Contractor in installments as further set forth in this Contract, covering all: (i) Contractor cost and expenses attributable to Contractor's Home Office overhead and management in connection with the Project; (ii) profit payable to Contractor in connection with the Project; and (iii) all income, revenue, rates, overtime, premium pay, taxes, benefits and expenses (including any business, travel or living expenses) in connection with Work performed by Home Office Personnel.

Home Office overhead and provide Welded with a profit.  It is not subject to escalation or reduction because of delays on the project and Welded warrants and represents that the Work will be completed in exchange for this Fixed Fee.[556]  Ninety percent of the Fixed Fee is payable over the course of Welded's performance; "the remaining 10% will be retained by [Transco] until final acceptance of the Work and [Transco] has been satisfied that all material and labor bills and all claims payable by Contractor have been paid and all liens discharged."[557]  The second requirement was not contested at trial and need not be addressed.[558]  But, Transco contends that final acceptance has not been earned and should not be given.  Welded asserts that it has completed all the Work and is entitled to final acceptance and the remaining 10% of the Fixed Fee.

Unhelpfully, the Contract does not define "final acceptance," despite its appearance in several provisions.  I am therefore left to determine the meaning of "final acceptance"

---

[556] **B. Fixed Fee**

The Fixed Fee is a fixed, firm negotiated amount which is neither subject to modification nor escalation or reduction, due to: (i) changes, modifications or deviations to the proposed pipeline set forth in the Scope of Work; (ii) changes, modifications or deviations to the pipeline route itself; (iii) any increase in the quantity of tasks, any additional effort, and/or changes or modifications to the means of construction which Contractor must employ to meet the Mechanical Completion Date set forth herein (iv) underestimated Contractor overhead, costs and expenses; (v) delay due to low Contractor productivity; (vi) extensions due to failure to achieve the Mechanical Completion Date; and/or (vii) costs or delay due to due to unexpected weather or geological conditions experienced over the course of the Project.  Contractor warrants and represents that it will complete the Work in accordance with the schedule and the Contract under the Fixed Fee set forth in the Contract.

JX001.0828.

[557] JX001.0041.

[558] Transco raised lack of payment of subcontractors in multiple stages of the case, but, ultimately, it did not put on any evidence on this issue at trial.  Neither is there any evidence of liens existing on the site.

from the Contract's other language.  Section I Article 3.B covers acceptance under the

Contract:

> Final acceptance and final payment to Contractor shall be made when
> Authorized Company Representative has determined to his or her complete
> satisfaction that all Work is of good quality and workmanship; all data, records,
> etc. have been delivered to and accepted by Company; all Contract provisions
> regarding liens, waivers, claims, affidavits, releases, etc. have been fulfilled; and
> all Work has been accomplished according to the terms of the Contract.[559]

In this section, final acceptance and final payment are addressed together.  Final payment is

also discussed in Section I Appendix G.  Paragraph 1.4.1 therein, titled "Final Payment,"

reads:

> Upon Company's receipt of Contractor's Final Invoice and associated
> documentation . . . Company shall promptly review such documentation and
> complete a final inspection of the Site, within thirty (30) days of receipt, to
> verify that Contractor has satisfactorily completed the Work.[560]

If Transco is satisfied with the Work, the Final Invoice is to be paid within five days, and

such payment is final payment under the Contract.  If Transco disputes the Final Invoice,

the Contract places the burden on Welded to seek a judicial determination.  That is what I

am asked to do here.

A key prerequisite of final payment involves Transco's satisfactory inspection and

verification of the Work.[561]  If satisfactory inspection and verification constitute final

acceptance, then Paragraph 1.2 of Appendix G (providing that final acceptance is a

prerequisite to the final Fixed Fee payment) and Paragraph 1.4.1 of Appendix G (providing

that final payment is paid only when Transco is satisfied with the Work) can be read

---

[559] JX001.0010.

[560] JX001.0043.

[561] *See* JX001.0043.

together harmoniously.  Moreover, this understanding of final acceptance and its

relationship to final payment helps explain why final acceptance and final payment are

treated together in Article 3.B.  Accordingly, I hold that final acceptance is Transco's

satisfactory inspection and verification of the Work upon receipt of the Final Invoice.  To

receive final acceptance and therefore receive the final payment, which includes the final

Fixed Fee amount, Welded must show that (1) it completed the Work satisfactorily and (2)

it submitted the Final Invoice.

Part of Welded's Work under the Contract was the cleanup and restoration of the

worksite following the laying of the pipe.[562]  And, it is undisputed that Welded did not

complete this cleanup and restoration.  Knowing only these facts, the apparent conclusion is

that Welded is not entitled to final acceptance and final payment.  Nevertheless, the

language of the Third Commitment Letter between Welded and Transco compels the

conclusion that Welded's Scope of Work was reduced.  In a paragraph titled "Completion

of Scope of Work," the Third Commitment Letter states:

> At 12:01 a.m. EST on November 7, 2018, unless otherwise agreed in writing
> by Welded and Transco, the Scope of Work set forth in the Contract shall be
> deemed reduced such that any remaining clean-up, restoration and mainline
> valve work on the pipeline right of way for Spread 7 shall not be required under
> the Contract.  From that point, Welded shall not be obligated to complete any
> such remaining clean-up, restoration and mainline valve work on the project.
> In addition, from that point, Transco shall not be obligated to use Welded to
> complete any such remaining clean-up, restoration and mainline valve work on
> the project.[563]

---

[562] *See* JX001.0051 ("At the completion of the job, Contractor shall be responsible for clean-up and
rough grading all the disturbed areas.  Contractor shall do final grade, fertilize, lime, seed and
mulch, as necessary, and restore all the disturbed areas to its original contours.").

[563] PX434.0009.

That paragraph contains similar provisions reducing the Scope of Work on Spreads 5 and 6, with December 9, 2018 being the last day that any Work is required of Welded.[564] That paragraph also contains provisions addressing liability issues between the parties—both on a go-forward and backward basis—and "otherwise" reserves each party's rights under the Contract:

> Transco shall use its commercially reasonable best efforts to remove Welded from all permits associated with the Project as of December 9, 2018, including, but not limited to those certain permits that Welded and Transco are co-permittees on PADEP Permit No. ESG03000150001 and all related local government permits, consistent with the applicable rules, guidelines and regulations of PADEP and other applicable governmental authorities, and from the date of the conclusion of Welded's work on each Spread as set forth herein, shall indemnify and hold harmless Welded (including any officers and directors of Welded) for any permit responsibilities or liabilities arising under the project from any acts and/or omissions occurring after the completion of the work on such Spread contemplated by this Third Commitment Letter. Transco shall not indemnify and hold harmless Welded (including any officers and directors of Welded) for any permit responsibilities or liabilities arising under the project from any acts and/or omissions occurring on or before the completion of the work contemplated by this Third Commitment Letter. Transco and Welded otherwise reserve all rights against each other as provided in the Contract and the Surety Bond shall remain in full force and effect.[565]

Welded witnesses credibly testified that Welded completed its reduced Scope of Work.[566]

Transco's Evan Kirchen also confirmed that the reduced Scope of Work was completed.[567]

---

[564] PX434.0009.

[565] PX434.0009.

[566] Aug. 22, 2023 Trial Tr. (Hawkins) 159:20–161:4; Aug. 24, 2023 Trial Tr. (Hood) 581:11–582:5, 584:19–24; Aug. 28, 2023 Trial Tr. (Pometti) 1035:4–18.

[567] Kirchen Dep. 66:18–67:1, Dec. 12, 2020:
Q: Is it also fair to say that Welded completed its scope on Spreads 5 through 7?
A: Yes. They completed the scope, except for the part that we removed from their scope, yeah.
Q: And that was post petition in connection with the commitment letters?
A: Yes.

Transco does not really argue that the reduced Scope of Work was completed unsatisfactorily. Rather, it contends that Welded did not fully complete all restoration and cleanup Work under the Contract required prior to the Third Commitment Letter. This argument has some surface appeal as Transco points out that it had to hire another contractor to complete the cleanup and restoration work. But, Transco fails to account for the provision reducing the Scope of Work or even argue how this provision should be read. Given the clear language and the undisputed testimony, I find that Welded completed its Scope of Work under the Contract, as reduced by the Third Commitment Letter and that any inspection would reveal the same. This language was drafted after the parties were very much at odds; Transco had already sued Welded in Oklahoma by that point. Moreover, the reservation language does not reserve rights with respect to what is covered in the provision.

I also find that Welded submitted the Final Invoice on October 30, 2019.[568] By that invoice, Welded sought payment of the $5,050,000 installment of the Fixed Fee. Transco argues that the required documentation was not attached to the Final Invoice and so the Final Fee is not owed. Appendix G requires the Final Invoice to be accompanied by documentation providing that no outstanding charges or liens remained on the Work and conveying ownership of the pipeline to Transco.[569] While Welded's Final Invoice is clearly bereft of the required documentation, Transco's ownership of the pipeline is not disputed, nor is there any contention that any liens or encumbrances remain on the Work.[570]

---

[568] PX497.

[569] JX001.0043.

[570] *See* PX497.

148

Because the Third Commitment Letter reduces the Scope of Work, the reduced

Scope of Work was completed, Welded submitted its Final Invoice, there is no evidence

that there are any outstanding liens on the ASR Project and Transco has ownership of the

pipeline, I conclude that Welded is entitled to the final installment of the Fixed Fee.

2.  Claims under the Contractor and Subcontractor Payment Act

In Count XI of the Complaint, Welded seeks interest, penalties and an attorney fee

under Pennsylvania's Contractor and Subcontractor Payment Act ("CASPA").  Welded

contends that Pennsylvania law should apply as Pennsylvania has the most significant

contacts with the ASR Project.  Transco argues that Oklahoma law, the choice of law in the

Contract, applies and, in any event, Transco has no liability under CASPA.

This Court observed in an earlier ruling that it is not clear whether federal choice-of-

law rules or Delaware choice-of-law rules (as the forum state) should govern this decision.[571]

The question is further complicated when (1) the adversary proceeding includes an objection

to a proof of claim and a complaint that could be (and previously has been) characterized as

a counterclaim to a filed proof of claim[572] and (2) the parties have stipulated in the Joint

Final Pretrial Order that the adversary proceeding is core.[573]  As Judge Goldblatt recently

---

[571] *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, 616 B.R. 649, 657 (Bankr. D. Del. 2020), ECF No. 120 (holding that "[w]hile it remains unclear if this holding [*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)] extends to circumstances in which a court derives its jurisdiction from a federal question, the absence of an overriding federal interest permits this Court to apply *Klaxon* and, thus, the Delaware choice-of-law rules.").

[572] *In re Welded Constr., L.P.*, 609 B.R. 101, 116 (Bankr. D. Del. 2019), ECF No. 48 ("as explained above, this proceeding is essentially an objection to proofs of claim filed by and counter-claims against the Defendants.").  Former Judge Sontchi did not consider this issue or explain why there was no overriding federal interest in this circumstance.

[573] Pretrial Order 4.

discussed, most of the cases in this jurisdiction examining choice-of-law issues in adversary

proceedings are in the diversity jurisdiction context or adopt, without discussion, the

Supreme Court's analysis in *Klaxon*,[574] which applies in diversity jurisdiction.[575] There are

no Third Circuit precedential decisions on the appropriate choice-of-law principles to be

applied when state law claims are heard in bankruptcy court based on bankruptcy

jurisdiction.[576] In a nonprecedential opinion, however, the Third Circuit has noted three

approaches taken by circuit courts: (1) application of the choice-of-law rules recognized in

the forum state (Eighth Circuit), (2) application of the federal choice-of-law rules (Ninth

Circuit) and (3) application of the choice-of-law rules of the forum state "unless there is an

overriding or conflicting federal interest" (Second Circuit, Fourth Circuit).[577] This latter

approach was adopted by another nonprecedential Third Circuit decision in a suit to recover

consideration paid in a stock redemption action.[578]

Fortunately, I do not need to decide this thorny legal issue.[579] Both the federal

choice-of-law principles and Delaware choice-of-law principles look to the Restatement

---

[574] 313 U.S. 487 (1941).

[575] *Miller v. Nelson (In re Art Inst. of Phila. LLC)*, Adv. Pro. No. 20-50627 (CTG), 2022 WL 18401591, at *5–6 (Bankr. D. Del. Jan. 12, 2022) (noting the split of authority among the circuits with the Ninth Circuit applying federal rules and the Second and Fourth Circuits applying the forum state's choice-of-law rules).

[576] *In re Art Inst. of Phila.*, 2022 WL 18401591, at *6. *See also In re Abeinsa Holding Inc.*, No. 20-3333, 2021 WL 3909984, at *3 (3d Cir. Sept. 1, 2021) (not precedential) ("This court has not yet precedentially resolved the choice-of-law rules applicable in bankruptcy proceedings – an issue that has long divided the circuit courts.").

[577] *Abeinsa*, 2021 WL 3909984, at *3.

[578] *PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.)*, 128 F. App'x 839 (3d Cir. 2005) (not precedential).

[579] *See Abeinsa*, 2021 WL 3909984, at *3 (the choice-of-law issue need not be resolved if the Circuit and state would follow the same approach).

(Second) of Conflict of Laws (Am. L. Inst. 1971) ("Restatement") to determine whose law applies.[580]

*a. A true conflict exists*

CASPA is codified at 73 Pa. Cons. Stat. §§ 501–517 (2024).  CASPA provides that if any "payment to a contractor is not paid within seven days of the due date established in subsection (c),[581] the owner shall pay the contractor, beginning on the eighth day, interest at the rate of 1% per month or fraction of a month on the balance that is at the time due and owing."[582]  CASPA also applies a penalty equal to 1% per month to damages that are wrongfully withheld.[583]  Additionally, CASPA allows a substantially prevailing party to recover "a reasonable attorney fee."[584]

According to Transco, Oklahoma law provides the same remedies as CASPA, rendering the conflict analysis moot.[585]  Oklahoma law provides that "[a]ny person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ."[586]  Oklahoma law also provides for the collection of a

---

[580]  *See In re Art Inst. of Phila.*, 2022 WL 18401591, at *6.

[581]  Subsection (c) provides that parties may establish a time for payment.  73 Pa. Cons. Stat. § 505(c) (2024) ("Except as otherwise agreed by the parties . . . .").

[582]  *Id.* § 505(d).

[583]  *Id.* § 512(a)(1).

[584]  *Id.* § 512(b).

[585]  *See* Transcontinental Gas Pipe Line Company, LLC's Opp'n to Welded Construction, L.P.'s Mot. for Partial Summ. J. regarding the Appl. of CASPA, ECF No. 346 ("Transco Opp'n") (arguments incorporated by reference in Transco Br. 58).

[586]  Okla. Stat. tit. 23, § 6 (2024).

reasonable attorney fee in labor or service contract civil actions.[587]  However, Transco cites

to no Oklahoma law providing for penalties in the construction context or otherwise.  The

absence of a penalty under Oklahoma law which is available under Pennsylvania law

creates an actual conflict requiring a conflict-of-laws analysis.[588]

     *b.  The Oklahoma choice-of-law provision is unenforceable*

     This is not the first time the choice-of-law issue has been raised and it is the subject of

two prior opinions.  First, in an earlier motion for partial summary judgment, Welded

sought a ruling that Pennsylvania law governs the dispute.  Applying Delaware's choice-of-

law rules, the Court (by former Judge Sontchi) performed an analysis under § 187 of the

Restatement[589] and concluded that the choice-of-law provision in the Contract is

unenforceable as Oklahoma does not have a substantial relationship to the transaction or

the parties to the Contract.[590]  But, the Court did not rule that Pennsylvania law applies

because Welded did not sufficiently address whether Pennsylvania law would apply (under

---

[587] Okla. Stat. tit. 12, § 936(A) (2024).

[588] *Laugelle v. Bell Helicopter Textron, Inc.*, C.A. No. 10C-12-054 PRW, 2013 WL 5460164, at *3 (Del. Super. Ct. Oct. 1, 2013).

[589] Section 187(2) provides:
    (2)    The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
        (a)    the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
        (b)    application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

[590] *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, 616 B.R. 649, 658 (Bankr. D. Del. 2020) (Sontchi, J.), ECF No. 120.  Consistent with general concepts of corporate separateness, Judge Sontchi did not consider the contacts of the other Defendants.

a Restatement analysis) absent an effective choice-of-law provision in the Contract.  In reviewing the factors enumerated in Restatement § 188[591] the Court found that all construction occurred in Pennsylvania, both Transco and Welded are Delaware corporations, Transco's principal place of business is in Texas and Welded's principal place of business is in Ohio.  From this, the Court concluded: "This information, at best, reveals the scattered interests of four states without conclusively showing Pennsylvania's interest to be dominant among them" and posited that Delaware may have an equal interest in this litigation.[592]

Second, I addressed the choice-of-law issue in my Memorandum ruling on Transco's pretrial motion for summary judgment.[593]  In that motion, Transco asked me to reverse the Court's previous ruling.[594]  Transco argued that the choice-of-law provision is enforceable as it has a "significant nexus to the parties' transaction because Oklahoma is the principal

---

[591] Section 188(2) provides:

> (2)    In the absence of an effective choice of law by parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>> (a)    the place of contracting,
>> (b)    the place of negotiation of the contract,
>> (c)    the place of performance,
>> (d)    the location of the subject matter of the contract, and
>> (e)    the domicil, residence, nationality, place of incorporation and place of business of the parties.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

[592] *In re Welded Constr., L.P.*, 616 B.R. at 660.

[593] *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, Adv. Pro. No. 19-50194, 2023 WL 4853146 (Bankr. D. Del. July 28, 2023), ECF No. 394.

[594] Transco argued that former Judge Sontchi's conclusion was incorrect.  Transco jumps on a clear mistake in the opinion (an errant reference that Ohio is Transco's principal place of business, when that is Welded's) and then simply discounts the finding that Texas is Transco's principal place of business. *See* Transco Opp'n 20–22.

place of business for i) Transco; ii) its [sic] Transco's sole parent company and co-Defendant Williams Company."[595]  I denied the motion for summary judgment because Transco created a credibility issue over its own principal place of business.[596]  I also noted that Transco cited no law for the proposition that a court should consider the principal place of business of a parent entity in a choice-of-law analysis.[597]

In its posttrial brief, Transco, once again, argues that the Oklahoma choice-of-law provision is enforceable.  It now urges that Oklahoma has a substantial relationship to the parties and the transaction because: (1) Transco is a subsidiary of Williams whose principal place of business is in Oklahoma, (2) more than half of Transco's corporate officers work in Oklahoma, (3) the Contract was executed in Oklahoma, (4) Welded invoiced Transco in Oklahoma and (5) Transco paid Welded from Oklahoma.[598]  Transco contends that these undisputed facts establish a "substantial" relationship to the parties or the transaction or at least a "reasonable" basis for the parties' choice of Oklahoma law.

As the bases for these "undisputed" facts, Transco points to two declarations that were not offered or admitted into evidence at trial (Dkt. Nos. 303, 388-1) for facts (i), (ii) and (iii) and to Mr. Hawkins's testimony (Aug. 23, 2023 Trial Tr. 372:19–375:22) and Exhibits D1894–D1905 for facts (iv) and (v).  Transco now abandons its argument that its own principal place of business is in Oklahoma.

---

[595]  *In re Welded Constr., L.P.*, 2023 WL 4853146, at *2.

[596]  *Id.*  The Contract identifies Transco's principal place of business as Houston, Texas, but Transco submitted a declaration in support of summary judgment in which Mr. Sztroin attests that Oklahoma is Transco's principal place of business.  *Id.*

[597]  *Id.* at n.18.

[598]  Transco Br. 58.

I have reviewed the referenced admitted evidence. None of it supports the above facts. Notwithstanding, it is not disputed that Transco is a wholly owned subsidiary of Williams and that Williams has its principal place of business in Oklahoma. I can also find from the admitted evidence that certain officers of Transco work in Oklahoma, though they may also work in Houston,[599] and that Welded's monthly invoices were addressed to Williams Gas Pipeline in Tulsa, Oklahoma.[600] I cannot find that Transco paid Welded from Tulsa. In fact, the cited evidence is to the contrary: Transco paid Welded from a JP Morgan Chase Bank, N.A. account located in New York.[601]

Analyzing these findings under Restatement § 187, I conclude that Oklahoma does not have a substantial relationship to the parties or the transaction. Williams is not a party to the Contract. That some of Transco's officers work, at least part time, in Oklahoma and that invoices were sent to Oklahoma does not provide a "substantial" relationship to the parties or the Contract. Nor do these facts provide a "reasonable" basis for the choice. Transco still provides no cases to support the proposition that the parent's principal place of business should be considered in a choice-of-law analysis. Finally, where invoices were sent or where the payment of an invoice originated are not significant enough contacts to

---

[599] These Transco officers are also Williams officers, which may explain why they perform some work out of Williams's offices. There is no evidence that meetings between the parties regarding the Contract took place in Oklahoma and there is abundant evidence that Transco and Welded attended meetings in Houston.

[600] PX124, PX151, PX140, PX150, JX034, PX182, PX192, PX207, JX060, JX067, JX068, JX071, PX329, JX085, PX394, JX102.

[601] See D1894–D1905. Mr. Hawkins's testimony to the contrary is simply incorrect. He has no firsthand knowledge of this and, like so much of the testimony I received during the case, he was simply reading from a document. In this case, he read incorrectly.

provide the "reasonable" basis; each of these "contacts" occurred after the contracting was complete.[602]

### c. Pennsylvania has the most significant relationship to the transaction and the parties

To determine the applicable law in the absence of an effective choice-of-law provision, Restatement § 188 applies. Section 188(2) provides a nonexclusive list of five factors to consider in determining the state with the most significant relationship: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.[603]  The Restatement elaborates that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue."[604]  Section 196 of the Restatement applies a presumption that a contract for services will be governed by the state in which the services are to be rendered.[605]  This presumption can be rebutted by demonstrating that another state has a more significant relationship with the transaction and the parties.[606]

---

[602] Williams specifically chose to have Transco become the party to the Contract.  *See supra* note 20. I will not disregard notions of corporate separateness in this circumstance.

[603] Restatement § 188(2).

[604] *Id.*

[605] Restatement § 196 ("The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied."); Restatement § 196 cmt. a ("The rule of this Section applies to contracts for the rendition of services whether these are to be rendered by the contracting party himself or by others in his behalf.").

[606] Restatement § 196.

As an initial matter, Transco does not assert that Oklahoma has the most significant relationship to the transaction or the parties. This candor is warranted as it is undisputed that the ASR Project was for construction services wholly within the Commonwealth of Pennsylvania.[607] The presumption of § 196 applies and, here, is not rebutted. Nonetheless, for the sake of completeness, I will briefly review the factors under § 188 to ensure no other state has a more significant relationship with the transaction and the parties.[608]

The record is not clear where the Contract was signed. Contract negotiations took place in person in Houston, Texas and remotely through various calls.[609] The place of performance and the location of the Contract's subject matter is Pennsylvania. Welded's principal place of business is Ohio.[610] Transco's principal place of business is Texas.[611] Reviewing the scattered nature of the Contract's contacts, it is evident that Ohio, Texas and Delaware all have some relationship with the transaction or parties. These relationships, however, do not eclipse Pennsylvania's relationship because, at its core, the Contract concerns a service to be rendered in Pennsylvania.

---

[607] *See* JX001.0050 ("The Atlantic Sunrise (ASR) Project is . . . connecting production regions in northeastern Pennsylvania to markets in the Mid-Atlantic and southeastern states . . . ."); Aug. 22, 2023 Trial Tr. (Hawkins) 52:21–23 ("Q:  Please describe for us the ASR project. A:  The ASR project was 97 miles of forty-two-inch pipeline for transmission of natural gas in Pennsylvania.").

[608] I note, however, that Transco does not really argue that Pennsylvania does not have the most significant relationship with the Contract, rather relying on the choice-of-law provision.

[609] Aug. 23, 2023 Trial Tr. (Wall) 406:19–25 ("Q:  And, Mr. Wall, you mentioned meetings. Did any of these meetings take place in person? A:  I would say I'm a big believer in having face-to-face meetings when you're trying to negotiate, so I think the majority of them took place in person in Williams Tower, in Williams' offices in Houston. But clearly, there were phone calls on different weeks, and there were conference calls.").

[610] JX001.0009.

[611] JX001.0009.

Two other factors inform this decision. First, the Commonwealth of Pennsylvania has enacted legislation specifically directed at construction within its borders. The Pennsylvania Supreme Court has held that CASPA was enacted to address "problems inherent in reliance on common law contract doctrine to solve payment disputes in the construction field" and to reduce barriers for contractors to pursue litigation.[612] Further, the

---

[612] See *Scungio Borst & Assocs. v. 410 Shurs Lane Devs., LLC*, 146 A.3d 232, 239 (Pa. 2016) (footnotes omitted).

> We begin our inquiry in this regard with a brief review of the law concerning timely payment of contractors prior to CASPA's enactment, the legislative history attendant CASPA's passage, and its substantive effect. Prior to CASPA's enactment, an unpaid contractor would typically pursue a breach of contract claim against the property owner. Yet, a contractor so proceeding could face a series of potential pitfalls. Under traditional contract law, a contractor was entitled to payment according to the terms of its contract, or, in the absence of such a term, within a "reasonable time" or upon completion of its work. See 17 C.J.S. Contracts § 79. Under these standards, a contractor would face the option of potentially costly litigation over whether delays in payment were "reasonable," or awaiting the conclusion of its work to be paid, an unsatisfying option for large and lengthy construction projects. Similarly, under traditional contract law, an unpaid contractor would be required to pay its own litigation costs, including attorneys' fees and expenses. See 20 C.J.S. Costs §§ 3, 173. Thus, if a contractor's damages were less than the cost of litigation, it might well be dissuaded from vindicating its rights.
>
> In 1994, however, the General Assembly considered H.B. 906, the legislation which became CASPA, then subtitled "[an act requiring] timely payment to certain contractors and subcontractors; and providing remedies to contractors and subcontractors." Engaging in no floor debate whatsoever, the legislature passed H.B. 906 in near-unanimous votes before the House and Senate. CASPA displaced the common law standards vis-à-vis what constitutes timely payment in the context of construction contracts with, as detailed above, a statutorily-specified timetable, and provided additional incentives—in the form of interest payments at a statutorily-provided rate, penalty damages, reasonable attorneys' fees, and costs—that reduced the aforementioned disincentives for contractors to pursue their contractual rights. In our view, the General Assembly in enacting CASPA intended to address the problems inherent in reliance on common law contract doctrine to solve payment disputes in the construction field, and did not intend, as SBA suggests, to impose liability on agents. First, we note that CASPA's subtitle focuses on two subjects—timely payment and remedies—and does not suggest that its provisions impose liability on non-contracting parties.

See also *Prieto Corp. v. Gambone Constr. Co.*, 100 A.3d 602, 607 (Pa. Super. Ct. 2014) ("CASPA is a comprehensive statute enacted in 1994 to cure abuses within the building industry involving payments due from owners to contractors . . . . The underlying purpose of CASPA is to protect contractors and subcontractors and to encourage fair dealing among parties to a construction contract.") (quoting *Zimmerman v. Harrisburg Fudd I, L.P.*, 984 A.2d 497, 500–01 (Pa. Super. Ct. 2009)).

only decision directly on point cited by either party holds that CASPA is a fundamental public policy of the Commonwealth of Pennsylvania.[613] Second, performance of the Contract required permits from the Pennsylvania Department of Environmental Protection and Transco worked with multiple municipalities within Pennsylvania in connection with necessary easements and other regulatory matters.[614] Transco also touted its commitment to the Commonwealth and the significant economic impact the ASR Project would have on the Commonwealth.[615]

Guided by § 196 and the circumstances surrounding this Contract, I conclude that Pennsylvania law is the default law under the Restatement analysis. Therefore, I will apply Pennsylvania law to this aspect of the dispute.

---

[613] *G.A. West & Co., Inc. v. Transcontinental Gas Pipeline Co., LLC*, No. 2016-08148, 2019 WL 9441731, at *2 (Pa. Ct. Com. Pl. June 20, 2019). Transco cited four cases for the proposition that CASPA is not a fundamental policy of the Commonwealth of Pennsylvania. Transco Opp'n 23–24 (citing *KNL Constr., Inc. v. Killian Constr. Co., Inc.*, No. 3:14-CV-412-UN2, 2014 WL 1671959 (M.D. Pa. Apr. 28, 2014), *Whiting-Turner Contracting Co. v. Westchester Fire Ins. Co.*, Civil No. JFM-13-348, 2013 WL 3177881 (D. Md. June 20, 2013), *Popple Constr., Inc. v. Kiewit Power Constructors, Co.*, Civil No. 3:17-CV-1760, 2018 WL 1998332 (M.D. Pa. Apr. 12, 2018) and *Precision Pipeline, LLC v. Dominion Transmission, Inc.*, Civil Action No. 3:16-CV-00180, 2017 WL 1100903 (E.D. Va. Mar. 23, 2017)). These cases are inapposite. The first three analyze the narrow issue of CASPA's forum selection clause in the context of federal law strongly favoring contractual forum selection provisions. The fourth case analyzed the nature of CASPA, but under Virginia not Pennsylvania law. Additionally, Transco's argument that § 503(c) of CASPA only came into the statute via the 2018 amendments, enacted after both the Contract and the Book Amendment were executed, while true, is not dispositive. First, *G.A. West* relies on § 514, not § 503(c), for its legal conclusion and § 514 was in existence prior to the 2018 amendments. Second, while research revealed no specific commentary on the 2018 amendments, § 503(c) appears to "double down" on and broaden the prohibition in § 514. Section 514 makes unenforceable choice-of-law provisions that choose law other than the Commonwealth of Pennsylvania to govern disputes arising under construction contracts performed in Pennsylvania. Section 503(c) provides that even construction contracts governed by Pennsylvania law are not permitted to waive provisions of CASPA unless the act so authorizes. In any event, § 514 is the most applicable section to this dispute and existed when the Contract was executed. That § 503(c) was added in 2018 does not alter the outcome here.

[614] Dunn Dep. 125:19–126:6, Jan. 5, 2021; *see also* 133:9–22 (the pipeline cut across ten counties in Pennsylvania that required permitting and variances).

[615] Dunn Dep. 129:15–131:3, Jan. 5, 2021; PX526.

*d. Welded is entitled to interest, a penalty, an attorney fee and expenses*

Welded asserts that it meets the sole prerequisite to a recovery under CASPA: it performed its work under the Contract. Welded further asserts that Transco's short pay of the September 2018 Invoice and its nonpayment of each invoice thereafter were not in compliance with the Contract or CASPA, thus subjecting the withheld amounts to interest and penalties. Specifically, Welded argues that Transco's October 4, 2018 letter does not provide a sufficient good-faith reason for any withholding, in part because Transco did not share the OGCS audit findings. Likewise, Welded asserts that Transco provided no response, explanation or notice regarding the September and October 2018 reconciliation invoices. Lastly, Welded contends that Transco's excuse for failure to pay the Final Fee when invoiced is a pretext as Welded completed the reduced Scope of Work and Transco accepted the pipeline and put it into service.[616]

Transco argues that Welded is not entitled to CASPA relief because Welded failed to perform according to the Contract as required by § 504. Transco recycles its accusations of breach against Welded, arguing that Welded breached the Contract by (1) mischarging Transco, (2) failing to promptly pay subcontractors, (3) failing to timely submit reconciliation invoices and (4) failing to meet schedule milestones. Transco also points to CASPA § 506(a), which permits an owner to withhold funds if a notice and explanation of the withholding is provided, to argue that the key question here is whether its withholding was "wrongful." Transco asserts its withholdings were not wrongful because it provided notice to Welded through its July 3, 2018 letter regarding the audit and provided an explanation in the October 4, 2018 withholding letter. As a final argument, Transco asserts

---

[616] *See generally* Welded's Post-Trial Br. 26–27, ECF No. 433.

that Welded breached CASPA by failing to timely pay its subcontractors, reasoning that "[f]undamental concepts of contract and equity" should prevent Welded from CASPA recovery.[617]

CASPA is a prompt payment statute.[618] It "was enacted to provide protection to contractors and subcontractors and to address related payment and contract disputes."[619] To serve that purpose, CASPA provides that owners are to timely pay contractors under the terms of the contract or face liability in the form of interest, penalties and an attorney fee.[620] CASPA is not a substitute for a traditional breach of contract action; rather, it "makes additional remedies available" to an unpaid contractor.[621] A "comprehensive" statute, it was designed to protect contractors and subcontractors in "major construction projects."[622]

Several sections of CASPA are implicated here. First, § 504 provides that "[p]erformance by a contractor . . . in accordance with the provisions of a contract shall entitle the contractor . . . to payment from the party with whom the contractor . . . has

---

[617] *See generally* Transco Br. 59–60.

[618] *A. Scott Enters., Inc. v. City of Allentown*, 142 A.3d 779, 783 (Pa. 2016); *see also C.J. Hughes Constr. Co. Inc. v. EQM Gathering OPCO, LLC*, No. 22-3391, 2024 WL 1652341, at *1 (3d Cir. Apr. 17, 2024) (not precedential); Deborah F. Buckman, Annotation, *State Prompt Payment Statutes—Construction Cases*, 83 A.L.R. 7th Art. 6 (2023); 3 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor Construction Law* § 8.66 (Nov. 2024).

[619] *Shin Da Enters. Inc. v. Yong*, Civil Action No. 21-3384, 2022 WL 15524952, at *8 (E.D. Pa. Oct. 27, 2022) (citing *Lomas v. Kravitz*, 130 A.3d 107, 131 (Pa. Super. Ct. 2015)); *see Zimmerman v. Harrisburg Fudd I, L.P.*, 984 A.2d 497, 500–01 (Pa. Super. Ct. 2009).

[620] *Scungio Borst & Assocs. v. 410 Shurs Lane Devs., LLC*, 146 A.3d 232, 233 (Pa. 2016).

[621] *Scungio Borst & Assocs. v. 410 Shurs Lane Devs., LLC*, 106 A.3d 103, 109 (Pa. Super. Ct. 2014).

[622] *El-Gharbaoui v. Ajayi*, 260 A.3d 944, 957 (Pa. Super. Ct. 2021).

contracted."[623] Thus, a party must establish their contractual right to payment and the counterparty's breach of contract before CASPA applies.[624] Second, § 505 provides that an owner must pay its contractor according to the construction contract.[625] Failure to timely pay invoices results in interest of 1% per month.[626] Third, § 506 provides some protections to owners by allowing withholding according to the terms of the contract for "deficiency items."[627] Deficiency items are work that does not meet the specifications of the contract.[628] If an owner withholds payment on that basis, the owner is required to notify the contractor and provide a written explanation of the basis within fourteen days of receiving the invoice.[629] Fourth, § 512 discusses the penalties available under CASPA.[630] If the contractor is forced to pursue litigation or arbitration against the owner, the owner is liable for a "a penalty equal to 1% per month of the amount that was wrongfully withheld."[631] "A payment shall not be deemed to have been wrongfully withheld if all of the following apply: (1) the amount bears a reasonable relation to the value of any claim held in good faith by the

---

[623] 73 Pa. Cons. Stat. § 504 (2024).

[624] *Scungio Borst*, 106 A.3d at 109.

[625] 73 Pa. Cons. Stat. § 505 (2024). While not relevant here, it also establishes a default time for payment in the absence of a relevant contract provision.

[626] *Id.*

[627] *Id.* § 506(a).

[628] *Id.* § 502 ("'Deficiency item.' Work performed but which the owner, the contractor or the inspector will not certify as being completed according to the specifications of a construction contract.").

[629] *Id.* § 506(b)(1).

[630] *Id.* § 512.

[631] *Id.* § 512(a)(1).

owner . . . against whom the contractor is seeking to recover payment and (2) the claim holder complies with section [506] or [511].[632] Additionally, an attorney fee is available to a "substantially prevailing party."[633]

Applying these sections to the instant matter, I first conclude that Welded has proven that it performed under the Contract for purposes of §§ 504 and 505. I have just ruled that Welded is entitled to be paid $56,191,324 on its outstanding invoices less those charges specifically found to be improperly billed for a net amount of $44,632,308. By not paying this outstanding amount, Transco breached the Contract.

Transco's arguments that Welded may not avail itself of CASPA because Welded breached the Contract by (1) mischarging Transco, (2) failing to promptly pay subcontractors, (3) failing to timely submit reconciliation invoices and (4) failing to meet schedule milestones fail for at least two reasons. First, I have already found that Welded substantially performed the Contract for purposes of entitlement to payment. Transco accepted the pipeline and put it into service, thereby choosing its remedy for any alleged breaches. Second, as on summary judgment, Transco does not cite to any case for the proposition that Transco can avoid its obligations under CASPA because Welded may have failed to meet its own obligations under CASPA with respect to subcontractors. Again, all subcontractors were ultimately paid, and there is no evidence that any subcontractor sued Welded (or filed a proof of claim against Welded) asserting claims under CASPA.[634]

---

[632] *Id.* § 512(a)(2).

[633] *Id.* § 512(b).

[634] *Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, Adv. Pro. No. 19-50194, 2023 WL 4853146, at *3 (Bankr. D. Del. July 28, 2023), ECF No. 394.

Because payment is owed to Welded on the unpaid invoices, Welded is entitled to interest beginning on the eighth day after payment was due at the rate of 1% per month. Mr. Gray calculated interest owed based on his conclusion that Transco owes Welded $56,191,324. He calculated interest at the CASPA interest rate beginning thirty days after the due date through August 23, 2023, the first day of trial on both a simple ($30,415,459) and a compound interest basis ($40,167,462).[635] The text of the statute does not reference compound interest. I will not award compound interest where the legislature does not appear to have provided for it. But, I will award simple interest at the statutory rate of 1% per month on the outstanding amount of $44,632,308. The parties should perform the math and provide the number to the court in the proposed form of judgment I will ask them to settle. Interest should begin to run from April 13, 2019 on all but the Final Payment. As for the Final Payment, interest should begin to run from the date of judgment.

Transco seems to suggest that interest should not be awarded because it was justified in withholding payment given its questioning of the bill in its October 4, 2018 letter. Transco argues its withholding was not "wrongful." However, whether the withholding of payment is "wrongful" is irrelevant to the award of interest. Interest is awarded under § 507(d) and, unlike with the awarding of a penalty, there is no mention of the reason for nonpayment.[636]

Welded also seeks a CASPA penalty award. Section 512 provides that if litigation is brought to recover payments due under CASPA and "it is determined that an owner . . . has

---

[635] Aug. 25, 2023 Trial Tr. (Gray) 872:10–873:22.

[636] *Compare C.J. Hughes*, 2024 WL 1652341, at *4 (refusing to read a good-faith requirement into attorney fee provision because it had no such express requirement). Moreover, the recovery of interest from the date payment was due is required under Oklahoma law.

failed to comply with the payment terms of this act . . . the court shall award, in addition to all damages due, a penalty equal to 1% per month of the amount that was wrongfully withheld."[637] CASPA does provide a "safe harbor."[638] A payment has not been wrongfully withheld if it meets the two-part test of § 512(a)(2), which provides:

> (2) An amount shall not be deemed to have been wrongfully withheld if all of the following apply:
>
> (i)    The amount bears a reasonable relation to the value of any claim held in good faith by the owner, contractor or subcontractor against whom the contractor or subcontractor is seeking to recover payment.
>
> (ii)   The claim holder complies with section [506] or [511].[639]

Transco cites to this safe harbor and primarily relies on § 506 to support its contention that its withholding was "reasonable" and in "good faith" and that it provided appropriate advance notice of the withholding.[640]

Transco's withholding does not fall within § 506. Section 506 does not address withholding of payment for any and all reasons. Rather, § 506 only addresses the withholding of payment for "deficiency items," a defined term, which means work that the owner does not certify "as being completed according to the specifications of a construction contract."[641] Transco admits in its brief that the concerns expressed with respect to the September 2018 Cash Call invoice were about "improper charges based on an audit" and

---

[637] 73 Pa. Cons. Stat. § 512(a)(1) (2024).

[638] *C.J. Hughes Constr. Co. Inc. v. EQM Gathering OPCO, LLC*, Civil Action No. 2:18-cv-168, 2022 WL 18581023, at *5 (W.D. Pa. Nov. 21, 2022) *aff'd* 2024 WL 1652341 (3d Cir. Apr. 17, 2024).

[639] 73 Pa. Cons. Stat. § 512(a)(2) (2024).

[640] Transco Br. 59 & n.380.

[641] 73 Pa. Cons. Stat. §§ 506, 502 (2024); *see C.J. Hughes*, 2022 WL 18581023, at *5.

Transco's calculation of a schedule disincentive.[642] These are not "deficiency items," nor do they come within the provisions of § 506 or the safe harbor of § 511. Further, Transco never provided a response or withholding notice to Welded's September and October 2018 reconciliation invoices.[643] Simply stated, Transco's withholding of payment on these unpaid invoices had nothing to do with the pipeline failing to meet specifications.

With respect to the Final Fixed Fee, Welded submitted its invoice for the Fixed Fee retainage on October 30, 2019.[644] Transco responded on November 25, 2019 that Welded had not met the Contract's conditions for final acceptance, Welded had not provided a necessary Release and Affidavit, Welded had overbilled Transco and exposed Transco to potential damages because of Welded's (presumably) then-failure to pay subcontractors and suppliers.[645] As before, Transco's withholding of payment had nothing to do with deficiency items. Transco, therefore, does not fall within CASPA's safe harbor under § 511.

Moreover, Welded argues, with some justification, that the litigation was a pretext for withholding payment. Transco did not invoke the dispute resolution process before it brought litigation. Instead, Transco waited to do so until after FERC approval of the pipeline and at the same time it placed the pipeline in service. The October 4, 2018 letter was based on the initial findings of the OGCS audit, which Transco largely, if not

---

[642] Transco Br. 59–60; *see also* JX094.

[643] Aug. 24, 2023 Trial Tr. (Hood) 582:8–583:14; JX103; *see also* Transco Br. 59–60 (addressing the October withholding but not the failure to pay the later reconciliation invoices). The July 2018 communications do not address withholding, rather Transco states that future payments will be made "under protest" and reserves its right to recover overpayments or damages. *See* PX282.0002–03.

[644] PX497.

[645] JX118.

altogether, abandoned. Transco did not send any notice to Welded (as CASPA requires) with respect to the final two invoices dated March 4, 2019. And, the OGCS's final audit findings concluded that Transco owed Welded a minimum of $8 million, which Transco did not pay. Against this, Transco's argument that it was justified in its position that Welded was improperly billing for certain costs rings a bit hollow even if some of its claims have been borne out by my findings.

Sanctions are mandatory under the statute if the owner has failed to comply with the payment terms of the Contract. Based on the above, I conclude that as to the monthly invoices, Transco did not comply. Accordingly, Welded may recover a penalty equal to 1% per month from April 13, 2019.

I nonetheless find that Transco did not wrongfully withhold the final installment of the Fixed Fee. Paragraph 1.4.2 of Appendix G provides that if Transco disputes any portion of the Final Invoice or documentation (or presumably, the lack thereof), it is empowered to withhold such amounts and require Welded to seek dispute resolution through arbitration or litigation.[646] Because the required documentation was absent, Transco could rightfully withhold payment pending resolution. I have now provided that resolution.

Finally, Welded seeks an attorney fee and expenses under § 512(b), which provides:

(b) Award of attorney fees and expenses.--Notwithstanding any agreement to the contrary, the substantially prevailing party in any proceeding to recover any payment under this act shall be awarded a reasonable attorney fee in an amount to be determined by the court or arbitrator, together with expenses.[647]

---

[646] JX001.0043.

[647] 73 Pa. Cons. Stat. § 512(b) (2024).

Transco does not address whether Welded is entitled to an attorney fee. In any event, having presided over the trial and written this opinion, I conclude that Welded is the "substantially prevailing party." While Transco was successful in some of its arguments regarding improper charges, Welded ultimately prevailed on the primary claims at issue. An attorney fee will be awarded in an amount to be determined once a submission is made.

## VI.    CONCLUSION

To recap. The parties agree that the outstanding invoices after adjustments for the Court's previous rulings is $56,191,324. My rulings require further negative adjustments as follows:

| | |
|---|---|
| Field Personnel | ($   264,960) |
| PTAG Agency Fee | ($   765,084) |
| Pickup Trucks | ($3,107,699) |
| Dump Trucks | ($1,212,433) |
| Trench Boxes | ($1,366,176) |
| Morookas | ($1,209,085) |
| Deckhands | ($   442,031) |
| Warehouse | ($     39,317) |
| Hauling Permits | ($   432,801) |
| Dent Remediation | ($1,395,932) |
| Weld Repairs/Cutouts | ($   987,500) |
| Postpetition Costs | ($   335,998) |
| TOTAL | ($11,559,016) |

This results in a judgment in favor of Welded and against Transco in the amount of $44,632,308 plus interest of 1% per month per my ruling, a penalty of 1% per month on all but the Final Invoice and an attorney fee to be determined.

The parties are directed to settle an order reflecting my rulings.

Dated: February 4, 2025

Laurie Selber Silverstein
United States Bankruptcy Judge